**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

BLACKWELL PUBLISHING, INC., ELSEVIER,          Case No. 07-12731
INC., OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATION, INC. and JOHN WILEY &        Honorable Avern Cohn
SONS, INC.,

      Plaintiffs,

v.                                             **DEFENDANTS' MOTION FOR**
                                               **SUMMARY JUDGMENT**

EXCEL RESEARCH GROUP, LLC d/b/a EXCEL
TEST PREPARATION, COURSEPACKS &
COPIES, and NORMAN MILLER, individually,

      Defendants.

_____/

PEAR SPERLING EGGAN & DANIELS,  P.C.      BODMAN LLP
Karl V. Fink (P13429)                     Susan M. Kornfield (P41071)
24 Frank Lloyd Wright Drive               Alan N. Harris (P56324)
Ann Arbor, Michigan 48105                 201 South Division Street, Suite 400
Telephone:  (734) 665-4441                Ann Arbor, Michigan  48104
Attorneys for Plaintiffs                  Telephone: (734) 761-3780
                                          skornfield@bodmanllp.com
                                          Attorneys for Defendants

_____/

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      Defendants Excel Research Group, LLC d/b/a Excel Test Preparation, Coursepacks &

Copies ("Excel") and Mr. Norman Miller (collectively, "Defendants"), pursuant to Fed. R. Civ.

P. 56, move for summary judgment and dismissal of the copyright infringement complaint

brought by Plaintiffs Blackwell Publishing, Inc., Elsevier, Inc., Oxford University Press, Inc.,

Sage Publication, Inc., and John Wiley & Sons, Inc., and state as follows:

      1.      Defendant Excel, owned by Mr. Miller, provides University of Michigan

("Michigan") students access to copy machines on which, for a per page fee, students can copy course materials identified by and assigned by their professors.

2.     Plaintiffs brought this action claiming that provision of this service constitutes copyright infringement by Defendants.  Plaintiffs admit that Defendants do not make the copies at issue, rather it is the Michigan students who copy the materials chosen by their professors as part of the course of study.  Excel does not sell coursepacks.

3.     Plaintiffs' Complaint fails and summary judgment is appropriate.  First, Plaintiffs have contractually authorized the copying of their copyrighted materials, including the creation of coursepacks, in multiple agreements entered into with Michigan with third parties who contract with Michigan.  Second, Plaintiffs do not contend that the students or professors are infringers, a prerequisite to finding Excel liable as a contributory or vicarious infringer.  Third, if the Court were to find that Excel copies and uses Plaintiffs' works, the activities at issue fall squarely within the fair use rights granted under the U.S. Copyright Act.

4.     Under Fed. R. Civ. P. 56 and applicable case law, summary judgment shall be rendered where pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

5.     In support of this Motion, Defendants rely on the accompanying Brief in Support of Defendants' Motion for Summary Judgment, the accompanying Exhibits (including the Declaration of Norman Miller), and Defendants' Statement of Material Facts Not in Dispute.

6.     Pursuant to Local Rule 7.1, Defendants' counsel has communicated with

Plaintiffs' counsel as to the nature of this motion. Plaintiffs do not consent to entry of summary judgment.

WHEREFORE, Defendants respectfully request that this Court grant their motion for summary judgment and award Defendants their attorneys' fees and costs under 17 U.S.C. § 505.

Respectfully submitted,

s/Susan M. Kornfield
Susan M. Kornfield (P41071)
Alan N. Harris (P56324)
BODMAN LLP
201 South Division, Suite 400
Ann Arbor, Michigan 48104
Telephone: (734) 761-3780
Facsimile: (743) 930-2494
Attorneys for Defendants

December 3, 2007

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BLACKWELL PUBLISHING, INC., ELSEVIER,
INC., OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATION, INC. and JOHN WILEY &
SONS, INC.,

      Plaintiffs,

v.

EXCEL RESEARCH GROUP, LLC d/b/a EXCEL
TEST PREPARATION, COURSEPACKS &
COPIES, and NORMAN MILLER, individually,

      Defendants.

_____/

Case No. 07-12731

Honorable Avern Cohn

**BRIEF IN SUPPORT OF
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

PEAR SPERLING EGGAN & DANIELS,  P.C.
Karl V. Fink (P13429)
24 Frank Lloyd Wright Drive
Ann Arbor, Michigan 48105
Telephone:  (734) 665-4441
Attorneys for Plaintiffs

BODMAN LLP
Susan M. Kornfield (P41071)
Alan N. Harris (P56324)
201 South Division Street, Suite 400
Ann Arbor, Michigan  48104
Telephone: (734) 761-3780
Facsimile: (734) 930-2494
Attorneys for Defendants

