UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC., and
JOHN WILEY & SONS, INC.,                          Civil Action No. 07-CV-12731

                              Plaintiffs,          Hon. Avern Cohn
vs.
                                         Mag. Morgan

EXCEL RESEARCH GROUP, LLC d/b/a
EXCEL TEST PREPARATION,
COURSEPACKS, & COPIES and
NORMAN MILLER, individually,

                                 Defendants.
_____/

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs submit this brief in opposition to defendants' motion for summary judgment. Before addressing the merits of the motion, plaintiffs wish to make clear their rationale in doing so.

First, plaintiffs do not waive their request for relevant discovery. The record unilaterally placed before this Court by defendants is self-serving, largely inadmissible, and full of gaps – as plaintiffs have pointed out in their separate response, filed herewith, to defendants' statement of facts. Summary judgment against plaintiffs on such a record would be grossly unfair. Plaintiffs believe a full disclosure of what goes on in defendants' business will only strengthen their opposition to defendants' motion.

Dockets.Justia.com

Second, plaintiffs could, but do not, oppose summary judgment purely on the grounds that the status of the factual record is so muddled. As the Court will have seen from plaintiffs' responses to defendants' fact statement, nearly every "fact" alleged by defendants is inadmissible, incomplete, or in dispute. The few things that can be said to be beyond dispute at this point are discussed *infra*.

Third, however, plaintiffs are mindful of the Court's desire to streamline proceedings in this action. Denial of summary judgment would certainly achieve that result, given that defendants have presumably put forward what they view as the best-case presentation of their defenses. And the flaws in defendants' argument go much deeper than the many imperfections in their presentation of the "facts." So, without waiving their rights to discovery, plaintiffs will address defendants' argument on the merits. If the Court agrees with plaintiffs on the merits, then this case can indeed move to a quick resolution.

**ISSUES PRESENTED**

Whether the coursepack business conducted at defendants' shop, Excel Test Preparation, Coursepacks & Copies ("Excel"), as described to date,

1.　　infringes plaintiffs' right of reproduction under 17 U.S.C. §106(1), under the rule laid down by *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, (6th Cir. 1996), given that defendants supply the premises, copying machines, paper, utilities, masters, and binding – everything necessary to such reproduction other than the labor of running the copying machines, which they outsource to their customers; and

2.　　infringes plaintiff's right of distribution under 17 U.S.C. §106(3)

## CONTROLLING AUTHORITY

The controlling authority in this case is *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381 (6th Cir.1996).

## SUMMARY OF FACTS

The only facts beyond dispute at this point are the following:

1.      Defendants' business consists, at least in part, of the reproduction on its premises of coursepacks containing copyrighted works owned by plaintiffs.

2.      This reproduction is not accidental, incidental, or haphazard.  Although given the record at present we do not know what steps defendants take to promote their coursepack business, clearly they have set up their business with the intent that coursepacks be reproduced in large numbers on their premises, and that they be paid for such reproduction.

3.      To facilitate such reproduction, defendants maintain a library of coursepack masters.  Who physically produces these masters is not entirely clear. Be that as it may, defendants do not suggest, and there is no evidence to suggest, that the creation of the masters has been authorized by the copyright owners of their contents.

4.      The excerpts reproduced from plaintiffs' copyrighted works are substantial, as that term is interpreted in *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d at 1389-1390.  The percentages that they represent of the works from which they are taken are set forth in Exhibit B to Plaintiffs' Response to Defendants' Statement of Facts (hereinafter "Pls. Resp.").[1]

5.      Upon request, defendants provide a student customer with coursepack master, a photocopying machine, and necessary supplies.  The student uses the

---

[1]  Based on the opinion in *Michigan Document Services*, anything in excess of 5% is presumptively substantial.  A few of the items in the Amended Complaint constitute 3% or 4%, one is 1%; but all of these far exceed the 1,000 word "brevity" threshold.  *Id.* at 1390.

photocopying machine to generate a copy of the coursepack master.  The student pays Excel for each page that he or she generates.  *See* ¶2 of defendants' statement of facts.

6.      No one pays any copyright fee for the reproduction of copyrighted material made in this manner, or for the lending of the coursepack master.

7.      The scale of defendants' operation appears to be substantial.  Pls. Resp., p. 10.

8.      Although there is no record at this point as to what profit defendants make on this business, Excel is not a nonprofit institution and presumably is making a profit on each coursepack copy made on its premises.

9.      The harm suffered by plaintiffs as a result of this cannot be calculated based on the information in hand.  For a general discussion of the market harm cauised by unlicensed coursepacks, *see Michigan Document Services*, 99 F.3d at 1386-1388.

