UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC., and
JOHN WILEY & SONS, INC.,                         Civil Action No. 07-CV-12731

                              Plaintiffs,        Hon. Avern Cohn

vs.                                                                                 Mag. Morgan

EXCEL RESEARCH GROUP, LLC d/b/a
EXCEL TEST PREPARATION,
COURSEPACKS, & COPIES and
NORMAN MILLER, individually,

                              Defendants.
_____/

## **PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF FACTS**

Plaintiffs submit this response to the statement of allegedly undisputed facts filed by defendants in support of their motion for summary judgment.

Despite defendants early representation to the Court that they could submit a simple, obvious set of operative facts, they have not done so. The statement of "facts" defendants have submitted

1.     relies heavily on inadmissible hearsay;

2.     is inaccurate or incomplete in many instances;

3.     relies heavily on speculative or conclusory allegations supported by no documentary or other objective evidence; and

4. fails to state material facts that were known to defendants at the time it was filed.

Most significant in the latter category is the fact that the contracts to which defendants devote so much of their argument simply *do not apply* to 31 of the 40 works at issue in the Amended Complaint.[1]

### 1. Specific Responses to Defendants' Alleged Undisputed Facts

Plaintiffs make the following responses to the numbered paragraphs (referred to below as "¶1," etc.) in defendants' statement of facts:

1. Plaintiffs agree that defendant Excel Research Group, LLC ("Excel") is a Michigan limited liability company owned and operated by defendant Norman Miller ("Miller"), although plaintiffs note that at the time the original Complaint was filed Excel was not in good standing as such, having failed for years to make the necessary filings and pay the necessary fees. The balance of the alleged facts stated in ¶1 appear to be irrelevant to the issues in this case. To the extent they may be relevant they concern defendant Miller's aspirations, personal knowledge, and state of mind, and plaintiffs, having had no opportunity to examine Miller under oath or inspect defendants' documents, decline to accept their accuracy.

2. Plaintiffs accept the statement in ¶2 for purposes of the present motion but state that, having had no opportunity to examine Miller under oath, they do not accept that ¶2 gives a complete picture of defendants' activities relative to coursepacks.

3. Plaintiffs accept the accuracy of the first sentence of ¶3. Having had no opportunity to examine Miller under oath or inspect defendants' documents, plaintiffs

---

[1] The Amended Complaint contains 41 counts. However, counts 32 and 34 relate to the same work, *The Handbook of Community Practice*, copied in two different coursepacks.

decline to accept defendants' statement of what readings "typically" consist of. Plaintiffs reject the last two sentences of ¶3 as pure hearsay and/or speculation.

4. The first sentence of ¶4 is hearsay if offered as proof of what students need. It is admissible only to establish what some unidentified number of professors have said to Excel, and plaintiffs accept its accuracy to that extent only for purposes of the present motion. Plaintiffs agree that some professors deliver to Excel copies of the readings they have selected, but plaintiffs have had no opportunity to examine defendants as to what other professors do. Finally, defendants' allegation of what professors say to students is pure hearsay.

5. Defendants concede in ¶5 that the Masters they maintain at Excel do not necessarily identify the author or the publisher of the excerpts contained in them. Without the opportunity to examine defendants' documents, plaintiffs have no idea how often this important information is omitted. Failure to give proper attribution to both author and copyright owner (the publisher) is damaging and one of many arguments against defendants' claim of fair use. Furthermore, to the extent that defendants attempt to rely on the Contracts attached to their pleadings, failure to include proper attribution also undercuts that defense. Note, for example, that the Blackwell Agreement (defendants' Exhibit 2) stipulates that each item included in a coursepack must "carry appropriate acknowledgement of the source," including the names of the author and publisher. (*Id.* at §3.3.1.)

6. Although the first sentence of ¶6 states things that defendants have no competence to testify to, plaintiffs accept the truth of such sentence for purposes of the

3

present motion. The balance of ¶6 is irrelevant to the issues in this case and, in any event, too nebulous to accept as it stands.

7. Concerning the first sentence in ¶7, plaintiffs note that defendants have not submitted a single example of the statements allegedly signed by students, and plaintiffs have had no opportunity to examine defendants' documents on this point. Plaintiffs assert that Excel is heavily involved in the making of students' personal copies of coursepacks and plaintiffs therefore deny the accuracy of the second sentence of ¶7. Plaintiffs have had no opportunity to examine defendants as to the circumstances surrounding the acts described in the last sentence of ¶7, and therefore refuse to accept the accuracy or sufficiency of such sentence.

8. The first sentence of ¶8 is pure hearsay. Concerning the second sentence, plaintiffs state that there is more to "making" a copy of a coursepack than standing in front of a photocopy machine and pushing the "print" button, and therefore do not accept the accuracy of such sentence. Plaintiffs accept for purposes of the present motion that defendants have refused students' requests that defendants stand in front of the machines and push "print."

