# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC., and
JOHN WILEY & SONS, INC.,

Civil Action No. 07-CV-12731

                    Plaintiffs,

Hon. Avern Cohn

vs.

Mag. Morgan

EXCEL RESEARCH GROUP, LLC d/b/a
EXCEL TEST PREPARATION,
COURSEPACKS, & COPIES and
NORMAN MILLER, individually,

                    Defendants.

_____/

## **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Fed.R.Civ.P. 56, plaintiffs Elsevier, Inc., Oxford University Press, Inc., Sage Publications, Inc. and John Wiley & Sons, Inc. (hereinafter "Plaintiffs"[1]) hereby move for partial summary judgment regarding Defendants' liability for infringement of the thirty-four copyrighted works identified on Exhibit A to Plaintiffs' Statement of Undisputed Facts submitted herewith (Counts 3-5, 7-22, 24-37, and 41 of Plaintiffs' Amended Complaint). Plaintiffs do not seek summary judgment on the other counts of the Amended Complaint at this time, and do not seek summary judgment as to damages at this time.

---

[1] As stated in the Declaration of Roy Kaufman submitted herewith, Blackwell Publishing, Inc., a named plaintiff, has ceased to have a separate corporate existence apart from plaintiff John Wiley & Sons, Inc.

As grounds for their motion, Plaintiffs state as follows:

1. Plaintiffs publish, and own copyright in, the books and scholarly journals identified on Exhibit A to their Statement of Undisputed Facts.

2. Numerous coursepacks manufactured at defendants' store, for use by University of Michigan students, contain unauthorized reproductions of the book chapters and journal articles that plaintiffs own and publish and that are identified in the Counts enumerated above.

3. Defendants are liable either for infringement of plaintiffs' copyright in said works, either because they have infringed plaintiffs' exclusive right of reproduction under 17 U.S.C. §106(1) through the unauthorized manufacture of coursepacks at the Excel copy shop, or because they have infringed plaintiffs' exclusive right of distribution under 17 U.S.C. §106(3) through the unauthorized rental of plaintiffs' material to defendants' student customers.

4. With respect to these thirty-four works, which defendants admit were included in Excel coursepacks, plaintiffs are entitled to summary judgment for liability.

5. In support of their motion, Plaintiffs rely on the Declarations of Barbara Cohen, Roy Kaufman, Paul Doda, Sara Van Valkenberg, and William S. Strong that are Exhibits to this Motion, on Plaintiffs' Statement of Undisputed Facts in Support of their Motion for Partial Summary Judgment submitted herewith, and on the accompanying Brief in Support of Plaintiffs' Motion for Partial Summary Judgment.

6.  Pursuant to Local Rule 7.1, Plaintiffs' counsel has communicated with Defendants' counsel as to the nature of this motion and Defendants do not consent to entry of partial summary judgment.

WHEREFORE, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Partial Summary Judgment with respect to Defendants' liability for copyright infringement as to the thirty-four copyrighted works identified on Exhibit A to Plaintiffs' Statement of Undisputed Facts, with damages to be determined upon further submission.

Respectfully submitted,

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC.,
JOHN WILEY & SONS, INC.,

Plaintiffs,

By their Attorneys:

KOTIN, CRABTREE & STRONG LLP

/s/ William S. Strong

Dated: June 29, 2009    By: __/s/ Amy C. Mainelli Burke_____
William S. Strong, Esq., BBO #483520
Amy C. Mainelli Burke, Esq., BBO#657201
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, MA 02114
(617) 227-7031
(617) 367-2988 (fax)


Local Counsel:

Claudia Rast (P40165)
Karl V. Fink (P13429)
Cynthia M. York (P39722)
Pear, Sperling, Eggan & Daniels, P.C.

24 Frank Lloyd Wright Drive
Ann Arbor, Michigan 48105
(734) 665-4441
(734) 665-8788 (fax)

## CERTIFICATE OF SERVICE

I, Amy C. Mainelli Burke, hereby certify that the foregoing Motion for Partial Summary Judgment, the Exhibits thereto and Plaintiffs' Statement of Undisputed Facts were filed with the Clerk of Court through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent by first class mail to those indicated as non registered participants on June 29, 2009.

/s/ Amy C. Mainelli Burke
Amy C. Mainelli Burke

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC., and
JOHN WILEY & SONS, INC.,

                              Plaintiffs,

vs.

EXCEL RESEARCH GROUP, LLC d/b/a
EXCEL TEST PREPARATION,
COURSEPACKS, & COPIES and
NORMAN MILLER, individually,

                              Defendants.
_____/

Civil Action No. 07-CV-12731

Hon. Avern Cohn

Mag. Morgan

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
MOTION FOR PARTIAL SUMMARY JUDGMENT**

## ISSUES PRESENTED

I.     Whether defendants have engaged in infringement of plaintiffs' copyrights, and specifically plaintiffs' exclusive right of reproduction under 17 U.S.C. §106(1), where:

1.     There is no dispute that reproduction of plaintiffs' works, without plaintiffs' permission, occurred on defendants' premises;

2.     Defendants supplied the masters used in creating such copies;

3.     Defendants supplied the machines, paper, and utilities used in making such copies;

4.     Defendants often provided the additional service of binding such copies in covers bearing their own trademark; and

5.     Defendants' employees assisted their customers as necessary in using the copy machines, and

6.     The only contribution of defendants' student customers to the manufacture of coursepacks was to push the button that caused defendants' machines to make the copies.

II.     Whether defendants have engaged in infringement of plaintiffs' copyrights, and specifically plaintiffs' exclusive right of distribution under 17 U.S.C. §106(3), where defendants have, in exchange for payment, lent coursepack masters to customers enabling customers to reproduce plaintiffs' copyrighted works on defendants' photocopying machines.

# CONTROLLING AUTHORITIES

The controlling authority in this case, with respect to defendants' unauthorized reproduction of plantiffs' copyrighted materials, is *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, (6th Cir. 1996).

With respect to defendants' unauthorized distribution of plaintiffs' copyrighted materials, the controlling authorities are:

*Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 300 (3d Cir.), *cert. denied*, 502 U.S. 939 (1991); and

*Brilliance Audio, Inc. v. Haights Cross Communs., Inc.*, 474 F.3d 365, 373 (6th Cir. Mich. 2007).

# INTRODUCTORY STATEMENT

This case concerns "coursepacks." A coursepack is a collection of readings designed by a professor specifically for use by students in a particular course. Defendants run a business that provides coursepacks to students at the University of Michigan.

Plaintiffs publish, and own copyright in, books and scholarly journals. They have sued defendants for copyright infringement because numerous coursepacks manufactured at defendants' "Excel" store, for use by U. of M. students, contain unauthorized reproductions of book chapters and journal articles that plaintiffs own and publish.

