UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC., and
JOHN WILEY & SONS, INC.,                          Civil Action No. 07-CV-12731

                Plaintiffs,         Hon. Avern Cohn

vs.                                               Mag. Virginia Morgan

EXCEL RESEARCH GROUP, LLC d/b/a
EXCEL TEST PREPARATION,
COURSEPACKS & COPIES and
NORMAN MILLER, individually,

                Defendants.

| | |
|---|---|
| WILLIAM S. STRONG BBO #483520 | DAVID A. NACHT (P47034) |
| KOTIN, CRABTREE & STRONG, LLP | NACHT & ASSOCIATES, P.C. |
| Attorney for Plaintiffs | Attorney for Defendants |
| One Bowdoin Square | 101 N. Main Street, Ste. 555 |
| Boston, MA 02114 | Ann Arbor, Michigan 48104 |
| (617) 227-7031 | (734) 663-7550 |

KARL V. FINK (P13429)
PEAR, SPERLING, EGGAN & DANIELS, P.C.
Local Counsel for Plaintiffs
24 Frank Lloyed Wright Drive
Ann Arbor, Michigan 48105
(734) 665-4441

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## ISSUE PRESENTED

I.     Whether no genuine issue of material fact exists that copyright infringement has occurred where:

A.     Defendants, while ostensibly for-profit, constitute a one-man shop that supplies copying supplies and masters of material provided by professors for students to make coursepacks. The business has never shown a profit and which has total revenue in the range of $60,000 per year for its coursepack operation, and for which the owner took home "I think about eight thousand." (**Ex. A**, Miller Dep. at 67).

B.     Students perform all the copying from masters supplied by professors; and Plaintiffs do not claim that either group are infringers;

C.     All, (or almost all), of the material is that for which the University of Michigan has already paid licensing rights to Plaintiffs for the benefit of its students; and evidently, Plaintiffs, while they choose to contest this issue later in the litigation, <u>do not include in this motion, well over 99% of the coursepack material that is copyrighted by Plaintiffs</u>;

D.     Unlike the record in *MDS*, Plaintiffs' Executives admit in Rule 30(b)(6) testimony that students have the right to make copies of copyrighted materials.

> **As to Elsevier,**
> "A student would have the right to pick up the journal and make a copy of an article, yes." (**Ex. B**, Hueckel Dep. at 35).
> "My understanding of the use of print materials is that there is something called fair-use and if the student can get a physical copy of a journal, they have a right to make a copy of an article from that journal." *Id.* at 44.
>
> **As to Wiley/Blackwell,**
> Q. "But if a student were to take a book or journal and Xerox the assigned reading for a class that constituted the portion of that material, that would fall within the sanctioned or expected use, appropriate use of that?"
>
> A. "I would grant that that would be an expected use for a student." (**Ex. C**, McKenzie Dep. at 20).

Q. "Now, if the student is able to take the material physically out of the library and perform the copies outside the library, does that matter as compared to using the copying machines in the library? Again, we're talking just about the assigned reading, a portion of the text?

A. "No."

*Id* at 21.

These admissions alone preclude summary judgment for Plaintiffs.

# TABLE OF CONTENTS

**Page**

INDEX OF AUTHORITIES……………………………………………………………….v

INTRODUCTION………………………………………………………………………….1

STATEMENT OF FACTS…………………………………………………………………3

STANDARD OF REVIEW ……………………………………………………………..6

ARGUMENT……………………………………………………………………………….6

CONCLUSION………………………………………………………………………....15

PROOF OF SERVICE……………………………………………………………………16

# INDEX OF AUTHORITIES

**Page**

## Cases

*Aerel, S.R.L. v. P.C.C. Airfoils, L.L.C.,*
448 F.3d 899 (6th Cir. 2006)……………………………………………………3

*Fitzgerald v. CBS Broadcast, Inc.,* 491 F. Supp. 2d 177……………………………………7

*Princeton University Press v. Michigan Document Services, Inc.,*
99 F.3d 1381 (6th Cir. 1996)…………………………………………………1, 2, 9

R. Tushnet, *ESSAY: Copy This Essay: How Fair Use Doctrine Harms Free Speech
and How Copying Serves It,* 114 Yale L.J. 535 (2004)…………………………………1

