UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC., and
JOHN WILEY & SONS, INC.,                           Civil Action No. 07-CV-12731

                            Plaintiffs,   Hon. Avern Cohn

vs.                                                Mag. Morgan

EXCEL RESEARCH GROUP, LLC d/b/a
EXCEL TEST PREPARATION,
COURSEPACKS, & COPIES and
NORMAN MILLER, individually,

                            Defendants.
_____/

## **PLAINTIFFS' REPLY TO DEFENDANTS' STATEMENT OF FACTS**

Plaintiffs hereby reply to the statement of facts included in Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment (defendants' "Response"), and also to various factual statements made elsewhere in the Response. For the sake of simplicity, plaintiffs will respond to defendants' factual allegations in the order in which they occur, page by page. As per the Court's Pretrial and Scheduling Order, plaintiffs will first either quote each allegation, or give a brief summary of it, and then state their response.

Page 1.

Allegation:    Licenses between the University of Michigan and plaintiffs "include all or virtually all of the material copied in Defendants' shop."

Response: There is no evidence in the record to establish how much of the material copied in defendants' shop comes from works that are subject to license agreements between plaintiffs and the University. As noted below, 29 of the 34 works at issue in the pending motion are not subject to any such license.

Allegation: Plaintiffs have made "binding admissions" in their 30(b)(6) depositions that students can make copies of journal articles and books from hard copies. [See passages quoted on page 2 of defendants' brief.]

Response: False. These so-called "admissions" are discussed below in response to defendants' numbered statement 12.

Page 2

Allegation: Plaintiffs have "sandbagged" defendants with "last-minute identifying of 34 documents out of thousands that they claim are not included on databases."

Response: Just what "thousands" defendants are referring to is unclear, but the 34 are, presumably, the 34 documents identified on Exhibit A to Plaintiffs' Statement of Undisputed Facts. The claim that these were identified at the "last minute" is astonishing. The works in question are all among those named more than two years ago in plaintiffs' Amended Complaint. Nor was this in any way obscure. As plaintiffs explained in their Statement of Undisputed Facts:

> The works included in this Motion for Partial Summary Judgment are identified in Exhibit A hereto. They are all but seven of the works identified in the Amended Complaint.[1]

---

[1] Stmt of Undisp. Facts, ¶8. Each of plaintiffs' declarants delivers the same message. See, *e.g.*, Declaration of Roy Kaufman at ¶3:
> Wiley (including Blackwell) is limiting its request for summary judgment at this time to one work identified in the Amended Complaint, namely that identified in Count 41.

2

If defendants have been "sandbagged," it is by their own careless reading of plaintiffs' papers.[2]

Pages 3-6

The following allegations are contained in the section headed "Statement of Facts," and are answered here consecutively by number.

    1.    "Excel does not make copies for students;" students do the copying.

Response:    As discussed at length in plaintiffs' opening brief, this is only superficially correct. Defendants are the true makers of the coursepacks as they control the entire process other than the pushing of the button on the copy machine that causes the copy to be created.

    2.    Same as above, essentially, with the addition that Excel refuses to "make" copies – i.e., to have its employees actually put the masters through the machines – even when requested.

Response:    No additional response needed. The identity of who runs the masters through the machines is not relevant.

    3.    Same as #1, essentially, with the addition that Excel does not "create an inventory of coursepacks for sale."

Response:    No additional response needed.

    4.    Excel employees are available to assist students with the copy machines.

Response:    Agreed. See Plaintiffs' Statement of Undisputed Facts, at ¶20.

---

[2] On this point plaintiffs must apologize for one minor error in their original Statement of Undisputed Facts. Although there are 34 line items on Exhibit A to their pending Motion, two of those line items identify different portions of a single work that were reproduced in two different coursepacks. See Van Valkenburg Decl., ¶3(d). Thus, there are actually 33 works at issue in the pending motion, not 34. Plaintiffs inadvertently referred in their motion papers to there being 34 works at issue, rather than 33. They apologize for any resulting confusion.

3

| | |
|---|---|
| 5. | Defendants "do not contest" that they supply the machines, the paper, and the electricity needed to make copies. Defendants "point out" that the University library provides the same materials. |
| Response: | The concession does not give a full picture of defendants' thorough involvement in the process of manufacturing coursepacks; see Plaintiffs' Statement of Undisputed Facts at ¶¶18-22. The statement concerning the University library is without foundation but also irrelevant. |
| 6. | Excel will, for a fee and upon request, bind the copy that the student has made. |
| Response: | Statement does not give the full flavor of defendants' operation; see Plaintiffs' Statement of Undisputed Facts at ¶22. And as stated above, the student does not truly "make" the copy. |
| 7. | Same as #1, with additional remark that "professors compile the coursepacks." |
| Response: | No additional response needed. The fact that professors compile the coursepacks is not relevant. |
| 8. | Same as #1. |
| Response: | No additional response needed. |
| 9. | Defendants did not seek copyright permission because the students "made" the copies, as students were "entitled to do" under licenses between plaintiffs and the University.[3] |
| Response: | As to the first part of this sentence, plaintiffs incorporate their responses above. As for plaintiffs' licenses to the University, plaintiffs are frankly |