## BRIEF IN SUPPORT OF DEFENDANTS'
## <u>MOTION FOR SUMMARY JUDGMENT</u>

**ISSUE PRESENTED**

Whether Defendants' Motion for Summary Judgment should be granted and Plaintiffs' copyright infringement action dismissed where: (a) Plaintiffs are parties to written contracts under which the University of Michigan, its professors and students, are given broad rights to copy and use Plaintiffs' works, including the express right to make the types of copies and educational "coursepacks" at issue in this case; (b) Plaintiffs' claims for contributory and/or vicarious infringement fail as a matter of law, as Plaintiffs make no claim of direct infringement against the University students or professors for copying and using excerpts of Plaintiffs' copyrighted works as a part of their assigned class readings; and (c) even if this Court were to find that Defendants "used" Plaintiffs' works by providing students and professors access to photocopy machines to enable their fair use copying (a service which itself is not a "use" of Plaintiffs' works), Defendants' "use" is a fair use expressly authorized by the U.S. Copyright Act.

Defendants suggest "Yes."

# CONTROLLING AUTHORITIES

The rights of copyright holders is subject to the fair use rights of the public. Fair use is not an infringement of copyright. U.S. Copyright Act, 17 U.S.C. §§ 101, 106, 107 *et seq.*

Fair use allows exploitation of a copyrighted work – without seeking permission from or paying fees to the copyright holder – in a manner that furthers the purpose of copyright law. The making of multiple copies for classroom use is typically a socially beneficial use. *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569 (1994).

The intent of the parties is in the words used in the instrument; Court does not have the right to make a different contract for the parties or to look to extrinsic evidence when the words used by them are clear and unambiguous and have a definite meaning. *UAW-GM Human Resource Center .v KSL Recreation Corp,* 228 Mich. App 486 (1998).

# I.  INTRODUCTION

For the past decade, students at The University of Michigan ("Michigan") have used photocopy equipment at the premises of Defendant Excel Research Group, LLC ("Excel") to copy the readings assigned by their professors.  Excel does not make copies for the students.  Many of the materials copied by the students are subject to written contracts between Michigan and Plaintiffs, pursuant to which Michigan has paid these publishers millions of dollars.  Now these publishers contend that the students cannot make their copies at Excel and that making available the means of production constitutes direct copyright infringement.

The contracts with Michigan do not specify the photocopy equipment that may be used to make the students' copies, and no such limitation appears in the U.S. Copyright Act ("the Act").  To the contrary, the Act expressly permits the making of "multiple copies for classroom use" for "purposes such as teaching."

Summary judgment for Defendants is appropriate.[1]  First, Plaintiffs have contractually authorized the copying of their copyrighted materials, including the creation of coursepacks.  Second, Plaintiffs do not contend that the students or professors are infringers, a prerequisite to finding Excel liable as a contributory or vicarious infringer.  Third, if the Court were to find that Defendant copies and uses Plaintiffs' works, the activities at issue fall squarely within the fair use rights granted under the U.S. Copyright Act.[2]

---

[1] Pursuant to the Court's motion practice guidelines, Defendants do not recite the well-established summary judgment case law.  *See* Fed. R. Civ. P. 56.

[2] A complete recitation of the facts is set forth in Defendants' Statement of Undisputed Facts, filed concurrently, and the Declaration of Norman Miller, an Exhibit to this Brief.

## II.    FACTUAL SUMMARY

Excel provides a service to Michigan professors and students.  Professors know that, in order to derive the greatest benefit from their assigned readings (including so that they can highlight passages and write comments in the margins), students need physical copies of their assigned course handouts[3].  Some professors deliver to Excel copies of the readings they have selected for a particular course for a particular semester, and advise their students that they can access the handouts at the library, at Excel, and (in some cases) electronically. Statement of Undisputed Facts ("Facts") ¶ 4.  Students can utilize Excel's copying equipment to make their personal copies.  Unlike some "copyshops," Excel does not create an inventory of coursepacks for sale to Michigan students, nor does it perform the copying for them.  Instead, the students must make their own copies.  Excel's per-page fee is less than the price it costs a student to use the copy machines at the library, all of which are owned by commercial entities.  Facts ¶¶ 10, 23.

Each Plaintiff is a party to a written agreement with Michigan (or with a library consortium which includes Michigan).  Facts ¶ 13.  As explained below, Michigan has paid Plaintiffs millions of dollars so that its students and faculty could access, copy, and use, Plaintiffs' works.  Thousands of articles, journals, books and other scholarly materials are licensed under the agreements.

### A.    Blackwell Publishing Site License Agreement.

Plaintiff Blackwell is party to a Site License Agreement with the Michigan Library Consortium, a group of academic institutions that includes Michigan.  Exhibit 2 ("Blackwell

---

[3] Professors determine the assigned readings for the semester, the order in which they appear, and how the readings are integrated with the course lectures, other readings, class exercises, guest lectures, and group communications and activities.  The readings are typically journal articles, newspaper articles, excepts from books, syllabi, sample tests, manuscripts, lab notebooks, bibliographies, tables of contents, PowerPoint slides, summaries, and unpublished articles.