10.      Plaintiffs and the University of Michigan are party to various licensing agreements under which plaintiffs provide the University and its students with electronic access to certain works.  These agreements, on their face, do not apply to 32 of the 40 works at issue here.  Pls. Resp., p. 9. They are irrelevant to the copying of the other eight works, for reasons that will be discussed *infra*.

# ARGUMENT

The Sixth Circuit in *Princeton University Press v. Michigan Document Services* ("*MDS*") set down a clear and unequivocal principle: commercial reproduction of copyrighted materials in coursepacks infringes copyright unless it has been authorized by the copyright owner(s). This is so regardless of the fact that the coursepacks are ultimately used for the laudable purpose of nonprofit education. *Id.* at 1386. One would have thought this was the end of the matter. However, defendants claim to have found a way around *MDS*. By the simple expedient of making the students run the copy machines – using masters, machines, and supplies owned by defendants – they claim they are not engaged in commercial reproduction and so have no liability for copyright. By moving for summary judgment defendants have in effect asked the Court to give its imprimatur to this ruse.

Since being sued, defendants have cast about for additional lines of defense, and have come up with the theory that license agreements between plaintiffs and the University of Michigan authorize student copying of plaintiffs' materials.[2] These agreements, however, have no bearing whatever on most of the works at issue here, and on the few to which they might be relevant they do not authorize the conduct sued on here. Plaintiffs will address the license defense first, and then turn to the main issue of the case.

---

[2] There is no indication in defendants' pleadings that they ever considered this line of reasoning when they were constructing their business model.

1.    **Plaintiffs' Licensing Agreements with the University of Michigan Give Defendants No Support.**

As noted above, 80% of plaintiffs' infringement claims are not even potentially subject to any defense based on license agreements. Only eight journals identified in the Amended Complaint are subject to the licenses attached to defendants' brief. Those eight are licensed to the University of Michigan under terms that do not authorize reproduction at Excel. To be specific:

a.    The Blackwell Agreement (defendants' Exhibit 2) covers two journals, items 1 and 2 on plaintiffs' Exhibit B. But it forbids "Commercial Use" of those journals, which it defines as "[u]se for the purpose of monetary reward (whether by *or for* the Licensee or an Authorized User) by means of the sale, resale, loan, transfer, hire or other form of exploitation of the Licensed Materials." (emphasis added). Thus, the Blackwell Agreement does not allow an Authorized User to be the beneficiary of any use from which any person receives monetary reward.

b.    The Elsevier Agreement (defendants' Exhibit 5) covers the  journals identified in items 3-7 on plaintiffs' Exhibit B. It allows students to print and download excerpts from the Elsevier database. It does not, however, grant permission for any other kind of reproduction, such as offsite photocopying – and it specifically says that all rights in the database remain with Elsevier "except as expressly set forth in this Agreement." (*Id.*, §1.5)

Defendants ask, why does it matter what machine the student uses? But the question should be reversed: why does it matter so much to students to have printed copies from a copy shop when they could download the materials and read them on their own computers? That is unclear on the record. Professors have purportedly "advised"

Excel that students need physical copies to derive the maximum benefit from the assigned readings, and this may be so. If so, it is a convenience or benefit separate from that conferred by the license, and Elsevier is within its rights to charge for that benefit. Elsevier is entitled to set such limits on the use of its intellectual property as it wishes to – prohibit the very sort of thing that Elsevier is now suing on – and the University has accepted those limits.

Moreover, the Elsevier Agreement specifically says that Authorized Users may not "substantially or systematically reproduce, retain or redistribute the Licensed Products." *Id.*, §1.4.3. Yet defendants' business relies on precisely such conduct.

c. The SAGE Agreement (defendants' Exhibit 4) covers the journals identified in items 31 and 37 on plaintiffs' Exhibit B. It allows students to print and download excerpts from the SAGE database. It also allows students and faculty to "use a reasonable portion of the Licensed Materials in the preparation of Course Packs," and allows the University may charge a fee to "cover costs of copying … Licensed Materials for Authorized Users." *Id,* Section IV. These provisions read together as a whole, as they should be, plainly allow the University and Authorized Users to photocopy coursepacks including SAGE material so long as the fees charged do not exceed cost-recovery. In other words, the SAGE Agreement allows coursepack production so long as no profit is made from the copying. Nowhere does the SAGE license allow third parties to copy material. And it would be very odd if the SAGE Agreement restricted the copying fees of its licensee, the University, to cost-recovery, yet were construed to allow commercial shops such as Excel to make a profit from reproducing SAGE materials.