9. Plaintiffs agree that the copies, once made, are put to non-profit educational use, but state that the making of the copies is a commercial enterprise.

10. Plaintiffs accept the accuracy of ¶10 for purposes of the present motion, subject to the same objection as stated above concerning the "making" of copies.

11. The statements in ¶11 are vague as to when, to whom, and by whom the alleged statements were made, and appear to be pure hearsay.

12. The statements in ¶12 are pure hearsay.

13.     Plaintiffs agree that each of them is party to a written agreement either directly with the University of Michigan or with a library consortium that includes the University of Michigan, and that copies of such licenses are attached as Exhibits 2-6 to defendants' brief.    Plaintiffs accept as true for present purposes the general statements in ¶13 concerning JSTOR.   However, defendants have failed to

- offer any proof that the license between JSTOR and the University of Michigan is still in effect;
- show that the JSTOR Agreement covers any of the journal articles identified in Exhibit B to the Amended Complaint; and
- inform the Court what "User Rules" applied to such articles at the applicable time.  (User Rules are the rules that govern the conduct of individuals affiliated with the University.  The JSTOR Agreement incorporates by reference JSTOR's such User Rules as in effect from time to time.  See Section 1 of defendants' Exhibit 1.)  Plaintiffs do not themselves know what User Rules were in effect at the time the materials identified in the Amended Complaint were copied.  But plaintiffs note that the *current* User Rules permit Authorized Users, such as students, to make copies of journal articles only "within the premises" of the licensed university, and expressly forbid reproduction of licensed content "in bulk in any form, such as by including Content in course packs."  See §§ 2.1 and 2.2(j) of JSTOR's "Terms and Conditions of Use of the JSTOR Archive" (Exhibit A to this Response).  If similar User Rules were in effect at the time of the copying identified in

plaintiffs' Amended Complaint, then the JSTOR Agreement supports plaintiffs' case, not defendants'.

14. Defendants try to insinuate that because plaintiffs in the aggregate receive "millions of dollars" they should not complain about losing money due to defendants' business. But the aggregate compensation received by all plaintiffs collectively under all the Contracts is a meaningless figure. The license fees collected by plaintiffs for the use of their material have to be examined more carefully. For example, a careful reading of the Wiley Agreement (defendants' Exhibit 3) makes clear that the license fee charged to the University of Michigan is the sum of (i) the total subscription price of all the journals to which the University wishes to subscribe, plus (ii) an electronic access fee. In other words, the University pays what it would pay for a single print subscription to each of the journals, plus an electronic access fee, and thereby obtains simultaneous instant access for all of its users without having to buy additional print subscriptions for heavily used journals. In exchange, Wiley requires the University and its members to adhere to strict guidelines in how they use this service. (These will be discussed below.)

15. The statements in ¶15 are sweeping and partly inaccurate generalizations. Each of the Contracts must be examined separately.

16. Defendants' discussion of the Blackwell Agreement in ¶16 is accurate without being comprehensive. However, it has no bearing on the issue presented by this case.

17. Defendants' discussion of the Blackwell Agreement in ¶17, as it relates to coursepacks, omits a critical detail. Section 4.5 of the Blackwell Agreement forbids "Commercial Use," which §1.2 defines as "[u]se for the purpose of monetary reward

6

(whether by *or for* the Licensee or an Authorized User) by means of the sale, resale, loan, transfer, hire or other form of exploitation of the Licensed Materials." (emphasis added) Thus, the Blackwell Agreement does not allow an Authorized User to be the beneficiary of any use that is for monetary reward.

18. Defendants' discussion of the Wiley Agreement is incomplete and seriously misleading. What the Wiley Agreement actually says about coursepacks is this:

> Authorized Users who are members of the Licensee's [i.e., the University's] *faculty or staff* may download and print out multiple copies of material from Licensed Electronic Products for the purpose of making a multi-source collection of information for classroom use (course-pack) to be distributed to students at the Licensee's institution *free of charge or at a cost-based fee*. [§C(1)(d), emphasis added]

By negative implication, coursepacks made off the Licensee's premises in a for-profit context are forbidden. Indeed, the Wiley Agreement specifically forbids any distribution of licensed material for use in any commercial enterprise. *Id.*, §C(2).

19. Plaintiffs accept the statements made in ¶19.

20. Without necessarily accepting defendants' gratuitous characterization of the grant of rights under the Elsevier Agreement as "broad," plaintiffs agree that ¶20 is generally accurate so far as it goes. However, the Elsevier Agreement specifically does not allow Authorized Users to "substantially or systematically reproduce, retain or redistribute the Licensed Products."

21. Defendants' discussion of the OUP Agreement is inaccurate and misleading. The provisions of the OUP Agreement that are pertinent to coursepacks are:

- §3.1.3, which allows students to print out (i.e., from their computers accessing the database) "single copies of portions of the Licensed Works," and

7

- §3.2, which allows the University – but not anyone else – to "incorporate portions of the Licensed Works into printed Course Packs…but not for Commercial Use [defined in the same manner as in the Blackwell Agreement]."