Since the *en banc* decision in *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381 (6th Cir. 1996) ("*MDS*"), it has been settled law in this Circuit – and for all practical purposes, throughout the country[1] – that the commercial reproduction of coursepacks requires permission of the owners of copyright in the contents of those coursepacks. Defendants however imagine that they have found a loophole in *MDS*, or a way around *MDS*. It consists of this: although defendants supply the masters for coursepacks, and supply the machines and paper and infrastructure for the reproduction of coursepacks from those masters, and assist students in the use of the machines – and although defendants charge for all of these things – it is their customers who actually push the buttons on defendants' photocopy machines. Defendants therefore claim it is not *they* who copy, but merely innocent students, and that such copying must

---

[1]  To the best knowledge of undersigned counsel, there has been no reported decision anywhere in the country on this topic since *MDS*. Prior to *MDS* there was only one other decision on the topic, and it too held unequivocally for the copyright holders. *See Basic Books, Inc. v. Kinko's Graphics Corp*, 758 F.Supp. 1522 (S.D.N.Y. 1991).

therefore be lawful.  By this disingenuous expedient, defendants consider themselves free to make money from coursepacks with no care for the copyright in what is reproduced.

This is simply a sham, and it must be brought to an end.

## SUMMARY OF FACTS

The facts upon which this motion rests are set forth in Plaintiffs' Statement of Undisputed Facts submitted herewith. Very briefly, the main points are as follows:

1. Defendants operate a coursepack business in Ann Arbor, Michigan under the name "Excel Test Preparation, Coursepacks & Copies," which will be referred to here as "Excel." Their customers are students at the University of Michigan.

2. A student wishing to obtain a copy of a coursepack must go to the front desk at Excel and pay the pre-set fee for a copy, whereupon Excel will hand over the coursepack master to the student.

3. The student takes the master to one of Excel's copy machines, located on the same premises.

4. Excel employees help set up the machine for the student, instruct the student in the use of the machine, and are present while the copying occurs, assisting the student as necessary.

5. Defendants supply the machines, the paper, the electricity – in short, the entire infrastructure – with which the copy is created.

6. In over half of all cases, Excel for an additional fee binds the copy that the student has made.

7. The only thing the student does is push the button that causes the machine to make a copy. As defendants put it in their own advertising, "We set up the equipment and [the students] press the START button."

8.      In this manner, Excel produced coursepacks that included reproductions of material from at least 34 copyrighted works owned by plaintiffs and identified in plaintiffs' Amended Complaint.

9.      Defendants at no time obtained, or even sought, permission for such reproduction, or paid any license fee for such reproduction.

10.     Defendants, indeed, at all relevant times advertised that their coursepacks cost less than coursepacks sold by their competitors precisely because copyright fees were not paid.

## ARGUMENT

Summary judgment should be granted where the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Williams v. Leatherwood*, 258 Fed. Appx. 817, 820 (6th Cir. 2007).

In order to maintain a copyright infringement action, a plaintiff must show (1) ownership of the copyright(s) at issue, and (2) unauthorized reproduction, distribution, or other use of the copyrighted work(s) in violation of the plaintiff's exclusive rights under 17 U.S.C. §106. *Stromback v. New Line Cinema*, 384 F.3d 283, 293 (6th Cir. 2004). In this case, there is no dispute

- That plaintiffs own copyright in the works at issue in this motion;

- That portions of plaintiffs' copyrighted works were reproduced at defendants' "Excel" shop in Ann Arbor in the coursepacks identified in the Amended Complaint.

- That plaintiffs did not authorize the inclusion of the works in such coursepacks.[2]

The only dispute, therefore, arises from defendants' claim that they are not liable for reproduction that occurred on their premises.

As will be shown, that claim rests on a sophistry. Defendants' business is set up to reproduce copyrighted works for profit, using students as proxies to push the buttons on defendants' copying machines. Defendants are the real produc ers of the coursepacks

at issue here. But as plaintiffs will show, if defendants escape liability for reproduction by making their customers "push the START button," they are instead liable for a different sort of infringement, because in that event they engage in unauthorized rental or lending of plaintiffs' materials. This case, therefore, is not about "student copying," as defendants try to claim. It is about commercial infringement, whether of one type or the other.

## I.  Defendants Have Themselves Infringed Plaintiffs' Exclusive Right of Reproduction.

The reproduction of coursepacks at defendants' Excel shop in Ann Arbor is indistinguishable, as a matter of law, from the reproduction at issue in *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381 (6th Cir. 1996) (hereinafter "*MDS*"). In *MDS*, the Sixth Circuit held an Ann Arbor copy shop liable for infringement because it reproduced coursepacks containing copyrighted material, without permission, and sold them to University of Michigan students.

The only factual difference here is that the students "push the START button" that causes Excel's machines to manufacture the coursepacks. But for that, defendants would be guilty of infringement beyond any question. Defendants claim, however, that having the student push the START button allows them to escape the rule of *MDS*. This is a distinction without a difference.

Defendants assert that only students "make" copies of plaintiffs' copyrighted materials. The copies, however, result almost entirely from the efforts and investment of defendants, with very minor assistance from their student customers. Students may be the ones who stand in front of the copying machines, pushing the START button. But

---

[2]  See Statement of Facts, ¶¶ ▓▓▓▓.

defendants control the entire process. Defendants keep the masters, maintain their quality, and lend them out only upon receipt of payment. They own, and supply, all other elements of the reproduction: the venue, the machines, the paper, the utilities. They set up the machines for each student to facilitate the copying, they train the students how to use the machines, and they hover around, assisting students in using the machines. They also, more than half the time, bind the copied pages together for the students' added convenience. These bound copies go out the door with Excel's trademark on them.

Defendants are thus engaged in an elaborate effort to reproduce plaintiffs' materials on a commercial basis without paying copyright fees – an effort in which their customers serve as proxies, performing a minor task that defendants' employees would otherwise perform. To pretend that defendants are not, in fact, reproducing plaintiffs' materials on a commercial basis is to elevate form, indeed pretense of form, over substance.

Plaintiffs have been unable to find any case quite like this in the case law – probably because the proffered defense is so plainly without merit. But plaintiffs note that in the field of music copyright, Congress assumed in crafting the Copyright Act that the owners of jukeboxes placed in public areas would be liable for unauthorized performance of music even though the jukeboxes would not perform anything unless a private customer caused them to do so by inserting money into the machine. *See* 17 U.S.C. §116; *Broadcast Music, Inc. v. Xanthas, Inc.*, 674 F.Supp. 553 (E.D.La.1987), *aff'd in relevant part*, 855 F.2d 233 (5th Cir.1988). And in *Columbia Pictures, Inc. v. Redd Horne, Inc.*, 749 F.2d 154 (3d Cir.1984), the defendant ran a theater where patrons could rent movies and view them in small booths; the defendant argued that these were

all private performances for which it could not be liable. The Third Circuit looked past the form of the undertaking to the effect, and found infringement.