## Court Rules and Statutes

Fed. R. Civ. P. 56…………………………………………………………6, 11

U.S. Const., art. I, § 8, cl. 8………………………………………………..6

U.S. Copyright Act, 17 U.S.C. §§ 106, 107, 507(b)……………………………7, 10, 14

## INTRODUCTION

Defendants reference and incorporate in its response their own motion and brief for summary judgment previously filed in this case, with accompanying exhibits. Defs.' Mot. Summ J. (No. 16). Defendants presume that the Court has read such pleadings and supplement as follows:

No other court has considered whether a shop such as Excel violates the Copyright Act for its conduct in making masters available to students to copy. The only authority by which this case has been brought is one split *en banc* Sixth Circuit opinion that claims that coursepacks do not constitute fair use when commercial shops create, assemble and reproduce them for student use. *Princeton Univ. Press v. Michigan Documents Services, Inc.*, 99 F.3d 1381 (6th Cir. 1996) (Hereinafter *MDS*). While Defendants contest the validity of that opinion, *See* R. Tushnet, *ESSAY: Copy This Essay: How Fair Use Doctrine Harms Free Speech and How Copying Serves It*, 114 Yale L.J. 535 (2004), even under *MDS*, Defendants' conduct is completely distinguishable.

The University of Michigan currently pays millions of dollars per year for licenses that allow its students to obtain copyrighted works from the Plaintiffs, which includes all or virtually all of the material copied in Defendants' shop. The University of Michigan Librarian has taken the position in his declaration that the contracts include coursepacks for student use. (**Ex. D,** Courant Decl. ¶9). Therefore, to the extent that *MDS* is good law, Plaintiffs are already being paid licensing fees and have nothing about which to complain.

To the extent that Plaintiffs claim to be able to identify 34 items outside of the Licensing Agreements – which Defendants deny – the binding admissions of their own 30(b)(6) depositions admit that students can make copies of journal articles and books from hard copies.

1

(**Ex. B** at 34-35, 39-41, 41; **Ex. C** at 18-21). Further, Plaintiffs claim that their business model is for the universities to pay for material on behalf of the students (*See* **Ex. B** at 12-15), and Plaintiffs expect students in the University of Michigan library to make copies of copyrighted materials sold to the University library using the machines that are available (which happen to be commercially provided at a profit) to reproduce portions of the material.

> "A student would have the right to pick up the journal and make a copy of an article, yes." (**Ex. B** at 35). "My understanding of the use of print materials is that there is something called fair-use and if the student can get a physical copy of a journal, they have a right to make a copy of an article from that journal."
>
> (**Ex. B** at 44).

Unlike in *MDS*, Excel does not sell coursepacks. Rather, it gets a master coursepack from professors, and provides it to students <u>who then make copies themselves</u>. Since neither the professor nor the student is a bad actor (unlike in the case of, say, the recipient of pirated music for internet download or the manufacturer of pirated karaoke music), no infringement occurs, and no doctrine under the Copyright Act says it occurs.

The "current record" that provides the basis for the supposed 34 violations is incredibly flimsy. It consists of affidavits from the general counsel of Plaintiffs, more about which will be stated later. These stand in contradiction to the Declaration of Paul Courant, University of Michigan Librarian (contracts include licensing for coursepacks). (**Ex. D**, Courant Decl. ¶¶ 9, 22).

Moreover, Plaintiffs have sandbagged Defendant with last-minute identifying of 34 documents out of thousands that they claim are not included on databases. (Plaintiffs objected to producing witnesses from companies where no electronic licensing agreements had been

negotiated on the grounds that <u>they were not relevant</u> and yet now uses general counsel affidavits from those companies as a basis for alleged infringement actions as to items not included in the electronic databases). These affidavits <u>cannot be considered</u> to the extent that they are contrary to the deposition testimony of the 30(b)(6) representatives. *See Aerel, S.R.L. v. P.C.C. Airfoils, L.L.C.,* 448 F.3d 899 (6th Cir. 2006*)* (later contradictory affidavits must be stricken). Moreover, rather bizarrely, to the extent that Plaintiffs now claim that the Court should rely upon them, they have made their general counsel witnesses to the action, and Defendants will be seeking to take their depositions to understand the role they played in learning the material presented in the affidavits.