---

[3] Defendants refer to the license agreements as being incorporated in an Exhibit F. Defendants' counsel has provided a hard copy of such exhibit to plaintiffs' counsel, but so far as plaintiffs are aware, no Exhibit F has been filed with the Court. Since the contents of that Exhibit are the same license agreements that were previously filed by defendants in support of their own summary judgment motion, plaintiffs will refer here to the earlier docket entries in identifying the licenses.

surprised to see this argument raised again, and especially to see it raised as regards the claims of SAGE Publications ("SAGE") and Oxford University Press ("OUP"). Plaintiffs make the following observations:

(1) The SAGE license, on its face, became effective *after* the reproductions alleged in the Amended Complaint had already occurred. (See Plntffs' Stmt of Undisp. Facts, ¶ 32(c).[4] Its effective date (December 31, 2006) is plain for all to see, at the top of on the first page, and the dates of the infringements – all earlier than 12/31/06 – are clearly set forth in Column 2 of Schedule A to the Amended Complaint and of Exhibit A to the pending motion. (The latest coursepacks identified as infringing SAGE material are from the Winter 2006 term, which began in January 2006.) Even a cursory examination would have confirmed this.[5]

(2) Plaintiffs' counsel made the above observation in an email to defendants' counsel dated February 23, 2009. See Second Declaration of William S. Strong, submitted herewith, at ¶1.

(3) The fact that all infringements predated the date of the license agreement was reiterated by Sara Van Valkenburg in her Declaration filed in support of plaintiffs' Motion. Van Valkenburg Decl., ¶11. Ms. Van Valkenburg also testified, in the interest of thoroughness, that

---

[4] The SAGE license is reproduced at Docket Entry 16-6.
[5] Furthermore, two of the SAGE works at issue here are books, and the SAGE license by its terms covers only journals. (See the second paragraph under heading (I) on the first page of the SAGE license.)

"SAGE had no license agreement in place with the University of Michigan prior to December 30, 2006." *Id.*

(4) With respect to the OUP license (Docket #16-8), undersigned counsel advised defendants' counsel by email on March 12, 2009, that, *inter alia*, the OUP books identified in the Amended Complaint had never been subject to the OUP license, and there was no other license in effect covering such books. See Second Strong Declaration, ¶2. Some of the same information was set forth in OUP's written discovery responses served on defendants on March 16, 2009. *Id.*, ¶3. Defendants never challenged this information or sought discovery with respect to it. *Id.,* ¶4. In short, there was absolutely no basis on which defendants could reasonably claim that the OUP license had any bearing on the lawfulness of the reproduction of the 19 OUP works at issue here.[6]

(5) So that the record as regards OUP will be absolutely clear, plaintiffs have filed herewith the Second Declaration of Barbara Cohen.

(6) Between them, the SAGE and OUP claims comprise 28 of the 33 claims at issue in the pending summary judgment motion. Of the other five other works at issue, four are Elsevier works, and arguably subject to the license between Elsevier and the University. (Docket #16-7.) However, the Elsevier license does not extend to anyone other than

---

[6] Plaintiffs' Statement of Undisputed Facts, at ¶32(b). The first sentence of said paragraph 32(b) was, on review, a flawed summary of the above information, but the main point – that the OUP books at issue here were never subject to the license – was correct.

"Authorized Users" (i.e., member of the University community); it does not extend to off-campus copy shops. It does not authorize any copying at off-campus copy shops. It permits students to "print and download" from the Elsevier database. (It also says that students cannot "substantially or systematically reproduce, retain or redistribute the Licensed Products.")

(7) The fifth and last work at issue here was published by plaintiff John Wiley & Sons, Inc. ("Wiley"). The Wiley license agreement with the University of Michigan (Docket #16-5) does not include that work.[7]

10. "Defendants' coursepacks cost less than their competitors because the competitors do not require students to make the copies for themselves but simply sell students pre-made coursepacks."

Response: This statement is not supported by any evidence. On the contrary, defendants themselves advertised that their coursepacks cost less than their competitors because defendants did not pay copyright fees. (*See* Plaintiffs' Statement of Undisputed Facts, at ¶25.)

11. "Currently, the vast bulk of journals on campus are read after being downloaded."