Agreement"). The Blackwell Agreement grants "Authorized Users" (including Michigan staff and students) access to a wide range of Blackwell titles "for the purposes of research, teaching and private study." The broad grant of rights includes Michigan's rights to make back-up copies, temporary local electronic copies, and provide single printed or electronic copies of single articles at the request of students (or other Authorized Users); and students' rights to search, view, retrieve and display the licensed material; electronically save parts of the licensed material for personal use, print single copies of parts of the licensed material, and distribute single copies of parts of the Licensed Material in print or electronic form to other Authorized Users. Blackwell Agreement, ¶¶ 1.1, 3.1.

The Blackwell Agreement expressly provides that Authorized Users may "Incorporate part of the Licensed Material in printed or electronic Course or Study Packs for the use of Authorized Users in the course of instruction" and permits systematic copying for the preparation and copying of coursepacks. Blackwell Agreement, ¶¶ 3.3.1, 4.2.

**B.      Enhanced Access License for Wiley Interscience Consortium Customers**.

Plaintiff John Wiley & Sons, Inc. ("Wiley") is party to an Enhanced Access License with the Committee on Institutional Cooperation ("CIC") through which it licenses access to the electronic version of products and services of Wiley Interscience. Exhibit 3 ("Wiley Agreement"). Michigan is a participating member in CIC. *Id.*

The Wiley Agreement grants "Authorized Users" (including faculty and students) the right to download, view, copy, save, store, and print out single copies "of individual articles, chapters or entries in the Licensed Electronic Product for the Authorized User's own personal use, scholarly, educational or scientific research or internal business use." ¶¶ 3, C1(a). The Wiley Agreement expressly allows Authorized Users to download and print multiple copies of materials from Licensed Electronic Products for the purpose of "making a multi-source

collection of information for classroom use (course–pack) to be distributed to students at the Licensee's Institution free of charge or at a cost-based fee." *Id.*, ¶ C1(d).

## C. <u>Sage Publications, Inc</u>.

Plaintiff Sage Publication, Inc. ("Sage Publication") is party to an agreement with the Michigan Library Consortium, Exhibit 4 ("Sage Agreement") pursuant to which "Authorized Users" (including faculty, staff, and students) can "print a reasonable portion of the Licensed Materials," "use a reasonable portion of the Licensed Materials in the preparation of Course Packs or other educational materials" and "charge a reasonable fee to cover costs or costs of copying or printing portion of Licensed Material for Authorized Users." Sage Agreement, Section IV.

## D. <u>Elsevier License Agreement</u>.

Under Plaintiff Elsevier, Inc's ("Elsevier") contract with Michigan, Exhibit 5 ("Elsevier Agreement"), "Authorized Users" (including Michigan students, faculty and staff) are granted broad grant of rights to (i) access, search, browse and view the licensed products; (ii) "print and download a reasonable portion of articles, abstracts, records or parts of chapters from the Licensed Products ("Excerpts"); and (iii) transmit Excerpts to other Authorized Users and to third-party colleagues for scholarly or research use. Elsevier Agreement, ¶ 1.2.

## E. <u>Oxford University Press License Agreement</u>.

Plaintiff Oxford University Press, Inc. ("OUP") is party to a Subscriber Agreement and Terms of Use Agreement, Exhibit 6 ("OUP Agreement"), with Michigan under which "Authorized Users" (including students, faculty, library patrons, or any person physically present on Michigan's premises) may (i) access Licensed Works by means of a secured network for the purposes of research, teaching, private study; (ii) download and save portions of the Licensed Works; (iii) print out single copies of the licensed works; (iv) distribute copies of the Licensed

Works to other Authorized Users; (v) incorporate portions of the Licensed Works into printed course packs for use by its students, and (vi) create "collections or compilations of printed materials … assembled by faculty or staff of the Subscriber, if the Subscriber is an educational institution, for use by students in connection with a specific course of instruction offered by the Subscriber to its students." *Id*., ¶¶ 1.1, 3.2.[4]

## III. ARGUMENT

### A. <u>Plaintiffs Authorized The Making Of These Copies</u>. [5]

Each Plaintiff is party to a written and unambiguous agreement under which Michigan, its faculty and students, are granted broad rights of access, copying, and use of Plaintiffs' works – including the right to copy the works and incorporate them into coursepacks. The agreements do <u>not</u> specify that students must utilize any particular photocopy machine. This is not surprising, as such a restriction would be impractical, if not ridiculous – equivalent to requiring that a person exercising their First Amendment rights use a certain printing press.