In sum, none of these license agreement provides students the sort of *carte blanche* copying rights that defendants claim, and none of them authorizes commercial reproduction. Defendants' attempt to portray the license agreements between plaintiffs and the University as some sort of blanket license for students to copy at will, and especially to have copying done at commercial shops, is an impermissible stretch of the plain language of the agreements. The license agreements simply do not say what defendants wish they said.

**2. Defendants Are Liable As Direct Infringers of Copyright.**

Shorn of this license defense, defendants' case consists entirely of an attempt to get around the precedent established by *Princeton University Press v. Michigan Document Services* (hereinafter "*MDS*"). In this effort, defendants rely on one central fallacy: that they have committed no infringing acts, because only students "make" the copies at issue here. Their premise is wrong on two separate counts.

First, defendants' liability does not depend solely on the "making" of copies. Defendants are also engaged in unauthorized *distribution* of plaintiffs' works in violation of 17 U.S.C.§106(3).[3] Such distribution takes place when defendants provide the coursepack masters to students, and again when the students pay for their coursepacks.

Plaintiffs have authorized neither the making of the masters (which contain reproductions of their material), nor the circulation of such reproductions. Defendants by their own admission provide the masters to any student enrolled in the class concerned, and they do so for purely commercial purposes: to generate profit by enabling

---

[3] Section 106(3) gives the copyright owner the exclusive right to "distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending."

the making of copies, for which they receive "about 7-8 cents" per page.[4]  This is commercial lending, and thus infringement.[5]

Another unauthorized distribution occurs at the end of the transaction, when the student pays for the coursepack.  It is then that title to the coursepack copy passes to the student.  If the student walked out of Excel without paying, defendants would rightly accuse him or her of theft.  In legal terms, a sale of the reproduction occurs when money changes hands and title to the object passes to the customer.  This unauthorized sale is an infringement of plaintiffs' distribution right.

Second, defendants' assertion that only students "make" copies of plaintiffs' copyrighted materials is mere sophistry.  The copies result primarily from the efforts and investment of defendants, with assistance from their student customers.  Students may be the ones who stand in front of the copying machines, feeding pages and pushing the "print" button.  But defendants supply all other elements of the reproduction: the venue, the machines, the paper, the utilities, and the masters.  (They also, at least sometimes, bind the copied pages together for the students' added convenience.)  Defendants and their customers are engaged in a common, seamless effort (for their own respective motives) to reproduce plaintiffs' materials on a commercial basis without paying copyright fees. To pretend that defendants are not directly and closely engaged in the copying process is to elevate form, indeed pretense of form, over substance.

---

[4]  Conceivably, Excel's profit margin may be even higher than its competitors' because it needs no employees to run the copying machines.  Its student customers do the drudge work for it.

[5]  Needless perhaps to add: it does not matter that the end result of such commercial lending is to put educational materials in the hands of students.  If that were so, then the sale of counterfeit copies of plaintiffs' books for educational use would be lawful. Under the rule of *MDS,* the educational end use by a copy shop's customers does not alter the commercial nature of the copy shop's use.  99 F.3d  at 1386.

Plaintiffs have been unable to find any case quite like this in the copyright case law – perhaps because the proffered defense is so plainly without merit. But plaintiffs note that in the field of music copyright, Congress assumed in crafting the Copyright Act that the owners of jukeboxes placed in public areas would be liable for unauthorized performance of music even though the jukeboxes would perform anything unless a private customer caused them to do so by inserting money into the machine. *See* 17 U.S.C. §116; *Broadcast Music, Inc. v. Xanthas, Inc.*, 674 F.Supp. 553 (E.D.La.1987), *aff'd in relevant part*, 855 F.2d 233 (5th Cir.1988).[6]

It is important to remember that we are not dealing here with "walk-up" business. We are not dealing with students who, possessing coursepack masters other than by loan from Excel, happen to come into Excel's shop and, without Excel's encouraging them or having any reason to know what they are up to, make copies quietly on a machine off in the corner. Such copies might well be illegal, and defendants might be liable for them, but that is a hypothetical question.[7] What plaintiffs sue on here are copies methodically made in furtherance of Excel's corporate business purposes.

---

[6] *See also, Columbia Pictures, Inc. v. Redd Horne, Inc.,* 749 F.2d 154 (3d Cir.1984). In that case the defendant ran a theater where patrons could rent movies and view them in small booths. The defendant argued that these were all private performances for which it could not be liable. The Third Circuit looked past the form of the undertaking to the effect, and found infringement.