Thus, the OUP Agreement does not allow coursepacks to be made in a commercial setting, and certainly does not allow students to photocopy in a commercial venue materials that they themselves have not downloaded from the University's secure network.

22. For the reasons stated above, ¶22 is incorrect.

23. The only facts in ¶23 to which defendants are competent to testify are what Excel charges per page, and defendants' statement on that score is ambiguous. (What does it mean to charge "about 7-8 cents" per page? What would cause variations in price?) The last sentence of ¶23 is based on a web page, which appears to be some sort of official document, but all the document states is that the University of Michigan library has an "$18m collection budget." Such a budget could cover a multitude of things – magazines, rare books, and so on – having nothing to do with the publications of plaintiffs or any other scholarly publishers. The rest of what is in the last sentence of ¶23 is speculation on defendants' part. Everything else in ¶23 is unsupported by any competent testimony or documentation and plaintiffs do not accept its accuracy.

24. Plaintiffs accept for present purposes Miller's allegation that he read "a variety of legal materials." Defendants' characterization of the contents of those materials, however, is not fact but legal argumentation. It is also highly misleading. What Miller purported to "note" is quite contrary to the spirit and the letter of the oral

argument before the original panel in the *Michigan Document Services* case (see defendants' Exhibit 7, at pp. 29-33).

### 2. Additional Material Facts

As noted above, the Contracts have no bearing whatever on 31 of the 40 works identified in the Amended Complaint. The Contracts deal almost entirely with scholarly journals. Only nine of the works identified in the Amended Complaint are journals; all the rest are books. The Wiley Agreement (defendants' Exhibit 3) does include certain books, listed in Appendix G(a) to such Agreement, but the Wiley books identified in the Amended Complaint (items 38-41 on the attached Exhibit B) are not among them. Of the nine journals copied, one (Blackwell's *Criminology and Public Policy*) is not governed by the Blackwell Agreement. This leaves only eight works that are even potentially subject to defendants' argument.

All this was plain on the face of the evidence. Furthermore, plaintiffs' counsel pointed it out to defendants' counsel in writing on November 16, 2007, more than two weeks before defendants filed their summary judgment papers. See Exhibit C hereto. Yet defendants' summary judgment papers make no reference to it, and indeed seem crafted to create the impression that the contract argument applies to everything at issue in this case – whereas in fact it applies, even potentially, to only 20%.

Plaintiffs wish to bring to the Court's attention the following additional information:

1. Despite defendants' protestation that they do not "sell" coursepacks, their customers do not share this perception. Attached hereto as Exhibit D are pages from University of Michigan course syllabi in which professors advise their students that their

9

courespacks are for "sale" at Excel. In fact, defendants do sell coursepacks because they pass title to such objects upon payment.

2. Defendants' unusual business model appears to be quite successful. Without discovery, plaintiffs cannot say what portion of Excel's business relies on coursepacks, but it seems to attract a large clientele. (See newspaper story attached hereto as Exhibit E.)

3. Without discovery, plaintiffs cannot determine exactly what competitive advantage Excel gains from having students do the button-pushing at its photocopy machines. But the newspaper story cited above suggests that Excel's competitors charge more because they pay copyright fees. In other words, Excel attracts business by not paying copyright fees, and students are so eager to save money that they will stand in line to operate defendants' copying machines.

4. The percentages of plaintiffs' works that have been copied by defendants are set out in Exhibit B to this Response.

Respectfully submitted,

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC.,
JOHN WILEY & SONS, INC.,

Plaintiffs,

By their Attorneys:

KOTIN, CRABTREE & STRONG LLP

Dated: January 25, 2008
By: /s/ William S. Strong
/s/ Amy C. Mainelli Burke
William S. Strong, Esq., BBO #483520
Amy C. Mainelli Burke, Esq., BBO#657201
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, MA 02114
(617) 227-7031
(617) 367-2988 (fax)

Local Counsel:

Claudia Rast (P40165)
Karl V. Fink (P13429)
Cynthia M. York (P39722)
Pear, Sperling, Eggan & Daniels, P.C.
24 Frank Lloyd Wright Drive
Ann Arbor, Michigan 48105
(734) 665-4441
(734) 665-8788 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on January 25, 2008, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will send notification of such filing to the following:

- Karl V. Fink   kfink@psedlaw.com,rhobbs@psedlaw.com
- Susan M. Kornfield   skornfield@bodmanllp.com,mpoupard@bodmanllp.com
- Alan N. Harris   aharris@bodmanllp.com,lhignite@bodmanllp.com

s/Amy C. Mainelli Burke
Amy C. Mainelli Burke, Esq.
Kotin, Crabtree & Strong, LLP
One Bowdoin Square
Boston, MA 02114
Telephone:   (617) 227-7031
Facsimile:   (617) 367-2988
Email: aburke@kcslegal.com