It is important to bear in mind that we are not dealing here with "walk-up" business. We are not dealing with students who, say, borrow coursepacks from their friends, and *happen* to come into Excel's shop and, without Excel's encouraging them or having any reason to know what they are up to, make copies quietly on a machine off in the corner. Such copies might well be illegal, and defendants might be liable for them, but that is a hypothetical question.[3] What plaintiffs sue on here are copies methodically made strictly in furtherance of Excel's corporate business purposes.

By not charging copyright fees for plaintiffs' material, defendants have managed to undercut the prices of their competition. This is not a coincidence; defendants advertise the fact to U of M professors. (Stmt of Undisp.Facts, ¶¶25-26.) The professors, responding to the lower price, give Excel their coursepack masters. The students then come to where the masters are, in order to get their coursepacks. The students are not autonomous actors; they have no choice but to go to Excel, and they have to play their bit part in the act – pushing the START button – under the watchful eye of Excel employees. Defendants control the entire process of reproduction from start to finish. To call this "student copying" is absurd. It is but a copyright-evasion charade, carefully organized and executed by defendants, with the students as secondary participants.

_____

[3] In *MDS* the Sixth Circuit said the following:
> As to the proposition that it would be fair use for the students or professors to make their own copies, the issue is by no means free from doubt.

*Id.* at 1389. Certainly, systematic and high volume copying by students would be far outside the Classroom Guidelines discussed with approval in *MDS,* 99 F.3d at 1390-91. If the students' copying was not fair use, then defendants might well be vicariously liable for it. *See Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 307 (2d Cir. 1963); *Gordon v. Nextel Comm'n,* 345 F.3d 922, 925 (6th Cir.2003).

## II. Alternatively, Defendants Have Infringed Plaintiffs' Exclusive Right of Distribution.

Assuming one were to accept, for purposes of argument, the notion that students "made" the coursepacks at issue here, defendants are still liable for infringement, but of a different facet of plaintiffs' copyright: namely, plaintiffs' exclusive right of distribution under 17 U.S.C. §106(3).

One can treat the students as "making" the copies at issue here only by drawing a line (an imaginary line, as plaintiffs have shown above) between the actions of Excel and the actions of its customers. Under that construct, the customer acts autonomously in making a copy once he or she has obtained the master from Excel.

But there's the rub. If Excel's role ends when it hands over the master, then it must be judged solely by its own conduct. The act of handing over the master assumes a separate legal significance. And that act is a commercial, public distribution.

Section 106(3) of the Copyright Act gives the copyright owner the exclusive right

> to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.

The delivery of a coursepack master to a student is an act of "rental" or "lending." Because it is an arm's length transaction, in exchange for payment, it is a rental or lending "to the public." *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 300 (3d Cir.), *cert. denied*, 502 U.S. 939 (1991) (unauthorized distribution to even one person is a public distribution).[4]

The illegality of defendants' conduct is underscored by Section 109(a) of the Copyright Act, which carves out a very limited exception to the public distribution right.

Section 109 permits the *owner* of a copy that has been made and sold by the copyright owner to rent or lend that copy. This is generally referred to as the "first sale" doctrine, as explained by the Sixth Circuit in the following words:

> This bargain, first developed in the common law ... and later codified in the first sale doctrine, 17 U.S.C. §109(a), provides that once a copyright owner consents to release a copy of a work to an individual (by sale, gift, or otherwise), the copyright owner relinquishes all rights to that particular copy").

*Brilliance Audio, Inc. v. Haights Cross Communs., Inc.*, 474 F.3d 365, 373 (6th Cir. Mich. 2007). As further explained in Nimmer and Nimmer, *Nimmer on Copyright*, §812[B][1] (Matthew Bender, 2009 rev. ed.):

> The appropriate lines of inquiry should be:
>
> (a) was the subject physical product (the "copy") lawfully manufactured with authorization of the copyright owner;
> (b) was that particular copy transferred under the copyright owner's authority;
> (c) does defendant qualify as the lawful owner of that particular copy; and
> (d) did defendant thereupon dispose of that particular copy...

If a defendant cannot satisfy each of the first three criteria, then he cannot invoke the first sale doctrine, and he has committed an infringement of the copyright owner's distribution right. *Id.* In the present case,

> (a) the physical product – the coursepack master – was not lawfully manufactured with authorization of the copyright owner;
>
> (b) the master was not transferred to defendants under the copyright owner's authority, and

---

[4] *See also Columbia Pictures, Inc. v. Redd Horne, Inc.*, *supra* (company engaged in public performance even though each showing of film by its customers was in a private booth on its premises).

(c) defendants were not even the owners of the masters; the masters belonged to

the professors.[5]

Therefore, the rental or lending to students of each work identified in the Amended

Complaint was a violation of the publisher's exclusive right under §106(3).

Needless perhaps to add, it does not matter that the end result of such commercial

lending was to put educational materials in the hands of students. Under the rule of *MDS*,

the educational end use by a copy shop's customers does not alter the commercial nature

of the copy shop's use. 99 F.3d at 1386. If the law were otherwise, then even the sale of

counterfeit copies of plaintiffs' books for educational use would be lawful.

Thus, even if one accepts *arguendo* the sophistical notion that it is the student

who makes the coursepack, not Excel, defendants are nevertheless liable for copyright

infringement.

Therefore this case is not, under any scenario, about "student copying." Either

defendants are liable for reproduction of coursepacks, because they organized, controlled,

and largely carried out such reproduction themselves, or they are liable for unauthorized

distribution of plaintiffs' copyrighted materials, because they lent or rented the masters to

their student customers. Thus, the "fair use" defense that defendants have raised in their

Answer and their prior unsuccessful summary judgment motion – based on their theory

that "student copying" is fair use – has no bearing here. Plaintiffs do not accept that

orchestrated, wholesale copying of their materials would qualify as fair use in any event,

but for purposes of this case the defense of fair use is irrelevant.

---

[5] Plaintiffs' Statement of Undisputed Facts, ¶19.

## CONCLUSION

Defendants are liable for infringement of the thirty-four works identified on Exhibit A to Plaintiffs' Statement of Undisputed Facts. Their liability is either for infringement of plaintiffs' exclusive right of reproduction, through the manufacture of coursepacks at the Excel copy shop, or for infringement of plaintiffs' exclusive right of distribution, through the rental of plaintiffs' material to defendants' student customers.