## STATEMENT OF FACTS

Defendants restate the statement of facts from their own motion and brief for summary judgment previously filed in this case. Defs.' Mem. Supp. Summ. J. at 2 (No. 16). In addition, as required by the Pretrial and Scheduling Order at 5 (No. 41), Defendants respond to Plaintiffs' Statement of Facts as follows:

1.      Students at The University of Michigan ("The University") have used photocopy equipment at the premises of Defendant Excel Research Group, LLC ("Excel") to copy the readings assigned by their professors. Excel does not make copies for the students.

2.      Excel sells no product. Excel has no inventory of products. It does not stock or sell course packs. It does not create or sell compilations. It does not create or sell books. Excel makes no sales of excerpts or articles to the public. Students using Excel's copying equipment sign statements attesting to their status as students and their enrollment in a particular course, and make their own copies. Excel does not make the students' personal copies of the professors' assigned readings. Excel has declined to make copies of materials at the request of graduate

students who wish to learn more about the subject matter of a course but who are not enrolled in a course. Excel has also declined to make copies for other professors who have asked for courtesy copies of the readings. Many students have asked Excel to make their copies for them, and have offered to pay in order to avoid standing in line and making their own copy, but Excel has refused to honor these requests. Defs.' Stmt. of Undisp. Facts, ¶ 7. (No. 17).

3.      Students can utilize Excel's copying equipment to make their own personal copies. Unlike some "copyshops," Excel does not create an inventory of coursepacks for sale to University students. Defs.' Mem. Supp. Summ. J. at 2. (No. 16).

4.      Excel employees are available to assist students with the copy machines. Defs.' Stmt. of Undisp. Facts, ¶ 2. (No. 17).

5.      Defendants do not contest that they supply the machines, the paper, and the electricity needed to make copies on their premises; however, Defendants would like to point out that the University library provides the same materials needed to make copies.

6.      Excel will, for a fee and upon request, bind the copy that the student has made.

7.      The students do, in fact, make the copies themselves. It should also be noted, however, that professors compile the coursepacks.

8.      Excel does not "produce" coursepacks as alleged in Plaintiffs' Motion for Partial Summary Judgment (p. 4, ¶8). Excel merely provides a place for students to copy coursepacks compiled by University professors. Defs.' Stmt. of Undisp. Facts, ¶7. (No. 17).

9.      Defendants did not seek permission because they have not made any reproductions. The students have made reproductions, which they are entitled to do pursuant to the various contracts in place with Plaintiffs and the University library.

10.    Defendants' coursepacks cost less than their competitors because the competitors do not require students to make the copies for themselves but simply sell students pre-made coursepacks.

11.    Currently, the vast bulk of journals on campus are read after being downloaded. (*See* **Ex. D**; **Ex. B** at 30; **Ex. E** at 14).

12.    Plaintiffs concede that to the extent students desire to copy hardbound journals from the library, they can do so, and that is what the Companies foresee and expect. (**Ex. B** at 34, 35, 41).

Q. "You've already testified that you expected the students to make copies of the journal articles, using the copy machines in the library, right?"

A. "Since the copy machines are near the journals we would assume they would do that."

(**Ex. B** at 41).

Plaintiffs have actually sent mixed messages about student copying of journal articles – because their primary business is to sell to universities, and they want to demonstrate higher usage to show demand. (**Ex. B** at 36) ("we did want to encourage the use of our materials.")

Most significantly, in its 30(B)(6) deposition, Elsevier's representative testified that students have the right under fair use to make a copy of a journal article from a physical copy. (**Ex. B** at 44).

In the 30(b)(6) deposition for Plaintiffs Wiley and Blackwell, the corporate representative and Vice President, Chris McKenzie, described the business relationship between his companies and the University of Michigan and its students. (**Ex. C** at 17-33). It is well worth reading in its

entirely to capture the company's understandings and admissions both as to how students will use printed materials and electronic materials.

The present motion claims to limit itself to those not governed by the electronic licensing agreements. The admissions are clear, and they are repeated:

> "if a student were to take a book or journal and Xerox the assigned reading for a class that constituted the portion of that material, that would fall within the sanctioned or expected use, appropriate use of that, I grant that would be an expected use for a student." (**Ex. C** at 20).
>
> Q. "Now, if the student is able to take the material physically out of the library and perform the copies outside the library, does that matter as compared to using the copying machines in the library? Again, we're talking just about the assigned reading, a portion of the text?"
>
> A. "No."

(**Ex. C** at 21).

## STANDARD OF REVIEW

This motion is governed by Fed. R. Civ. P. 56, and summary judgment can only be granted upon no genuine issue of material fact.