Response: Plaintiffs are at loss to discern the relevance of this statement. Furthermore, although defendants cite their own "**Ex D; Ex. B** at 30; **Ex. E** at 14" as evidence for it, nothing in those references actually supports

---

[7] This, again, is something that should have been apparent to defendants, who bear the burden of proving their license defense. The work is not identified in any of the lists of licensed materials attached to the document defendants have entered into evidence.

7

the statement, and there is no other evidence in the record to support it.

12. Plaintiffs "concede" and "foresee and expect" that students will copy hardbound journals from the library, and they have a "fair use" right to do so. For this defendants cite the deposition of Edward E. Hueckel (their Ex. B) at pp. 34, 35, 41, 44.

Response: As to what students might do with hardbound journals, Mr. Hueckel's testimony was beyond the scope of his designated competence as a 30(b)(6) witness for Elsevier, and is therefore admissible only to show his personal opinions. Second Strong Declaration, ¶¶5-6.

For what other purpose defendants proffer this evidence is obscure. If they proffer it to show what the Elsevier license means, it is inadmissible. There is no showing of ambiguity concerning the language of the license, so parol evidence is not admissible on that topic. Even if admissible, the evidence is irrelevant because

(1) The Elsevier license concerns electronic versions of Elsevier journals, not hardbound physical copies in the collection of the University library, so Mr. Hueckel;s expectations as to what students would do with hard copies has nothing to do with the license.

(2) It is obvious from Mr. Hueckel's testimony that he is referring to *ad hoc* copying of journal articles. ("Since the copy machines are near the journals we would assume they would do that.") It has nothing to do with organized off-site copying.

So far as Mr. Hueckel's statement about fair use is concerned, defendants try to cast this testimony as an admission against interest. But the attempt must fail. Mr. Hueckel's testimony about student copying of physical materials in the University library was beyond the scope of his designated competence as a 30(b)(6) witness for Elsevier. Second Strong Declaration, ¶¶5-6. Thus, it constitutes at most his personal opinion on the issue. Indeed, Mr. Hueckel makes clear he is giving only his second-hand understanding of a legal issue: "My understanding of the use of print materials is that there is something called fair-use and if the student can get a physical copy of the journal, they have a right to make a copy of an article from that journal…"[8]

12 (cont'd): Defendants next claim that Wiley's 30(b)(6) deponent, Christopher McKenzie, "admitted" that "if a student were to take a book or journal and Xerox the assigned reading for a class that constituted the portion of that material, that would fall within the sanctioned or expected use, appropriate use of that, I grant that would be an expected use for a student." Like Mr. Hueckel's testimony cited above, this testimony of Mr. McKenzie is outside the scope of what he was designated to address under Rule 30(b)(6). Second Strong Decl., ¶¶5-6. Moreover, defendants grossly misstate what he said. The actual colloquy, as shown at p. 20 of defendants' Exhibit C, is as follows:

> Q. But if a student were to take a book or a journal and Xerox the assigned reading for a class that constituted a portion of that material, that

---

[8] It should also be noted, for the record, that as a 30(b)(6) witness for Elsevier, Mr. Hueckel had no capacity to bind any of the other plaintiffs.

would fall within the sanctioned or expected use, appropriate use of that material?

    MR. STRONG: I object to the question. You have three different adjectives out there.

    A. I am again not a lawyer and would not speculate on the copyright law governing that use, but I would grant that that would be an expected use for a student.

In short, Mr. McKenzie admitted to nothing beyond a certain realism, or resignation, as to what students will do. He does not admit that any student had the right to participate in the sort of conduct that has gone on at defendants' shop.

12 (cont'd):    Defendants also characterize the following as an "admission":

    Q. "Now, if the student is able to take the material physically out of the library and perform the copies outside the library, does that matter as compared to using the copying machines in the library? Again, we're talking just about the assigned reading, a portion of the text?"

    A. "No."

Again, the testimony is (i) outside Mr. McKenzie's 30(b)(6) designation and (ii) taken out of context. The full colloquy runs thus, at pp.20-21 of defendants' Exhibit C:

    Q. Okay. Just to clarify, you don't need to keep telling me you're not a lawyer. I'm not asking you for a legal opinion. I'm asking you because you're a Vice President of Wiley and Wiley is in the business of selling and licensing information and you're an officer of this company. Right?

    A. Correct. I'm an officer of Wiley Subscription Services, Inc.

    Q So I'm asking you just in that capacity, as you understand things, recognizing that you're not a lawyer, and we're not having a legal debate here, just as you understand how the business works, that's all. So you expect students to take print materials off the shelves and to copy portions of them for their assigned reading. Right?

      A. Yes.

      Q. Now, if the student is able to take the material physically out of the library and perform [sic] the copies outside the library, does that matter as compared to using the copying machines in the library? Again, we're talking just about the assigned reading, a portion of the text.