Under Michigan law, "[t]he primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v. Chrysler Corp,* 445 Mich. 109, 127 n.28 (1994). In *UAW-GM Human Resource Center v. KSL Recreation Corp,* 228 Mich. App

---

[4] Michigan also is party to a License Agreement with JSTOR, which also encompasses some of the materials at issue. Exhibit 1, ¶ 13. JSTOR is a not-for-profit organization with a dual mission to create and maintain a trusted archive of important scholarly journals, and to provide access to these journals as widely as possible. JSTOR offers researchers the ability to retrieve high-resolution, scanned images of journal issues and pages as they were originally designed, printed, and illustrated. *See* www.jstor.com. There are approximately 750 journal titles, representing thousands of articles, available through JSTOR. *See* http://www.jstor.org/about/all.list.html. Under the JSTOR terms of use and License Agreement, faculty and students, among others, are granted broad on-line access rights, as well as the right to download copies of articles, and the right to print articles from the JSTOR database for personal use. JSTOR Agreement, 1.

[5] Pursuant to the Court's motion practice guidelines, Defendants do not recite the well-established summary judgment case law. *See* Fed. R. Civ. P. 56.

486, 491 (1998), the court emphasized that "[w]e must look for the intent of the parties in the words used in the instrument. This Court does not have the right to make a different contract for the parties or to look to extrinsic evidence when the words used by them are clear and unambiguous and have a definite meaning." The courts must construe contract language "according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided." *Dillon v. DeNooyer Chevrolet Geo,* 217 Mich. App. 163, 166 (1996). *See also Smith v. Physicians Health Plan, Inc,* 444 Mich. 743, 759 (1994) (courts should not create ambiguity where none exists). If contract language is clear and unambiguous, its construction is a question of law for the court. *Port Huron Ed Ass'n MEA/NEA v. Port Huron Area School Dist,* 452 Mich 309, 323 (1996). As has long been recognized, "A contract should not be construed so as to forfeit or render nugatory the rights of one of the parties to it, unless the language employed imperatively requires such construction." *Lukazewski v. Sovereign Camp of the Woodmen of the World,* 270 Mich. 415, 420 (1935) (citations omitted).

These Plaintiffs have been paid millions of dollars in order for Michigan students and faculty to have the right to access and copy Plaintiffs' materials. Facts, ¶ 14. Plaintiffs contend that these agreements are ***completely irrelevant***. This position is, frankly, shocking. The agreements ***expressly*** provide for copying by students and professors and for the creation of coursepacks. There are no limitations as to ***where*** a student or professor can exercise their rights granted under the agreements, and the Court should reject any request to re-write the contracts.

In these days of web-based access to library systems and electronic course management systems, students can access their assigned readings whether they are in their dorm room, an apartment, at home with family, on vacation, at a hotel, or at a coffee shop – it would be nonsensical to suggest they have to be standing on a particular floor, or in front of a particular

machine, in order to be able to make their copies. Outsourcing has also eliminated the notion of "not for profit" copying – the University library photocopy machines are owned by commercial entities. Facts, ¶ 23. Plaintiffs' contention that no "commercial" copying can be done would render null the contractual right to copy.

As a result, Plaintiffs are unable to explain *where* a student is permitted to make a copy of a coursepack if not at an entity such as Excel. Plaintiffs' predictable outcry that Excel is "making money" or that it is making a "commercial use" is specious. Excel is not making *any* "use" of the works at issue. Excel sells no product, makes no copies, and stocks no coursepacks. Facts, ¶ 10. Excel sells a service, namely, access to a machine on which a student can make his or her copy of, in this case, materials prepared by and provided to Excel by Michigan professors. The costs charged by Excel are *less* than the "on-campus" machines. Facts, ¶ 23. Summary judgment for Defendants is proper.

**B.    Plaintiffs Cannot Establish Direct Infringement.**

Section 501 of the U.S. Copyright Act (the "Act") holds liable for direct infringement any person who violates one or more of the rights of the copyright holder as set forth in Sections 106 and as limited by Sections 107- 122. However, as set forth in Paragraph 31[6] of their Amended Complaint, Plaintiffs admit that Defendants do not copy the works in which Plaintiffs hold copyright, but that the ***students*** copy the works.

"The Copyright Act does not expressly render anyone liable for infringement committed by another." *See Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417 (1984). Defendants could be liable to Plaintiffs (under some theory of contributory or vicarious

---

[6] "Plaintiffs are informed and believe that defendants do not themselves perform the copying for each of their customers. Rather, defendants require each student to copy the pages of each coursepack him/herself on Excel's premises, using Excel's copying machines. . . ."

7

infringement) only if there is direct infringement by a third party. *See id.*; *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304 (2nd Cir. 1963). Therefore, this Court cannot find Defendants liable for copyright infringement unless it finds that the students are direct infringers, and these Plaintiffs did not sue the students or allege any such infringement. For this reason alone, summary judgment in favor of Defendants is proper.

### C. If The Court Finds That Defendants' "Used" Plaintiffs' Works, The "Use" Is Authorized By The Copyright Act.

If Plaintiffs' case survives despite a failure to allege direct infringement and/or despite the express permission granted in the contracts to create coursepacks, it nevertheless should be dismissed because the activities at issue fall squarely within the parameters of fair use.