[7] In *MDS* the Sixth Circuit said the following:
> As to the proposition that it would be fair use for the students or professors to make their own copies, the issue is by no means free from doubt.
*Id.* at 1389. Certainly, systematic and high volume copying by students would be far outside the Classroom Guidelines discussed with approval in *MDS,* 99 F.3d at 1390-91. Admittedly, the Classroom Guidelines are directed to copying by teachers, not students, but the result should be no different simply because teachers tell their students to obtain copies at an off-campus shop. If such large-scale copying were carried out at Excel, then defendants (even if technically unaware of it) might well be vicariously liable for it. *See Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963). And if

### 3.  Defendants' Have No Valid Claim of Fair Use

As a last fallback, defendants argue that the reproduction of coursepacks on their premises is fair use.  In this they rely largely on arguments that were expressly repudiated in the Sixth Circuit's *en banc* decision in *MDS*.  Compare, for example, defendants' discussion of "transformative use" at page 14 of their brief with the Sixth Circuit's brusque dismissal of that argument, 99 F.3d at 1389; defendants' discussion of the second statutory fair use factor at pp. 14-15 of their brief with the Sixth Circuit's even brusquer treatment of that issue, 99 F.3d at 1389; defendants' discussion of the amount and substantiality of the use with the Sixth Circuit's discussion in *MDS* at 1389-1391. Indeed, defendants' entire fair use discussion seems to be an attempt to reargue *MDS*.  Tellingly, the only quotations from *MDS* in their brief are from the dissenting opinions.

The premise underlying defendants' fair use arguments is even less sound. Defendants imagine the students as the lead actors, and themselves as merely "enabling" their customers' fair use.  As discussed at length above, this vision inverts reality. Defendants have created a business for copying coursepacks in which they supply everything but the last bit of labor; the students simply show up to run the machines, and in doing so put money in the pockets of Excel and its owner.  As discussed in footnote 6 above, even truly autonomous student copying of coursepacks is far from sure to be a fair use.  But the copying that goes on here is of a very different nature.  The student is a stalking horse, deliberately put forward in an attempt to provide legal cover for

---

Excel, even without supplying masters, were to continue deliberately to make its machines available for the systematic reproduction of coursepacks by students, it is hard to imagine the Sixth Circuit condoning such activity.  *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir.1996) (swap meet operator liable for infringing distribution of copyright materials by swap meet attendants, when it knew that such activity was going on and received payment from those involved).

defendants' commercial business.  And as the Sixth Circuit said in *MDS*, "'[t]he courts have … properly rejected attempts by for-profit users to stand in the shoes of their customers making nonprofit or noncommercial uses'" *Id.* at 1389, *citing* Patry, *Fair Use In Copyright Law*, at 420 n. 34.  In keeping with *MDS*, the Court must look to the true underlying commercial nature of the copying that is at issue here.


## CONCLUSION

Defendants are engaged in the manufacture and distribution of coursepacks for profit.  In manufacture, because they provide every necessary element of reproduction other than the labor of standing by the photocopying machine  and pushing the "print" button.   In distribution, because they lend coursepack masters to students, and part with title to the copies made on their machines, all in exchange for payment.  Defendants thus fall squarely within the rule laid down by *Princeton University Press v. Michigan Document Services, Inc.*  Their motion for summary judgment must be denied.

Respectfully submitted,

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC.,
JOHN WILEY & SONS, INC.,

Plaintiffs,

By their Attorneys:

KOTIN, CRABTREE & STRONG LLP

Dated: January 25, 2008       By: /s/ William S. Strong
          /s/ Amy C. Mainelli Burke
          William S. Strong, Esq., BBO #483520
          Amy C. Mainelli Burke, Esq., BBO#657201
          KOTIN, CRABTREE & STRONG, LLP
          One Bowdoin Square
          Boston, MA 02114
          (617) 227-7031
          (617) 367-2988 (fax)

Local Counsel:

Claudia Rast (P40165)
Karl V. Fink (P13429)
Cynthia M. York (P39722)
Pear, Sperling, Eggan & Daniels, P.C.
24 Frank Lloyd Wright Drive
Ann Arbor, Michigan  48105
(734) 665-4441
(734) 665-8788 (fax)

**CERTIFICATE OF SERVICE**

     I hereby certify that on January 25, 2008, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will send notification of such filing to the following:

- Karl V. Fink    kfink@psedlaw.com,rhobbs@psedlaw.com
- Susan M. Kornfield    skornfield@bodmanllp.com,mpoupard@bodmanllp.com
- Alan N. Harris    aharris@bodmanllp.com,lhignite@bodmanllp.com

          s/Amy C. Mainelli Burke
          Amy C. Mainelli Burke, Esq.
          Kotin, Crabtree & Strong, LLP
          One Bowdoin Square
          Boston, MA 02114
          Telephone:    (617) 227-7031
          Facsimile:    (617) 367-2988
          Email: aburke@kcslegal.com