With respect to these thirty-four works, plaintiffs are therefore entitled to summary judgment for liability.

Respectfully submitted,

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC.,
JOHN WILEY & SONS, INC.,

Plaintiffs,

By their Attorneys:

KOTIN, CRABTREE & STRONG LLP

/s/ William S. Strong
Dated: June 29, 2009        By:  /s/ Amy C. Mainelli Burke
                            William S. Strong, Esq., BBO #483520
                            Amy C. Mainelli Burke, Esq., BBO#657201
                            KOTIN, CRABTREE & STRONG, LLP
                            One Bowdoin Square
                            Boston, MA 02114
                            (617) 227-7031
                            (617) 367-2988 (fax)

Local Counsel:

Claudia Rast (P40165)
Karl V. Fink (P13429)
Cynthia M. York (P39722)
Pear, Sperling, Eggan & Daniels, P.C.
24 Frank Lloyd Wright Drive
Ann Arbor, Michigan 48105
(734) 665-4441
(734) 665-8788 (fax)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC., and
JOHN WILEY & SONS, INC.,                    Civil Action No. 07-CV-12731

                Plaintiffs,    Hon. Avern Cohn

vs.
                              Mag. Morgan

EXCEL RESEARCH GROUP, LLC d/b/a
EXCEL TEST PREPARATION,
COURSEPACKS, & COPIES and
NORMAN MILLER, individually,

                Defendants.

_____/

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF THEIR
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs respectfully submit, in support of their Motion for Partial Summary
Judgment, the following statement of facts they believe to be not in dispute in this case.

***The Parties***

1.    Plaintiff Blackwell Publishing, Inc. ("Blackwell"), formerly a Delaware
corporation and a subsidiary of plaintiff John Wiley & Sons, Inc., has ceased to have a
separate corporate existence. Declaration of Roy Kaufman (hereinafter "Kaufman
Decl."), ¶ 1.

2.      Plaintiff Elsevier, Inc. ("Elsevier) is a New York corporation. Declaration of Paul Doda (hereinafter "Doda Decl."), ¶ 1.

3.      Plaintiff Oxford University Press, Inc. ("OUP") is a Delaware non-profit corporation headquartered in New York City. Its parent organization is the University of Oxford, a public university located in Oxford, England. Declaration of Barbara Cohen (hereinafter "Cohen Decl."), ¶ 1.

4.      Plaintiff SAGE Publications, Inc. ("SAGE") is a Delaware corporation headquartered in Thousand Oaks, California. Declaration of Sara van Valkenburg (hereinafter "Van Valkenburg Decl."), ¶ 1.

5.      Plaintiff John Wiley & Sons, Inc. ("Wiley") is a New York corporation headquartered in Hoboken, New Jersey. Kaufman Decl., ¶ 1.

6.      Defendant Excel Research Group, LLC ("Excel") is a Michigan limited liability company located in Ann Arbor, Michigan. It does business under the name "Excel Test Preparation, Coursepacks & Copies." Admitted – see Answer to Amended Complaint (Docket Entry #12), ¶6.

7.      Defendant Norman Miller ("Miller") is the owner and an officer of defendant Excel, and as such had and has the power and authority to direct the actions of Excel. Admitted – see Answer to Amended Complaint (Docket Entry #12), ¶8.

*Plaintiffs' Copyrights*

8.      The works included in this Motion for Partial Summary Judgment are identified in Exhibit A hereto. They are all but seven of the works identified in the Amended Complaint. All works included in this Motion were registered in the United

2

States Copyright Office except those works identified as "Non-US Works," for which registration is not a prerequisite to suit. 17 U.S.C. ¶411.

9.     All registered works were registered within five years following first publication. Cohen Decl., ¶ 6; Kaufman Decl., ¶ 4;Van Valkenburg Decl., ¶6. Each registration is therefore *prima facie* evidence of the validity of the copyright and of all statements included in the registration, including those identifying the owners of copyright. 17 U.S.C. ¶410.

10.    Plaintiff Elsevier is the publisher, and owner of copyright in, the works identified in Exhibit A hereto as "Elsevier Items." Doda Decl., ¶ 3. At the time that such works were reproduced at Excel, Excel could have obtained a license to reproduce the portions that it reproduced, either directly from Elsevier or through CCC. *Id.*, ¶ 7.

11.    Plaintiff OUP is the publisher, and owner of copyright in, the works identified in Exhibit A hereto as "OUP Items." Cohen Decl., ¶ 3. At the time that such works were reproduced at Excel, Excel could have obtained a license to reproduce the portions that it reproduced, either directly from OUP or through CCC. *Id.*, ¶ 7.

12.    Plaintiff SAGE is the publisher, and owner of copyright in, the works identified in Exhibit A hereto as "SAGE Items." Van Valkenburg Decl., ¶¶ 3, 7. At the time that such works were reproduced at Excel, Excel could have obtained a license to reproduce the portions that it reproduced, either directly from SAGE or through CCC. *Id.*, ¶8.

13.    Plaintiff Wiley is the publisher, and owner of copyright in, the work identified in Exhibit A hereto as "Wiley Item." Kaufman Decl., ¶¶ 3, 4. At the time that

3

such work was reproduced at Excel, Excel could have obtained a license to reproduce the portions that it reproduced through CCC. *Id.*, ¶ 5.

### *Defendants' Business*

14.     Defendants at their shop known as "Excel" engage in three lines of business. Deposition of Norman Miller (hereinafter "Miller Dep."), pp.5- 7, 62-63, 91-93. Two of them –test preparation (i.e., preparing students for standard tests such as the LSAT), and ad hoc copy services – are not at issue here. The third line of business is coursepacks, and that is the basis of plaintiffs' Amended Complaint.[1]

15.     A coursepack is a collection of readings designed by a professor specifically for use by students in a particular course. A coursepack may include, for example, journal articles, excerpts from books, and perhaps other printed materials. Answer to Amended Complaint, ¶27.[2]

16.     Although defendants produced no documentation to indicate how much of their business lay in coursepacks, it is clear from Mr. Miller's testimony that coursepacks represent a plurality, probably a majority, of Excel's business. *Id.*

17.     Defendants currently handle approximately seventy University of Michigan coursepacks per semester. In the past, the number they handled was even higher than that. Miller Dep., p. 50.