## ARGUMENT

Courts typically ask three questions to determine whether a defendant's use of copyrighted material is of the type that copyright is meant to prohibit, or whether it is instead the type that actually tends to advance copyright's goals of "promot[ing] the progress of science and the useful arts." U.S. Const., art. I, § 8 cl. 8. First, courts ask whether a defendant's use of the copyrighted material falls into a category specifically identified by Congress in the copyright

statute as especially important to copyright's ends: "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship or research." 17 U.S.C. § 107. Second, courts ask whether the defendant's use was "productive" or "transformative" - i.e. whether it added anything to the copyrighted work in its use, and thus is treatable more as a new work referencing the old than as an instance of strict copying. Third, courts ask whether the use was commercial - i.e. whether it primarily served defendant's private interests rather than the public interest in underlying copyright law. *See* 17 U.S.C. § 107; *Fitzgerald v. CBS Broadcast., Inc.*, 491 F. Supp. 2d 177 (D. Mass. 2007) (Gertner, J.) (internal citations omitted).

*MDS* applied the above analysis, incorrectly, to include the explicit act of preparing coursepacks. It was a divided *en banc* opinion, and the entire court clearly wrestled with the tough competing policies inherent in the fair use doctrine. *See* 17 U.S.C. § 107. The real question is, does the analysis change when the licensing fee has already been paid? And when the Defendant does not himself copy, but provides the material for the copying to occur? And does it change when the Plaintiffs <u>admit</u> that students have the right to engage in copying for classroom use at copy stores?

> **I.**  **Plaintiffs' Efforts to Enforce Copyright Act Rights As to the University Students is Unenforceable Since Plaintiffs are Already Paid by the UM for these Rights.**

Apparently, Plaintiffs are only moving for summary judgment as to a small portion of materials not included in the Licensing Agreements. But the vast bulk of the activity concerns activity covered by the Agreements, and the Court must understand the relationship between the Agreements and Plaintiffs' activities to consider this motion.

Even if *MDS* would otherwise control, the Licensing Agreements between Plaintiffs and the University preclude the double-charge sought for coursepacks. Plaintiffs appear to concede

that this issue is one not ripe for summary judgment because of questions of fact. However, Defendants maintain it to be a matter of law in the favor of Defendants. That is, when materials are included in coursepacks, and those materials are also the subject of the electronic licensing download agreements between the University of Michigan and the publishers, then the publishers have no right to charge coursepack licensing fees in addition to the licensing fees paid by the University on behalf of its students.

University Librarian, Paul Courant, clearly states that the University of Michigan interprets its contracts with the Plaintiffs as including coursepacks. (*See* **Ex. D**). The language of the contracts in no way excludes coursepacks and allows materials to be downloaded for educational uses by University end-users, which includes all students using materials for classroom or research purposes. (*See* **Ex. F**, Licensing Agreements).

This means that while Plaintiff/publishers have been in the habit of charging duplicate license fees for coursepacks, that habit is unenforceable. The lost revenue sought by Plaintiffs is nothing more than double-dipping. This is not only true as to Defendants but to traditional copy-shops that provide course-packs to the University students.

Plaintiffs proffer virtually no defense on this critical point. They seem to rely on the fact that the language in the Licensing Agreements which allows a student to download and print material does not include the term "copy." Yet they acknowledge that the intent of the Agreements was to allow students to have access to all material. (**Ex. E** at 14; **Ex. C** at 31, 24-25; **Ex. B** at 33).

When asked at depositions, the corporate representatives and/or business executives who negotiated the agreements with the University of Michigan and/or maintained the relationships with that customer, acknowledged that they understood that the University had purchased the

8

right for their students to have access to download and print all copyrighted material available in electronic form for classroom purposes. (*See e.g.* McKenzie Dep. at 32.)

> Q. "So earlier you testified that a student could download in his or her own [d]orm room the material subject to the license agreement and they could print it in their own dorm room, right?"
>
> A. "Correct."
>
> Q. "Can they print an extra copy in their own dorm room?"
>
> A. "Yes."
>
> Q. "Can they take it to the local copy store and run a copy for use in their own scholarly material and work?"
>
> A. "Yes."
>
> Q. "Is it fair to say that you as the Vice President of Wiley neither know nor care where the copying machines that the students use, whether they are in the University of Michigan Library or outside of the library belong to the University of Michigan or to some contractor or vendor?"
>
> A. "Correct."