      A. No.

Here again, it is unclear what if anything Mr. McKenzie has "admitted,"

but it is clearly not an admission of any legal point whatever.

Page 7

| | |
|---|---|
| Allegation: | Plaintiffs "admit" that students have the right to engage in copying for classroom use at copy stores. |
| Response: | Plaintiffs have made no such admission. See discussion above. |

Page 10

| | |
|---|---|
| Allegation: | Plaintiffs "concede…as a matter of law" that "the vast bulk of Defendants' activities" do not infringe "as a result of the Licensing Agreements." |
| Response: | Plaintiffs have made no such concession. There is no evidence in the record at this point as to what "the vast bulk of Defendants' activities" consist of, nor are such activities relevant to the pending motion, which seeks a finding of infringement as to 33 specific works. (For the record, plaintiffs do not believe that the license agreements excuse any of defendants' conduct.) |

Page 12

| | |
|---|---|
| Allegation: | Plaintiffs "admit" that students "have the right to take physical copies; bring them to the copy store and make a copy for use in classwork." For this defendants cite pages 32-33 of the deposition of Christopher McKenzie, Wiley's 30(b)(6) witness. |

11

Response: Plaintiffs have made no such admission. Mr. McKenzie has testified only that, so far as Wiley is concerned, a student who has printed out a copy of licensed material can take it to a copy shop to make another copy. And since the Wiley work at issue in the pending motion is not even governed by the Wiley-UM license agreement, that testimony has no bearing on the motion.[9]

Allegation: The professor holds copyright in "a number" of items at issue in this case.

Response: This is simply false. The unrebutted testimony of plaintiffs' declarants establishes that copyright in all works at issue in this motion is owned by the respective plaintiff identified in Exhibit A to plaintiffs' motion.

Page 13

Allegation: Excel is "essentially an agent of the professor."

Response: There is nothing in the record to support a finding of agency. Indeed, since Excel evidently did not turn over its coursepack revenues to the professors, the suggestion is wrong on its face.

Pages 13-24

Allegation: Plaintiffs "concede that fair use is a question of fact for those materials subject to the licensing agreement," and such materials "constitute the vast bulk of copying that is performed at the store by students."

---

[9] For the record, however, plaintiffs note that the Wiley license explicitly allows students to "download, view, copy and save to hard disk or diskette and store or print out" single copies of individual articles and chapters, and allows faculty to make coursepacks "to be distributed to students … free of charge or at a cost-based fee" It also provides that students and faculty cannot otherwise "copy, distribute, transmit or otherwise reproduce material from [the licensed products]." Thus, even more explicitly than the Elsevier license, it does not authorize student copying off-campus, let alone for-profit copying by an off-campus copy shop. Mr. McKenzie's testimony indicates a certain forbearance of the part of Wiley with respect to the activity described in the question and answer, but cannot be introduced to alter the language of the agreement, which is unambiguous.

12

Response: Plaintiffs have made no such concession. Indeed, the statement appears to confuse the issue of fair use with the issue of what is permitted by license. As for the "vast bulk" of copying, there is no evidence whatever in the record to support the statement – even if the statement were relevant to the pending motion, which it is not.

Pages 13-24

Allegation: Some (unidentified) claims of plaintiffs are barred by the statute of limitations.

Response: Every infringement at issue here occurred within three years prior to June 28, 2007, the filing date of this action. The earliest coursepacks at issue were for the Fall Semester of 2004. See 2nd column, labeled "Course," on Exhibit A to Plaintiffs' Statement of Undisputed Facts.

Respectfully submitted,

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC.,
JOHN WILEY & SONS, INC.,

Plaintiffs,

By their Attorneys:

KOTIN, CRABTREE & STRONG LLP

Dated: August 3, 2009

/s/ William S. Strong
By: _____/s/ Amy C. Mainelli Burke_____
William S. Strong, Esq., BBO #483520
Amy C. Mainelli Burke, Esq., BBO#657201
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, MA 02114
(617) 227-7031

13

(617) 367-2988 (fax)

Local Counsel:

Claudia Rast (P40165)
Karl V. Fink (P13429)
Cynthia M. York (P39722)
Pear, Sperling, Eggan & Daniels, P.C.
24 Frank Lloyd Wright Drive
Ann Arbor, Michigan 48105
(734) 665-4441
(734) 665-8788 (fax)

## **CERTIFICATE OF SERVICE**

I, Amy C. Mainelli Burke, hereby certify that the foregoing Reply to Defendants' Statement of Facts was filed with the Clerk of Court through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent by first class mail to those indicated as non registered participants on August 3, 2009.

/s/ Amy C. Mainelli Burke
Amy C. Mainelli Burke