The U.S. Copyright Act, 17 U.S.C. § 101 *et seq.,* grants rights to copyright holders and simultaneously places limitations on those rights.[7] One of the most important limitations, "fair use," ensures "that copyright protection advances rather than thwarts the essential purpose of copyright: 'to promote the Progress of Science and useful Arts.'" U.S. Const. art. I, § 8, cl. 8; *see also Lexmark Int'l, Inc., v. Static Control Components, Inc.,* 387 F.3d 522, 537 (6th Cir. 2004). Fair use allows exploitation of a copyrighted work – without seeking permission from or paying fees to the copyright holder – in a manner that furthers the purpose of copyright law. *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 577 (1994). Examples of socially beneficial fair uses are set forth in § 107, namely "criticism, comment, new reporting, teaching (including multiple copies for classroom use), scholarship, or research." *Id.* at 576. Those uses were enumerated because they were the kinds of uses that "Congress most commonly had found to be fair uses." *Id.* at 577.

Fair use is not an exception to copyright law – it is integral to copyright law itself because it enables the law to achieve its Constitutional purpose of advancing public knowledge. *See Fogerty v. Fantasy, Inc.,* 510 U.S. 517 (1994). Fair use is the "guarantee of breathing space within the confines of copyright." *Campbell,* 510 U.S. at 579. Fair use also helps to preserve the public interest purpose of copyright law: "creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." *Fogerty,* 510 U.S. at 526.

"The ultimate test of fair use is whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it." *Bill Graham Archives v. Dorling Kindersley Limited,* 448 F.3d 605, 608 (2nd Cir. 2006). It is within this framework that we find defendant Excel providing students and professors at Michigan with the means to exercise their fair use rights.

1. THE FAIR USE STATUTORY FRAMEWORK.

Section 107 of the Act states:

"Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, new reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

1. the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

2. the nature of the copyrighted work;

---

[7] Section 106 of the Copyright Act makes all the rights of copyright holders "Subject to sections 107 – 122" and Section 107 of the Copyright Act confirms that fair use is not an infringement and exists "Notwithstanding the provisions of sections 106."

3. the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

4. the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors."

This section establishes that (a) fair use exists "notwithstanding" the rights of copyright holders, (b) fair use can involve reproduction in copies or the exercise of any other right granted to copyright holders in Section 106, (c) certain uses exemplify fair use, including making multiple copies for classroom use, (d) the Act places no restriction as to where the fair use copies are made, (e) the Act places no restriction on who makes the fair use copies, and (f) fair use is "not an infringement of copyright."

Copyright infringement is the violation of "any of the exclusive rights of the copyright owner as provided by sections 106 through 122." 17 U.S.C. § 501. Since <u>all</u> of the rights of copyright holders are subject to ***all*** the limitations on those rights, copyright holders possess no legal right to interfere with or limit fair use. *See Quality King Distributors, Inc. v. L'Anza Research International, Inc.,* 523 U.S. 135 (1998). Fair use is outside their sphere of legal rights and belongs to the public. *Sony*, 464 U.S. at 433-34 (All reproductions of a work are not within the exclusive domain of the copyright owner; some are in the public domain. Any individual may reproduce a copyrighted work for a "fair use;" the copyright owner does not possess the exclusive right to such a use. Compare 106 with 107).

2. THE MDS LITIGATION.

In 1996, an *en banc* U.S. Sixth Circuit Court of Appeals decided *Princeton University Press v. Michigan Document Services, Inc.,* 99 F.3d 1381 (6th Cir. 1996), *cert. denied,* 117 S. Ct.

1336 (1997) ("*MDS*").  The divided Court (8-5) held that a for-profit copy shop violated the copyrights of three publishers when it copied, compiled, and sold to students coursepacks containing their assigned readings.  The panel decision (vacated by the rehearing *en banc)* and five of the *en banc* judges found that the photocopying and sale of coursepacks was a fair use and not an infringement of copyright.  *See Princeton Univ. Press v. Michigan Doc. Servs., Inc.,* 855 F. Supp. 905 (E.D. Mich. 1994).  None of the 13 judges in the *en banc* court suggested that the students and professors were prohibited from making their own fair use copies by using the services of Michigan Document Services.

While Plaintiffs assert that *MDS* prohibits Excel from enabling student copying, in fact, the opposite is true.  Indeed, as noted by Mr. Miller (Excel's owner) in his Declaration, when he read the *MDS en banc* decision, the panel decision, the trial court decision, various briefs, and the oral argument transcript (all in advance of his decision to expand the services of Excel to include making photocopying equipment available to students), the publishers conceded critical facts and points in order to secure their victory before the Sixth Circuit, namely:

> (a) copying of excerpts by students was a not-for-profit copying,
>
> (b) the students and professors could have claimed a fair use for their copying,
>
> (c) students were users of the excerpts they copied,
>
> (d) the infringing activity was the copying by a for-profit company, not the copying by students or professors,
>
> (e)  the publishers expressly declined to argue that the professors could not make these copies on rented photocopy machines,
>
> (f) the publishers did not dispute that the professor could make multiple copies for classroom use on rented photocopy machines, and
>
> (g) the publishers declined to argue that the professors could not charge the students fees for the copying of the excerpts. Facts ¶ 24.