18.     An Excel coursepack comes about in the following manner. First, a professor brings Excel photocopies for the contents of the coursepack – or creates photocopies using Excel's machines. These photocopies constitute the "master" of the

---

[1]   The pages cited here from the Deposition of Norman Miller are attached as, collectively, Exhibit A to the Declaration of William S. Strong submitted herewith.
[2]   *See also* the discussion of coursepacks in *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381 (6th Cir. 1996).

coursepack. Occasionally, Excel will re-copy something that is damaged or faint. Excel then numbers the pages of the master by hand. Miller Dep., pp.36-41. Defendants claim that "We also go to great lengths to maintain the integrity of the master, so that each student will receive a clear, high-quality copy." Miller Dep., p. 17 and Exhibit 1.

19.     Defendants do not assert ownership of the coursepack master. The master apparently belongs to the professors who created it. Miller Dep., pp. 50-52.

20.     A student wanting a copy of the coursepack will come to Excel's premises and pay Excel for the use of the master. In the following colloquy, defendant Miller described in his own words what occurs:

Q       If you walk in the door, what's the layout? What do you see when you walk in the door?
A       I'm not quite clear what you mean. Just a general--
Q       Well, is there a--are there photocopy machines out on the floor as you walk into the--
A       Okay. We are on the second floor, so as someone ascends the staircase, there is an arrow and it says, "Coursepacks," and directs them to travel around to the front counter, and then they meet with someone. The equipment is all on the other side of a half-level partition, if you will. So they come to the register before they go back.
Q       Okay. So they come to the counter?
A       Correct.
Q       And you keep the masters of the coursepacks behind the counter?
A       Yes.
Q       So then they take a coursepack and then they have to go around to another area? I'm sorry to be dense, I just--I want to understand. Is it a separate room that they go to to make the copies?
A       It's a separate area within the room. There's like a half-wall around that.
Q       Okay. So you can see over--
A       You can see over it, yes. And they first would, you know, fill out our form and then, you know, get the material that they're enrolled in.
Q       Okay. How many copy machines are there?
A       Working?
Q       At any one time, how many are working, right.
A       Right now, I'd say there's eight or nine that are working.
        We have more that have--you know, it's a problematic aspect that we have maybe four or five that aren't working, but, you know--
Q       You've mentioned a form, and I think that was one of the things I had asked you

to produce. Do we have a copy of that form here that the student fills out?

A    I don't personally have one, but--

\*\*\*\*\*

Q    What does the form say?

A    It has, you know, the course they're enrolled in, and then there is a short statement that says, "I am a student in this class and am making a copy for educational purposes," then they date it and sign it, and then we get the material that they are, you know, needing, and then send them over to the--what we call the service area, where they would be guided to a piece of copy equipment and told how to operate it successfully.

Q    Okay. So you have--the statement has a printed statement that, "I'm a student in this course and I'm doing this for educational purposes"?

A    Yes.

Q    Okay. So all they have to do is fill out the course and sign the statement?

A    They put their name and address, too, just as a--

Q    Okay. And how long do you retain those forms?

A    Usually, just for a semester or two. I've been keeping them for longer since the action, and so I have--

Q    Okay. So you have a person, then, at the front desk who has--who gives this form to the student. The student signs the form, hands it back to that person, is that correct?

A    The student fills out the form and hands it to the person at the front desk, correct.

Q    Front desk, okay. And then what happens? Does that same person at the front desk go and get the master?

A    Yes.

Q    Okay.

A    That's behind the front desk. And they would--the student would also pay for the, you know, use.

Q    Okay. So all that--all right. So I just want to make sure I understand. They get the master and they pay at the time that you hand them the master?

A    Yes.

Q    And so there's a fixed price for every coursepack?

A    It's per-page, yes.

Q    Okay. What do you mean, it's per page?

A    Well, a given coursepack would be fixed proportional to the number of pages in that--

Q    So you set the price depending on how many pages there are in it?

A    Correct.

Q    And is it always the same price per page?

A    Yes.

Q    And what price is that?

A    Well, there are a couple of different options. If they have it on plain paper, it's seven cents. If it's on paper that's got the holes in it, it's seven and a half cents. And then there is a fee for making a bound document, which is, essentially, a one cent per page charge but with a minimum for that.

\*\*\*\*\*

6

Q    Okay. So then they take the master and they go around to the other side of this
     half wall partition, and then you say you have another person or persons there
     who will help them work the machines?
A    Yes.
Q    How many people do you have on duty over in that area?
A    The number varies substantially. The beginning of a term there would be--we
     would use temporary help. Usually, there would be one person, sometimes the
     person that--later in the semester, the person that does the front counter would
     then do the other--
Q    When things are quiet?
A    Things are quiet. It's a small--
Q    Okay. So at a peak period, you would have how many people out on the floor
     there?
A    Again, it would vary, but I would say three or four.
Q    Okay. And their duties--I want to understand exactly what it is they do. The
     student comes to them bearing this master, and what's the interaction that they
     have with this person?
A    The person on the floor would describe to the student how the process works, to
     make sure that the student is able to successfully make a good copy and, also, not
     tear up the master.
Q    Okay.
A    Then the people on the floor also would do all of the mechanical things that
     copiers need as in adding paper, toner, removing jams and doing the binding.
Q    Okay. Oh, they do the binding, as well?
A    Yes, we do the binding.
Q    So, I mean--
A    The students do not do--
Q    --these people that are out on the floor do the binding?
A    Yes, yes.
Q    Okay. So that's not done behind the front desk?
A    No, see, the binding is done after they have copied something.
Q    Okay. Is there a separate machine for that?
A    There is a separate machine for that.
Q    What kind of binding is it?
A    It's like a book. It's a polymer adhesive, so it makes a--I mean, it's--I'm not sure
     quite how to describe it--
Q    Oh, I see.
A    It's a permanent type of binding. It makes it look like a paperback book, kind of.
*****
Q    Okay. Do you have any idea approximately how many--what percentage of the
     coursepacks that come out of your shop are bound?
A    That's a little hard to say. I would say more than half.

Miller Dep., pp.. 25-32

21.    In short, defendants supply the master, the machines, the paper, the electricity, the technical assistance – everything that goes into the manufacture of the coursepack copy, other than pushing the button on the photocopying machine. As defendants boast in their advertising, "We set up the equipment and [the students] press the START button." Miller Dep., p. 17 and Exhibit 1. Defendants are further involved by binding more than half of the coursepacks made at their shop. And for all this, defendants receive payment.

22.    All coursepacks that Excel binds also have a front cover bearing Excel's trademark, prominently identifying Excel as the source of the coursepack. Miller Dep., p. 31-32; for examples see Exhibit B to the Cohen Declaration.

23.    Defendants have never obtained copyright permission for the contents of any coursepack. Miller Dep., p..90-91.

24.    Despite defendants' protestation that they do not "sell" coursepacks, their customers do not share this perception. Attached as Exhibit B to the Strong Declaration are pages from University of Michigan course syllabi in which professors advise their students that their coursepacks are for "sale" at Excel.