(**Ex. C** at 32-33).

Professors provide to Excel, a master copy of their own downloaded and printed materials for inclusion in the coursepack. The students can also download and print their own copies – or simply read them on-line. Plaintiffs do not contend that the professors or the students are doing anything improper. But if the student should choose to make copies, somehow, Excel is engaged in infringement? The Sixth Circuit's analysis in *MDS*, which weighed the commercial loss for publishers as outweighing the educational benefit for the students, in determining that fair use failed to apply, would clearly find in favor of Defendants under the same analysis.

After all, Plaintiffs are now getting millions of dollars in licensing rights for use by the University scholarly community. Therefore, their commercial interests are being satisfied in significant ways that comport with the Copyright Act's concerns. However, students are now being asked to pay twice for the intellectual property rights: first, in their tuition to the University, a portion of which finds its way into the University's payments to Plaintiffs; and second, when they purchase coursepacks. This double-dipping is not only an unearned entitlement for Plaintiffs; it directly contradicts the purpose of the Copyright Act to promote educational uses. *See* U.S. Copyright Act, 17 U.S.C. §§Sec. 106, 107.

If the University had been willing, the publishers could have obtained contractual language that limited the use of printed materials and electronic materials for research, allowing them to continue to try to collect fees. For instance, they could have written "no such licensing rights have been purchased for student use of material for coursework, and students must continue to pay for intellectual property rights of any materials purchased." There is no language approaching that.

Finally, since we merely have assertions put forward in affidavits by general counsel that the 34 items are somehow not included in the Licensing Agreements, <u>it is quite possible as a factual matter, that the Licensing Agreements intended to include and thus do include the material that Plaintiffs contend they do not.</u>

## II.    *MDS* Does Not Control Because Selling Previously-Made Coursepacks is a Different Business from Lending a Coursepack Master and Copying Equipment.

Apparently, Plaintiffs concede that as a matter of law, they cannot prevail that the vast bulk of Defendants' activities infringe as a result of the Licensing Agreements. Therefore, they are moving for "partial" summary judgment as to a few items that they contend in assorted

affidavits and constructed from reviews of discovery material they have found that <u>they claim</u> are not included in the Licensing Agreements.

A preliminary matter: this motion cannot succeed because there is no natural way to separate the creation of coursepacks into materials that are included in the University library but not included in the Licensing Agreements, and those that are included in the University Licensing Agreements. The motion simply makes no sense, and all of the various technically narrow and footnoted affidavits attached to Plaintiffs' brief only make the point clearer: this is not the stuff of summary judgment. Can this Court really be comfortable issuing a ruling on the basis that there is "no genuine issue of material fact" that a book chapter or journal wasn't included in a list of thousands of articles based upon a general counsel's assertion in an affidavit? Affidavits must be "credible" within the meaning of Rule 56. Surely, it strains credibility to believe that <u>the</u> general counsels for large multinational corporations would be reviewing the coursepacks and comparing their items to lists – as compared to the more likely option, that s/he signed an affidavit drafted by someone, based on someone else's looking at lists and tables and trying to figure out such things.

The affidavits should be from the person who looked at the lists and made the determination, not the person who took someone else's word that the work was done carefully and without careless error. We don't even know from the affidavits who assisted the various general counsel in compiling the information. In short, what we have is an assemblage of legal assertions from the Plaintiffs' legal team. It is like the summary poster used by counsel at closing argument that is not evidence. This is not the basis for summary judgment.

<u>Defendants Never Copied and Therefore Never Infringed.</u>

There is not a single case in the hundreds of fair use cases holding someone liable for copyright infringement when they do not make copies but simply take action to facilitate the making of copies by others who have a legal right to do so. Plaintiffs' counsel is an acknowledged expert in the field and he cannot find such a case. In no way are Plaintiffs like the facilitator of pirated music: in this case, the students have the right to make the copies of materials.

As discussed fully in Defendants' brief in support of its motion for summary judgment, in *MDS*, the Court considered at oral argument but did not rule on the very question put forward by Plaintiffs – students performing the copying in the copy shop. Plaintiffs' brief quotes the court leaving the option open. Defs.' Mem. Supp. Summ. J. at 8, 11. (No. 16).