Summary judgment for Defendants is warranted where (a) there is no authority, including Sixth Circuit authority, holding that students cannot make their own fair use copies, (b) the students who copy the works are also the users of the materials copied, (c) the student copies are not-for-profit copies, and (d) Excel does not sell coursepacks.

### 3. THE CREATION OF THE COURSEPACKS AT ISSUE IS A FAIR USE.

(a)    The First Statutory Fair Use Factor:
<u>Defendants' Use is Non-profit and Educational.</u>

The first factor inquires as to "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes" and "is guided by the examples given in the preamble to 107, looking to whether the use is for criticism, or comment, or news reporting, and the like." *Campbell*, 510 U.S. 569, 578-79. A "use" falling within one of the enumerated uses is likely to be fair. *Higgins v. Detroit Educational Television Foundation*, 4 F. Supp. 2d 701, 705 (E.D. Mich. 1998) (citations omitted).

Here, Michigan's professors determine the assigned readings for their particular course, the order in which the readings are assigned, and how the readings are integrated with course lectures, other readings, class exercises, guest lectures, and group communications and activities. Facts, ¶ 3. Professors use the excerpts to expose the students to, and to engage them with, the ideas, facts, perspectives, theories, concepts, principles, and imagination expressed in the excerpts. There is interplay among the assigned readings and other course activities – and a particular excerpt will take on a new meaning because of its juxtaposition and use with other course content. Facts, ¶ 6. Students using Excel's copying equipment sign statements attesting to their status as students and their enrollment in a particular course, and make their own copies. Facts, ¶ 7. The students and professors use the excerpts in connection with their educational

activities.  Facts, ¶ 9.  There is no question that the purpose of the use of the excerpts is not-for-profit educational use.

By not suing those who engaged in direct copying – the students – the publishers hope this Court will not see the students as the users of the work, and will conclude that Excel must be the user and must be making a commercial use of the work.  *The fact that Excel is a for-profit entity is immaterial to the fair use analysis under these facts*.  In *Sony,* 464 U.S. 417 (1984), the Supreme Court had to determine whether Sony, a for-profit company, was liable for contributory copyright infringement.  Although the plaintiffs framed the issue as Sony's liability for the commercial manufacture of the devices that enabled copying of plaintiffs' broadcasts, the Court could not analyze Sony's liability without first determining whether the persons making the copies – the home viewers – were fair users or infringers.  The Court held that the copying by the home viewer was a noncommercial use, and that it was a fair use.

A second aspect of the first fair use factor is whether the copying "supercedes the objects of the original work," and, thus, acts as a market substitute.  *Campbell,* 510 U.S. at 579.  Professors do not assign excepts when they would otherwise assign the book from which the excerpt was taken; thus the excerpts do not substitute for the works from which they were copied.  Facts, ¶ 3.  Plaintiffs do not allege any market substitution in this case.  Similarly, in *Blanch v. Koons,* 467 F.3d 244, 254 (2nd Cir. 2006), the first fair use factor strongly favored the artist who had used the entirety of a commercial photograph in his painting.

In connection with a "first factor" analysis, some courts have examined the claimed fair use to evaluate whether the use somehow "transforms" the work that was copied.   The notion is that the more transformative a use, the more it furthers the goal of copyright law and the less likely a claim for market substitution.  However, a unanimous Supreme Court clarified that a

transformative use is not required in a fair use case involving the making of multiple copies for classroom use:[8] "the obvious statutory exception to this focus on transformative uses is the straight reproduction of multiple copies for classroom distribution." *Campbell*, 510 U.S. at 579, fn. 11.

Thus, the first factor weighs decisively in favor of Defendants.

(b)     The Second Statutory Fair Use Factor:
        <u>The Excerpted Works are Largely Informational.</u>

Analysis of the second fair use factor, "the nature of the copyrighted work" also favors Defendants.   This factor is, unfortunately, sometimes confused with the concept of copyrightability.   This factor can never weigh in favor of a plaintiff ***merely*** because the copied work was copyrightable; indeed, if the were not copyrightable, there would be no claim for infringement.   Congress would not have to have enumerated the "making of multiple copies for classroom use" "for purposes such as teaching" as a typical fair use if the students were copying unprotectable content.

In *Campbell,* the Supreme Court stated:

> This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.  . . . . This fact, however, is not much help in this case, or ever likely to help much in separating the fair use sheep from the infringing goats in a parody case, since parodies almost invariably copy publicly known, expressive works.

*Campbell*, 510 U.S. at 586.

---

[8] While transformative use is not required in a case involving classroom copying, the facts demonstrate that the use of the excerpts is, in fact, transformative.  The excerpts are not isolated handouts; they are integrated with the course content in a manner that allows the students to see that a particular excerpt "add something new, with a further purpose, or different character, altering the first with new expression, meaning, or message." *Campbell,* 510 U.S. at 579.