25.    Defendants adopted the business model described above in a deliberate effort to get around copyright. From the beginning, they have touted their alleged avoidance of copyright as a virtue of their business. Miller Dep., p. 17 and Exhibit 1.

26.    Defendants specifically promote their coursepack model as saving money by avoiding copyright fees. They say:

> Since each student is making just one copy for his or her own individual use, no copyright permissions or royalty fees are involved... As a result, you have greater flexibility and convenience in selecting your readings and your students benefit by paying substantially less (generally saving 50% or more) for their coursepacks.

Miller Dep., Exhibit 1. In short, defendants have deliberately sought to drive business to their shop by their copyright-evasion scheme. They have at the same time sought to take business away from shops that *do* go to the bother of getting copyright permission for their coursepacks.

27.     At no time prior to the initiation of this lawsuit did defendants seek legal advice as to the validity of their claims. Miller Dep., p.16.

### *Unauthorized Reproduction of Plaintiffs' Materials*

28.     Plaintiffs' seek summary judgment at this time as to thirty-four book excerpts and journal articles that have been reproduced in Excel coursepacks.[3] Defendants have admitted to all of these. Miller Dep., pp. 78-83 and Exhibit 3.[4] Thus, as to these thirty-four copyrighted works there is no dispute that they were reproduced in whole or in part in Excel coursepacks. These works are identified on Exhibit A hereto.

29.     The excerpts reproduced from plaintiffs' copyrighted works consist of entire journal articles, and entire chapters of books – in many cases well over 10% of the books from which they are taken. The percentages that they represent of the works from which they are taken are set forth on Exhibit A.

30.     In reviewing coursepacks that were not known to them when the Amended Complaint was filed, but were produced in discovery, plaintiffs have identified numerous other publications of theirs that were copied in the same manner as described above. See Cohen Decl., ¶10; Kaufman Decl., ¶¶ 7-8;   For example,

---

[3] As noted below, plaintiffs have through discovery identified yet more infringed works, but these have not been formally added to case as of this date.
[4]   With respect to a fourth work, defendants admit that some but not all portions identified by plaintiffs were reproduced. *Id.*

a.    The coursepack for Environment 449, Winter 2009 (Professor Romani)

contains the following:

- 17 different excerpts from Wiley's journal *Public Administration Review*, including multiple excerpts from several issues;
- two chapters, constituting 57 pages, from Wiley's book *Understanding and Managing Public Organizations*, 3rd ed., by Hal G. Rainey, and
- an article from Wiley's *Journal of Policy Analysis and Management*, Vo. 21, No. 4.

Kaufman Decl., ¶ 7.

b.    The coursepack for Political Science 389-005/German 302, Winter 2009

(Professor Rensmann) contains Chapters 5 and 6 in Pulzer, *German Politics 1945-*

*1995* (Oxford University Press 1995), pp 90-128.  See Ex. B to Cohen Decl., ¶10.

Plaintiffs will seek to amend the Complaint at the appropriate time to add these works to

the case.

31.    As noted above, defendants never sought permission for reproduction of

any of plaintiffs' materials in coursepacks.

32.    Defendants, in their summary judgment motion filed in December, 2007,

have asserted that plaintiffs' license agreements with the University of Michigan Library

authorized the reproduction identified in the Amended Complaint. (The license

agreements are reproduced as Exhibits to Defendants' Motion for Summary Judgment,

Docket Entry #16.)  However, this is not correct.  Specifically:

a.    The Elsevier agreement (defendants' Exhibit 5, Docket Entry 16-7) covers

the journals identified in items 3-7 on Exhibit A hereto.  It allows students

to print and download excerpts from the Elsevier database.  It does not,

however, grant permission for any other kind of reproduction, such as

offsite photocopying – and it specifically says that all rights in the

database remain with Elsevier "except as expressly set forth in this Agreement." (*Id.*, §1.5)  Moreover, the Elsevier Agreement specifically says that Authorized Users may not "substantially or systematically reproduce, retain or redistribute the Licensed Products." *Id.*, §1.4.3.  Yet defendants' business relies on precisely such conduct.

b.  The OUP agreement (defendants' Exhibit 6, Docket Entry 16-8) covers journals only, not books.  All the OUP works identified in the Amended Complaint (items 8-22, 24, 26-28 on Exhibit A hereto) are books.  In so saying OUP does not concede that the aforesaid agreement would authorize reproduction of journal contents in Excel coursepacks; that issue is simply not relevant here.

c.  The SAGE agreement (defendants' Exhibit 4, Docket Entry 16-6) became effective on December 30, 2006, after all the SAGE infringements identified in the Amended Complaint had occurred.  There was no agreement in effect between SAGE and the University prior to that date.  Van Valkenburg Decl., ¶ 11.  In so saying SAGE does not concede that the aforesaid agreement would authorize reproduction of SAGE journal contents in Excel coursepacks; that issue is simply not relevant here.

d.  The Wiley agreement (defendants' Exhibit 3 – Docket Entry 16-5) at Section C ("Terms and Conditions of Use"), allows Authorized Users to "download, view, copy and save to hard disk or diskette and store or print out" single copies of individual articles and chapters (Paragraph C(1)(a)), and allows U of M faculty to make coursepacks "to be distributed to

11

students … free of charge or at a cost-based fee" (Paragraph C1(d)).  In Paragraph 2 of Section C, the agreement specifically says that "[e]except as provided in Paragraph C(1) above, Authorized Users may not copy, distribute, transmit orotherwise reproduce material from [the licensed products].  Thus the Wiley agreement, like the other license agreements between plaintiffs and the University, in no way authorizes what has gone on at Excel.[5]

Respectfully submitted,

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC.,
JOHN WILEY & SONS, INC.,

Plaintiffs,

By their Attorneys:

KOTIN, CRABTREE & STRONG LLP

Dated: June 29, 2009     By:    /s/ William S. Strong
                 /s/ Amy C. Mainelli Burke
William S. Strong, Esq., BBO #483520
Amy C. Mainelli Burke, Esq., BBO#657201
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, MA 02114
(617) 227-7031
(617) 367-2988 (fax)

---

[5] The Blackwell agreement is, technically, not at issue here because no Blackwell work is included in the present Motion for Partial Summary Judgment.  However, that agreement (defendants' Exhibit 2) expressly forbids "Commercial Use" of those journals, which it defines as "[u]se for the purpose of monetary reward (whether by *or for* the Licensee or an Authorized User) by means of the sale, resale, loan, transfer, hire or other form of exploitation of the Licensed Materials." (emphasis added).  Thus, the Blackwell Agreement does not allow an Authorized User to be the beneficiary of any use from which any person receives monetary reward.