Strangely for Plaintiffs however, their corporate representatives have admitted in Rule 30(b)(6) depositions that as for printed materials – that is those not covered by the Licensing Agreements (which relate to electronic downloads), students have the right to take physical copies; bring them to the copy store and make a copy for use in classwork. (**Ex. C** at 32-33). Thus, this party admission takes us out of the realm of *MDS* and creates a new realm for this case, where students clearly have the right to make copies of copyrighted materials for classroom use, regardless of whether they are included in licensing agreements.

So, all that we have here are students making copies of a number of items for use in their classes. What is the difference? Should it matter that a professor provides a group of original copies for Mr. Miller to hold at the Excel Store instead of the University librarian? No.

In fact, the intervention of the professors cuts in the direction of the Defendants. The first is that to the extent the professor holds the copyrights on works – and that clearly applies to a

12

number of items at issue in this case -- those claims are barred by the doctrines of accord, waiver and estoppel.

The second implication is that Excel is essentially an agent of the professor. It is only by the grace of the professor that Excel obtains the material. It is the professor who decides what should be in the coursepack. It is the professor who desires that his students have the hard-bound coursepack available to them. It is the professor who wants his students to reproduce the materials: materials that all professors and students are lawfully allowed to reproduce whether or not they are included in electronic licensing agreements because they are also in the Library.

So what does the professor do to get copies of the work to his students? He puts them in one place where the students can copy them. That place is simply Excel's shop. That is it. That is the entire transaction. Excel, the middleman, has not copied anything. It has been an agent of the professor in allowing the materials to be made available to students.

Since there is no claim here that either professors or students are violating the Copyright Act, Defendants' willingness to serve as the professors' agent cannot violate the Act.

### III.   *MDS* Does Not Control Because the Few Items Upon Which the Partial Motion for Summary Judgment is Claimed Have Not Been Established as Outside the Licensing Agreements.

There are genuine issues of material fact concerning whether each of the items mentioned in the partial motion for summary judgment is or is not included in the electronic download license agreements. It is simply impossible to tell on the record whether that is so. Upon review of Plaintiffs' brief and exhibits, the Court cannot have a comfort level that it knows that none of the 34 were contained in the Licensing Agreements based on the say-so of the general counsels.

Moreover, since Plaintiffs concede that fair use is a question of fact for those materials subject to the licensing agreements, and since those items (those included in the licensing

agreements) constitute the vast bulk of copying that is performed at the store by students, the notion that Defendants could have taken additional steps to prevent their inclusion is questionable.

Finally, the University has each of the materials assigned in its classes in its libraries, and the Plaintiffs concede that students can and will make copies of portions of the hardcopies found in copyshops and at the library at the commercial copy machines available in the University library. This testimony by executives for Plaintiffs was not part of the _MDS_ record, but has been developed in this case. Thus, the holding of _MDS_ must be narrowed to its facts and is plainly distinguishable by these Rule 30(b)(6) admissions.

## IV.  Some of Plaintiffs' Alleged Infringements May Be Time-Barred

The Copyright Act bars lawsuits premised on a copyright claim brought after three years from accrual of that claim. 17 U.S.C. § 507(b). Plaintiffs now apparently, for the first time, are alleging violations from prior to that period. (See Plaintiffs' brief, alleging that summary judgment is appropriate as to those infringements that occurred prior to the Licenses with the University) They are barred.

Since according to Plaintiffs, several of the Copyrights are actually held by the authors, who are sometimes the professors, and since the professors are the ones who provide Excel with masters, Plaintiffs cannot claim that the holder was without notice.

## CONCLUSION

WHEREFORE, for the reasons set forth above, Defendants respectfully request that this

Honorable Court deny Plaintiffs' Motion for Partial Summary Judgment.

*Respectfully submitted,*
NACHT & ASSOCIATES, P.C.

Dated: July 27, 2009     s/ David A. Nacht
           David A. Nacht (P47034)
           Attorney for Defendants
           101 N. Main Street, Ste. 555
           Ann Arbor, MI 48104
           (734) 663-7550
           dnacht@nachtlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2009, my paralegal, Courtney L. Ceci, electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

William S. Strong and Karl V. Fink,

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: n/a

*Respectfully submitted,*
NACHT & ASSOCIATES, P.C.

Dated: July 27, 2009

s/ David A. Nacht
David A. Nacht (P47034)
Attorney for Defendants
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
dnacht@nachtlaw.com