Here, professors selected the assigned readings to expose the students to the ideas, facts, historical and cultural perspectives, theories, concepts, principles, and intellectual challenge of the content – just the sort of goals advanced by U.S. copyright law. If this factor does not weigh in favor of fair use,[9] then there would have been no point in Congress enumerated the making of multiple copies for classroom use for purposes such as teaching, because material selected for teaching is always seeking to expose students to information, ideas, concepts, and the like through expressive content. As with the rulings in *Campbell* and *Bill Graham Archives,* both of which involved the copying of content "closer to the core" of copyright and which did not weigh against a fair use, this factor favors Defendants.

(c)     The Third Statutory Fair Use Factor: Professors Selected No More
        <u>than Necessary to Accomplish the Pedagogical Purpose</u>.

The third fair use factor is the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." Here, the Court examines the justification for the quantitative and qualitative degree of copying. The inquiry is whether the amount copied was excessive in light of the purpose for the copying, and relates back to the first factor. *Campbell*, 510 U.S. at 588-89. This factor does not involve counting words or computing percentages and "there are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use." *Higgins*, 4 F. Supp. 2d at 707 (citing *Maxtone-Graham v. Burtchaell*, 803 F. Supp. 2d 1253, 1263 (2nd Cir. 1986)).

Indeed, depending upon the explanation for the copying, a fair use can involve copying the entire work (or almost the entire work). In *Campbell*, a unanimous Supreme Court held that a parodist could make a commercial use of a copyrighted work of the creative arts (musical

---

[9] The excerpts are often scholarly works, rich with quotations from other content (thus reducing the portion of copyrightable content to which these Plaintiffs can claim ownership).

composition), including using the "heart of the work," and the use could be fair. *Campbell*, 510 U.S. 569 (1994). This paved the way for *Leibovitz v. Paramount Pictures Corp.,* 137 F.3d 109 (2nd Cir. 1998), where it was a fair use for a for-profit company to copy and parody an entire work of the visual arts to advertise the release of its movie. In *Suntrust v. Houghton Mifflin Co.,* 252 F. Supp. 3d 1165 (11th Cir. 2001), a commercial publisher made a fair use of a fictional work when it copied dialog, characters, plot twists, and settings from a fictional work in order to comment upon and criticize aspects of the work (even though the copyright holder had a system for licensing the work). In *Field v. Google, Inc.,* 412 F. Supp. 2d 1106 (D. Nev. 2006), the owner and operator of a for-profit search engine made a fair use of third party copyrighted works when it copied and electronically stored those works for the purposes of operating its business. In *Bill Graham Archives*, 448 F.3d 605 (2006) , a commercial publisher made a fair use of art posters when it reproduced, in their entirety, small versions of those posters, even where the plaintiff had established a system licensing its works. In *Blanch*, 467 F.3d 244 (2006), it was a fair use to incorporate the entirety of a commercial photograph into a commercial work of the visual arts. In those cases, the courts examined the totality of the circumstances, giving weight to uses that were critical, parodic, transformative, and/or socially useful.

Here, the Michigan professors selected only the amount necessary to accomplish the educational purpose for selecting the work and did not use the copied material as a substitute for assigning the purchase of any work. This factor therefore also supports a finding of fair use.

(d)     The Fourth Statutory Fair Use Factor: Plaintiffs Were Paid
        For the Copying of the Works (and/or Were Not Entitled to be Paid).

This factor looks at "the effect of the use upon the potential market for or value of the copyrighted work." The inquiry "must take account not only of harm to the original, but also of harm to the market for derivative works." *Campbell*, 510 U.S. at 590. This factor requires a

balancing of "the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." *Bill Graham Archives*, 448 F.3d at 613.

A copyright holder cannot meet its burden of demonstrating economic injury merely be demanding a fee for the claimed fair use. The question is not whether the holder has made a demand, but whether it is entitled to the fee demanded: "If the use is otherwise fair, then no permission need be sought or granted." *Id.* Indeed,

> "were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would always favor the copyright holder." . . .; *see Princeton Univ. Press v. Mich. Document Servs.,* 99 F.3d 1381, 1387 (6th Cir. 1996) (stating that a copyright holder must have a right to copyright revenues before finding that a failure to pay a license fee equals market harm); Leval, *supra,* at 1124 (stating that "[b]y definition every fair use involves some loss of royalty revenue because the secondary user has not paid royalties"); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.05[A][4] (2005) (stating that "it is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar")."

*Id.* at 614.

There is no legal support for the permission fees demanded by these publishers in these circumstances. First, Congress identified the making of multiple copies for classroom use as a designated fair use. That use would be read out of the statute if it could be eliminated by a simple demand for payment of fees for the copying where there is no allegation, much less proof, of even one lost book sale.