Local Counsel:

Claudia Rast (P40165)
Karl V. Fink (P13429)
Cynthia M. York (P39722)
Pear, Sperling, Eggan & Daniels, P.C.
24 Frank Lloyd Wright Drive
Ann Arbor, Michigan  48105
(734) 665-4441
(734) 665-8788 (fax)

# EXHIBIT A

**Exhibit A to Plaintiffs' Statement of Undisputed Facts**

**List of Infringed Items Showing Percentages that Copied Pages Represent of the Original Works**

| Count No. | Course | Book/Journal Name | Chapter/Article Name | Book/Article Author | Pub Yr | Page Range | Pages in Entire Work | % Copied | Copyright Reg. No. |
|---|---|---|---|---|---|---|---|---|---|
| **Blackwell Item:** | | | | | | | | | |
| 1 | | | NOT INCLUDED IN MOTION –see Kaufman Declaration ¶ 3 | | | | | | |
| 2 | | | NOT INCLUDED IN MOTION –see Kaufman Declaration ¶ 3 | | | | | | |
| **Elsevier Items:** | | | | | | | | | |
| 3 | SPP 692/UP 598 Fall 2004 | Journal of Criminal Justice | Abandoned Buildings: Magnets for Crime? | Spelman, William | 1993 Vol. 21 | 481-495 | N/A Defendants copied entire journal article. | 100% | None, non U.S. Work |
| 4 | SI 551/751 Winter 2005 | Information Processing & Management | Information Behaviour: An interdisciplinary perspective | Wilson T.D. | 1997 33(4) | 551-572 | N/A Defendants copied entire journal article. | 100% | None, non U.S. Work |

| # | Course/Term | Publication | Title | Author | Year | Volume | Pages | Notes | % | Copyright |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 | SI 551/751 Winter 2005 | Information Processing & Management | Material Mastery: Situating Digital Library Use in University Research Practices; Waiting for Chiropody; contextual results from an ethnographic study of the information behaviour among attendees at community clinics | Covi, L.M. ; Pettigrew, K.E. | 1999 | Vol. 35 | 293-316; 801-817 | N/A Defendants copied entire journal article. | 100% | None, non U.S. Work |
| 6 | | | NOT INCLUDED IN MOTION – See Doda Declaration, ¶ 3. | | | | | | | |
| 7 | Soc. 102 Fall 2006 | Social Science and Medicine | Whose Fault is it? People's own conceptions of the reasons for Health Inequalities | Blaxter | | 44(6) | 747-756 | N/A Defendants copied entire journal article. | 100% | None, non U.S. Work |

**OUP Items:**

| # | Course/Term | Publication | Title | Author | Year | Pages | Total | % | Copyright |
|---|---|---|---|---|---|---|---|---|---|
| 8 | ED 392 Winter 2006 | The American Dream and the Public Schools | Chapter 2 Double Bind Number One; Womb/Brain | Hochschild and Scovronick | 2003 | 28-51 | 316 | 8% | TX-5-744-856 |
| 9 | ED 868 Winter 2005 | Beyond the Double Bind: Women and Leadership | Double Bind Number Three: Sameness/Difference | Jamieson | 1995 | 53-76; 99-119 | 296 | 15% | TX-4-392-270 |

| # | Course | Title | Chapter | Author | Year | Pages | Count | % | TX Number |
|---|--------|-------|---------|--------|------|-------|-------|---|-----------|
| 10 | SPP 692/UP 598 Fall 2005 and Fall 2004 | Crime is not the problem: lethal violence in America | What Americans Fear | Franklin Zimring and Gordon Hawkins | 1997 | 3 -20 | 274 | 7% | TX-4-610-691 |
| 11 | SPP 692/UP 598 Fall 2005 and Fall 2004 | Harm to Others: the moral limits of the Criminal Law | Assessing and Comparing Harms | Joel Feinberg | 1985 | 186-193; 214-215 | 269 | 4% | TX-1-390-350 |
| 12 | SPP 692/UP 598 Fall 2005 and Fall 2004 | Offense to others: the moral limits of the criminal law | Offensive nuisances | Joel Feinberg | 1985 | 1 -13 | 328 | 4% | TX-1-642-537 |
| 13 | SPP 692/UP 598 Fall 2005 and Fall 2004 | Incapacitation | Elements of a Theory | Franklin Zimring and Gordon Hawkins | 1995 | 42-59 | 208 | 9% | TX-4-538-577 |
| 14 | SPP 692/UP 598 Fall 2005 and Fall 2004 | Malign Neglect : Race Crime and Punishment in America | Social Adversity and the Criminal Law; Social Adversity and Punishment; Racial Disproportion in the Criminal Justice System; Race and the War on Drugs | Michael Tonry | 1995 | 125-161; 49-81; 81-111 (cut off mid- article) | 256 | 39% | TX-4-618-124 |

| # | Course | Title | Work | Author | Year | Pages | | % | TX Number |
|---|--------|-------|------|--------|------|-------|---|---|-----------|
| 15 | SPP 692/UP 598 Fall 2004 | Between Prison and Probation | | Norval Morris and Michael Tonry | 1990 | 36-59, 82-109 | 298 | 17% | TX-2-858-278 |
| 16 | SPP 692/UP 598 Fall 2005 | Debating the Death Penalty (Bedau and Cassell, eds.) | Why the Death Penalty is Morally Permissible; Why the United States will Join the Rest of the World in Abandoning Capital Punishment | Lois Pojman and Stephen Bright, respectively | 2004 | 52-75; 152-182 | 260 | 21% | TX-5-962-522 |
| 17 | SPP 692/UP 598 Fall 2005 | The Contradictions of Capital Punishment | The Consequences of Contradictory values | Franklin Zimring | 2003 | 119-139 | 272 | 8% | TX-5-737-393 |
| 18 | SPP 692/UP 598 Fall 2005 and Fall 2004 | American Youth Violence | | Franklin Zimring | 1998 | 17-39;106-125 | 226 | 19% | TX-4-912-467 |

| # | Course | Title | Author | Year | Pages | | % | TX Number |
|---|--------|-------|--------|------|-------|---|---|-----------|
| 19 | SPP 692/UP 598 Fall 2005 and Fall 2004 | Readings in Juvenile Justice Administration | Barry Feld | 1999 | 161-67; 184-209 | 384 | 9% | TX-4-941-972 |
| 20 | SW 633, Section 003 and Section 001 Winter 2004 | The Politics of Child Abuse in America | Costin, Lela, Karger, Howard and Stoesz, David | 1996 | 3-12, 171-189 | 214 | 14% | TX-4-253-807 |
| 21 | SW 633, Section 003 and Section 001 Winter 2004 | The Tender Years: Toward developmentally sensitive child welfare services for very young children | Berrick, Jill Duerr, Barbara Needell, Richard Barth and Melissa Jonson-Reid | 1998 | 1-27 | 203 | 13% | TX-4-722-252 |
| 22 | SW 633, Section 003 and Section 001 Winter 2004 | Safe Passage: Making it through adolescence | Dryfoos, Joy G. | 1998 | 3-69 | 304 | 22% | TX-4-767-296 |
| 23 | | NOT INCLUDED IN MOTION –see Cohen Declaration ¶ 4(b) | | | | | | |