Second, they have already been paid (if not overpaid) by Michigan under the contracts in place. In certain respects, they have received a windfall. The University allocates more than Eighteen Million Dollars per year for electronic access to literary content, journal articles, books,

films, sound recordings, and other acquisitions by the library system. Facts, ¶ 23. If, for some reason, some of the excerpts at issue in this litigation were not encompassed by the specific contracts with these publishers, the simple answer to their demand for money is that they are not entitled to fees when the use is otherwise fair. Fair use is outside their legal control, and the right does not belong to them exclusively. *Sony.* This factor also weighs in favor of Defendants.

(e)     Consideration of Nonstatutory Factors.

The statutory factors are not exclusive, and a court may consider other factors relevant to a consideration as to whether a use furthers the purpose of copyright law. *See MDS*, 99 F.3d 1381 (1996). Here, there are additional facts that support a finding of fair use.

First, copying for classroom use is an incentive for authors. As noted in *MDS*, authors write "for many professional and personal reasons, such as making a contribution to a particular discipline, providing an opportunity for colleagues to evaluate and critique the authors' ideas and theories, enhancing the authors' professional reputations, and improving career opportunities." *Id.* at 1410 (Ryan, J., dissenting). Their primary incentive was widespread dissemination of their writing, not permission fees collected from students, "where the works in their entirety would not have been assigned in any case." *Id.*

Second, enabling students to have access to the readings assigned by their professors is a "laudable societal objective," and judicial constructions of the plain language of the U.S. Copyright Act that limit the ability of students to exercise their fair use rights "thwarts" the purpose of the law. *Id.* at 1400 (Martin, Chief Judge, dissenting).

Third, is a social benefit to encouraging educational institutions to use the labor of others who can support the exercise of fair use rights in a manner that is efficient. *See, id.,* at 1395-96 (Merrit, J., dissenting). Excel's services enable students to have quality photocopies at a lower price than they would pay at the University library or other photocopy locations. The effort

expended by Excel to check the materials handed to it by professors (to check for missing pages, pages with text cut off, and pages with poor quality printing) make up for the time students spend standing in line, waiting their turn to make their fair use copies.   Nothing in the *MDS* opinion or the Act suggests that a for-profit business cannot assist a nonprofit educational user, and "the fact that a charge is made for a work, or that a profit is anticipated . . . does not convert the use into a commercial one." *Higgins*, 4 F.2d at 705.

Fourth, Defendants' undertook an extraordinary effort to understand applicable law, and to conduct Excel's business in a manner consistent with even the restrictive view of fair use set forth in the *MDS en banc* majority.   Mr. Miller read briefs, decisions, transcripts, statutory sections, and concluded – accurately – that there is no authority for the proposition that the students cannot make their own copies with the assistance of a third party.   Defendants' good faith is further demonstrated by the fact that there is no attempt to deprive authors and publishers of the recognition they deserve; the identity of the authors and publishers of the content, when such information is made available to Defendants, is included with the excerpts copied by the students.   Facts, ¶ 5.

Fifth, there is no "free" mechanism under which students receive their course handouts. All copying of assigned readings cost the students money.   If they log onto the University of Michigan computer system and mark a file for printing, the students are charged by the University.   If they purchase a copy card for use at the University library, the students pay about 10 cents per page, and the for-profit companies who provide the machines make the money.   If the students copy the readings at Excel, they pay 7-8 cents[10].  Facts, ¶ 23.

---

[10]   Excel makes no more money for copyrighted content than public domain content or a blank page.  Facts, ¶ 23.  If this Court were to find that the fee charged by Excel for the copying by the student injected a commercial element into this first factor analysis, such element should be

# IV.     CONCLUSION

Contract law would be turned upside down if publishers who expressly authorized the copying of their works could, after the fact, dictate where the users stood when they made their authorized copies.  Copyright law would itself be violated if fair users had to ask copyright holders where the users had to stand, and which button they had to push, when they made their fair use copies.   Defendants request that this Court grant their motion for summary judgment and award Defendants their attorneys' fees and costs under 17 U.S.C. § 505.

Respectfully submitted,

s/ Susan M. Kornfield
Susan M. Kornfield (P41071)
Alan N. Harris (P56324)
BODMAN LLP
201 South Division, Suite 400
Ann Arbor, Michigan 48104
Telephone: (734) 761-3780
skornfield@bodmanllp.com
Attorneys for Defendants

December 3, 2007

---

given very little weight, as the fee bears no relation to the content copied.  *See Campbell*, 510 U.S. 569 (1994); *Higgins,* 4 F.2d at 705.

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2007, I electronically filed the foregoing with the

Clerk of the Court using the ECF system which will send notification of such filing to the

following:

kfink@psedlaw.com

I declare under penalty of perjury that the foregoing statements are true and correct.

s/ Susan M. Kornfield
Susan M. Kornfield (P41071)
BODMAN LLP
201 South Division, Suite 400
Ann Arbor, Michigan 48104
Telephone: (734) 761-3780
skornfield@bodmanllp.com