| # | Course | Title | Title (2) | Author | Year | Pages | Count | % | TX No. |
|---|---|---|---|---|---|---|---|---|---|
| 24 | SW 820 Fall 2005 | The color of welfare: how racism undermined the war on poverty | Explaining American exceptionalism; The politics of welfare reform | Jill Quadagno | 1994 | 187-197; 117-134 | 262 | 11% | TX-4-530-086 |
| 25 | Moved to SAGE Item 38A below, see Cohen Declaration ¶ 4(a) and Van Valkenberg Declaration ¶ 3 | | | | | | | | |
| 26 | SW 820 Fall 2005 | Social Security in the 21st Century | Bridging the centuries: the case for traditional Social Security | Robert M. Ball and Thomas N. Bethell | 1997 | 258-295 | 336 | 11% | TX-4-409-415 |
| 27 | SPP 692/UP 598 Fall 2004 | When Prisoners Come Home | | Joan Petersilia | 2003 | 77-155 | 288 | 27% | TX-5-743-977 |
| 28 | Soc. 102 Fall 2006 | Freedom Summer | | McAdam | 1988 | 66-115 | 368 | 14% | TX-2-416-588 |

**SAGE Items:**

| # | Course | Book Title | Article Title | Author | Year | Pages | Total / Ranges | % | Reg. No. |
|---|---|---|---|---|---|---|---|---|---|
| 29 | Educatio n 771 Winter 2006 | Organizational Environments: Ritual and Rationality | The Structure of Educational Organizations | Meyer, John, Brian Rowan | 1983 | 71-97 | 302 | 9% | TX-1-323-645 |
| 30 | Educatio n 771 Winter 2006 | Organizational Theory and Public Policy | State Expansion and Organizational Fields | DiMaggio, Paul J | 1983 | 146-61 | 304 | 5% | TX-1-223-942 |
| 31 | ED 392 Winter 2006 | American Behavioral Scientist | Everyday Race-Making: Negotiating Racial Boundaries in school | Lewis, A. | 2003 47(3) | 283-305 | N/A Defendants copied entire journal article. | 100% | TX 5-884-010 |
| 32 | SW 502 Section 5 Fall 2005 | The Handbook of Community Practice | Theorizing in Community Practice | Reed, B. | 2005 | 84-102 | 728 | See Count 34 below | TX-6-116-867 |
| 33 | SW 502 Section 5 Fall 2005 | Human Services as Complex Organizations | Power in Social Work Practice and Theoretical Approaches to Human Service Organizations | Hasenfeld Y. Evolution, Models, and the Changing Context of Community Practice; Participatory Methods in Community Practice; Four Models of Community Practice | 1992 Weil, M and Gamble D.N.; Castelloe, P. and Gamble, D.N.; Jansson, B.S.; Dempsey | 258-275; 24-44 | 410 / 117-149; 261-275; 319-338; 276-286; 189-203; 59-83; 287-304 | 10% | TX-3-741-350 |
| 34 | SW 652 Fall 2006* | The Handbook of Community Practice | Charles H. Kieffer | | 2005 | | | | TX-6-116-867 |

| No. | Course | Book/Journal Title | Article Title | Author | Year/Vol. | Pages | Amount | % | Registration No. |
|---|---|---|---|---|---|---|---|---|---|
| 35 | SW 652 Fall 2006 | Social Work in the 21st Century | Multicultural Community Organizing; Prospects for Community Organization; Policy Practice: Local State, and National Arenas; Political, Social and Legislative Action; The Practice of Community Organizing; Diverse Populations and Community Practice; Radical Community Organizing | Gutierrez, L.; Wenocur, S. and Soifer, S.; D., McCroskey, J. and Schneider, R.; Mondros, J.; Rubin, H.J. and Rubin, I.S.; Bankheard T. and Erlich, J.L.; Reisch, M. | 1997 | 249-259; 198-208 | 493 | 4% | TX-4-524-673 |
| 36 | SW 652 Fall 2006 | Empowerment Evaluation | Participatory and Empowerment Evaluation | Dugan, M.A. | | 277-303 | 430 | 6% | TX-4-111-569 |
| 37 | SPP 692/UP 598 Fall 2004 | Annals of the American Academy of Political and Social Sciences | Lawful Policing | Welsey Skogan and Tracey Meares | 2004 vol. 593 | 66-83 | N/A Defendants copied entire journal article. | 100% | TX 5-987-270 |
| 38A** | SW 820 Fall 2005 | Annals of the American Academy of Political and | Puerto Ricans and the underclass debate | Marta Tienda | No. 501, Jan.1989 | 105-119 | N/A Defendants copied entire | | TX000253619 2 |

Social Sciences                                                                100%

                                                                        journal
                                                                        article.

**Wiley Items:**

| | | | | | | |
|---|---|---|---|---|---|---|
| 38 | | | NOT INCLUDED IN MOTION –see Kaufman Declaration ¶ 3 | | | |
| 39 | | | NOT INCLUDED IN MOTION – see Kaufman Declaration ¶ 3 | | | |
| 40 | Methods in Community Based Participatory Research for Health (Israel, Eng, Schulz and Parker, eds.) | Policy Analysis and Advocacy: An Approach to Community Based Participatory Research | NOT INCLUDED IN MOTION –see Kaufman Declaration ¶ 3 | | | |
| 41 | SW 652 Fall 2006 | | Freudenberg, N., Rogers, M.A., Ritas, C. and Nerney, S.M. | 2005 | 349-370 | 528 | 4% |

TX-6-212-212

\* Count 34 in the Amended Complaint included two articles not listed here, that defendants claim were not included in this coursepack.
\*\*Moved to SAGE list from OUP list. Is Count 25 in Amended Complaint.

**NOTES:**

1. In computing percentages copied where journals are concerned, plaintiffs have assessed them as 100% because in each case the entire journal article was copied.

2. In computing percentages copied where books are concerned, plaintiffs' counsel obtained page count information from publicly available websites such as www.amazon.com.

3. Items 32 and 34 above, although they appear in different coursepacks, are both taken from the same book.