UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC., and
JOHN WILEY & SONS, INC.,                              Civil Action No. 07-CV-12731

                                    Plaintiffs,        Hon. Avern Cohn

vs.
                                                       Mag. Morgan

EXCEL RESEARCH GROUP, LLC d/b/a
EXCEL TEST PREPARATION,
COURSEPACKS, & COPIES and
NORMAN MILLER, individually,

                                    Defendants.
_____/


**JOINT SUBMISSION OF STATEMENTS OF FACTS RELEVANT TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

  Pursuant to the Court's Pretrial and Scheduling Order (Docket #41), the parties

submit the following statement, which integrates the following:

- Plaintiffs' Statement of Undisputed Facts in Support of Their Motion for Partial

    Summary Judgment (Docket #44),

- Defendants' Statement of Facts, contained in their Response to Plaintiffs' Motion

    for Partial Summary Judgment (Docket #46), and

- Plaintiffs' Reply to Defendants' Statement of Facts (Docket #51).

  In certain instances footnotes have been added or modified for the sake of

presenting the clearest possible unified factual record.  Where a party made no response

to a statement of fact, this is indicated below by the words "Response:  None."  In all

other respects the following reproduces the parties' statements and responses (if any) verbatim, except where noted.

## A. PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS, AND DEFENDANTS' RESPONSES THERETO

1.      Plaintiff Blackwell Publishing, Inc. ("Blackwell"), formerly a Delaware corporation and a subsidiary of plaintiff John Wiley & Sons, Inc., has ceased to have a separate corporate existence.  Declaration of Roy Kaufman (hereinafter "Kaufman Decl."), ¶ 1.

**Response:**  None

2.      Plaintiff Elsevier, Inc. ("Elsevier) is a New York corporation.  Declaration of Paul Doda (hereinafter "Doda Decl."), ¶ 1.

**Response:**  None

3.      Plaintiff Oxford University Press, Inc. ("OUP") is a Delaware non-profit corporation headquartered in New York City.  Its parent organization is the University of Oxford, a public university located in Oxford, England.  Declaration of Barbara Cohen (hereinafter "Cohen Decl."), ¶ 1.

**Response:**  None

4.      Plaintiff SAGE Publications, Inc. ("SAGE") is a Delaware corporation headquartered in Thousand Oaks, California.  Declaration of Sara van Valkenburg (hereinafter "Van Valkenburg Decl."), ¶ 1.

**Response:**  None

5.      Plaintiff John Wiley & Sons, Inc. ("Wiley") is a New York corporation headquartered in Hoboken, New Jersey.  Kaufman Decl., ¶ 1.

**Response:**  None

6.      Defendant Excel Research Group, LLC ("Excel") is a Michigan limited liability company located in Ann Arbor, Michigan.  It does business under the name "Excel Test Preparation, Coursepacks & Copies."  Admitted – see Answer to Amended Complaint (Docket Entry #12), ¶6.

**Response:**  None

7.      Defendant Norman Miller ("Miller") is the owner and an officer of defendant Excel, and as such had and has the power and authority to direct the actions of Excel.  Admitted – see Answer to Amended Complaint (Docket Entry #12), ¶8.

**Response:**  None

*Plaintiffs' Copyrights*

8.      The works included in this Motion for Partial Summary Judgment are identified in Exhibit A hereto.  They are all but seven of the works identified in the Amended Complaint.  All works included in this Motion were registered in the United States Copyright Office except those works identified as "Non-US Works," for which registration is not a prerequisite to suit.  17 U.S.C. ¶411.

**Response:**  None

9.      All registered works were registered within five years following first publication. Cohen Decl., ¶ 6; Kaufman Decl., ¶ 4;Van Valkenburg Decl., ¶6.  Each registration is therefore *prima facie* evidence of the validity of the copyright and of all statements included in the registration, including those identifying the owners of copyright.  17 U.S.C. ¶410.

**Response:**  None

10. Plaintiff Elsevier is the publisher, and owner of copyright in, the works identified in Exhibit A hereto as "Elsevier Items." Doda Decl., ¶ 3. At the time that such works were reproduced at Excel, Excel could have obtained a license to reproduce the portions that it reproduced, either directly from Elsevier or through CCC. *Id.*, ¶ 7.

**Response:** None

11. Plaintiff OUP is the publisher, and owner of copyright in, the works identified in Exhibit A hereto as "OUP Items." Cohen Decl., ¶ 3. At the time that such works were reproduced at Excel, Excel could have obtained a license to reproduce the portions that it reproduced, either directly from OUP or through CCC. *Id.*, ¶ 7.

**Response:** None

12. Plaintiff SAGE is the publisher, and owner of copyright in, the works identified in Exhibit A hereto as "SAGE Items." Van Valkenburg Decl., ¶¶ 3, 7. At the time that such works were reproduced at Excel, Excel could have obtained a license to reproduce the portions that it reproduced, either directly from SAGE or through CCC. *Id.*, ¶8.

**Response:** None

13. Plaintiff Wiley is the publisher, and owner of copyright in, the work identified in Exhibit A hereto as "Wiley Item." Kaufman Decl., ¶¶ 3, 4. At the time that such work was reproduced at Excel, Excel could have obtained a license to reproduce the portions that it reproduced through CCC. *Id.*, ¶ 5.

**Response:** None

*Defendants' Business*

14.     Defendants at their shop known as "Excel" engage in three lines of business.  Deposition of Norman Miller (hereinafter "Miller Dep."), pp.5- 7, 62-63, 91-93. Two of them –test preparation (i.e., preparing students for standard tests such as the LSAT), and ad hoc copy services – are not at issue here.  The third line of business is coursepacks, and that is the basis of plaintiffs' Amended Complaint.[1]

**Response:**  None

15.     A coursepack is a collection of readings designed by a professor specifically for use by students in a particular course.  A coursepack may include, for example, journal articles, excerpts from books, and perhaps other printed materials. Answer to Amended Complaint, ¶27.[2]

**Response:**  None

16.     Although defendants produced no documentation to indicate how much of their business lay in coursepacks, it is clear from Mr. Miller's testimony that coursepacks represent a plurality, probably a majority, of Excel's business.  *Id.*

**Response:**  None

17.     Defendants currently handle approximately seventy University of Michigan coursepacks per semester.  In the past, the number they handled was even higher than that.  Miller Dep., p. 50.

**Response:**  None

---

[1]   The pages cited here from the Deposition of Norman Miller are attached as, collectively, Exhibit A to the Declaration of William S. Strong submitted [with plaintiffs' motion].

[2]   *See also* the discussion of coursepacks in *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381 (6th Cir. 1996).

18.     An Excel coursepack comes about in the following manner.  First, a professor brings Excel photocopies for the contents of the coursepack – or creates photocopies using Excel's machines.  These photocopies constitute the "master" of the coursepack.  Occasionally, Excel will re-copy something that is damaged or faint.  Excel then numbers the pages of the master by hand.  Miller Dep., pp.36-41.  Defendants claim that "We also go to great lengths to maintain the integrity of the master, so that each student will receive a clear, high-quality copy."  Miller Dep., p. 17 and Exhibit 1.

**Response:**  None

19.     Defendants do not assert ownership of the coursepack master.  The master apparently belongs to the professors who created it.  Miller Dep., pp. 50-52.

**Response:**  None

20.     A student wanting a copy of the coursepack will come to Excel's premises and pay Excel for the use of the master.  In the following colloquy, defendant Miller described in his own words what occurs:

Q     If you walk in the door, what's the layout?  What do you see when you walk in the door?
A     I'm not quite clear what you mean.  Just a general--
Q     Well, is there a--are there photocopy machines out on the floor as you walk into the--
A     Okay.  We are on the second floor, so as someone ascends the staircase, there is an arrow and it says, "Coursepacks," and directs them to travel around to the front counter, and then they meet with someone.  The equipment is all on the other side of a half-level partition, if you will.  So they come to the register before they go back.
Q     Okay.  So they come to the counter?
A     Correct.
Q     And you keep the masters of the coursepacks behind the counter?
A     Yes.
Q     So then they take a coursepack and then they have to go around to another area?  I'm sorry to be dense, I just--I want to understand.  Is it a separate room that they go to to make the copies?
A     It's a separate area within the room.  There's like a half-wall around that.

| | |
|---|---|
| Q | Okay. So you can see over-- |
| A | You can see over it, yes. And they first would, you know, fill out our form and then, you know, get the material that they're enrolled in. |
| Q | Okay. How many copy machines are there? |
| A | Working? |
| Q | At any one time, how many are working, right. |
| A | Right now, I'd say there's eight or nine that are working.<br>We have more that have--you know, it's a problematic aspect that we have maybe four or five that aren't working, but, you know-- |
| Q | You've mentioned a form, and I think that was one of the things I had asked you to produce. Do we have a copy of that form here that the student fills out? |
| A | I don't personally have one, but-- |
| | ***** |
| Q | What does the form say? |
| A | It has, you know, the course they're enrolled in, and then there is a short statement that says, "I am a student in this class and am making a copy for educational purposes," then they date it and sign it, and then we get the material that they are, you know, needing, and then send them over to the--what we call the service area, where they would be guided to a piece of copy equipment and told how to operate it successfully. |
| Q | Okay. So you have--the statement has a printed statement that, "I'm a student in this course and I'm doing this for educational purposes"? |
| A | Yes. |
| Q | Okay. So all they have to do is fill out the course and sign the statement? |
| A | They put their name and address, too, just as a-- |
| Q | Okay. And how long do you retain those forms? |
| A | Usually, just for a semester or two. I've been keeping them for longer since the action, and so I have-- |
| Q | Okay. So you have a person, then, at the front desk who has--who gives this form to the student. The student signs the form, hands it back to that person, is that correct? |
| A | The student fills out the form and hands it to the person at the front desk, correct. |
| Q | Front desk, okay. And then what happens? Does that same person at the front desk go and get the master? |
| A | Yes. |
| Q | Okay. |
| A | That's behind the front desk. And they would--the student would also pay for the, you know, use. |
| Q | Okay. So all that--all right. So I just want to make sure I understand. They get the master and they pay at the time that you hand them the master? |
| A | Yes. |
| Q | And so there's a fixed price for every coursepack? |
| A | It's per-page, yes. |
| Q | Okay. What do you mean, it's per page? |
| A | Well, a given coursepack would be fixed proportional to the number of pages in that-- |

| Q | So you set the price depending on how many pages there are in it? |
|---|---|
| A | Correct. |
| Q | And is it always the same price per page? |
| A | Yes. |
| Q | And what price is that? |
| A | Well, there are a couple of different options.  If they have it on plain paper, it's seven cents.  If it's on paper that's got the holes in it, it's seven and a half cents.  And then there is a fee for making a bound document, which is, essentially, a one cent per page charge but with a minimum for that. |

*****

| Q | Okay.  So then they take the master and they go around to the other side of this half wall partition, and then you say you have another person or persons there who will help them work the machines? |
|---|---|
| A | Yes. |
| Q | How many people do you have on duty over in that area? |
| A | The number varies substantially.  The beginning of a term there would be--we would use temporary help.  Usually, there would be one person, sometimes the person that--later in the semester, the person that does the front counter would then do the other-- |
| Q | When things are quiet? |
| A | Things are quiet.  It's a small-- |
| Q | Okay.  So at a peak period, you would have how many people out on the floor there? |
| A | Again, it would vary, but I would say three or four. |
| Q | Okay.  And their duties--I want to understand exactly what it is they do.  The student comes to them bearing this master, and what's the interaction that they have with this person? |
| A | The person on the floor would describe to the student how the process works, to make sure that the student is able to successfully make a good copy and, also, not tear up the master. |
| Q | Okay. |
| A | Then the people on the floor also would do all of the mechanical things that copiers need as in adding paper, toner, removing jams and doing the binding. |
| Q | Okay.  Oh, they do the binding, as well? |
| A | Yes, we do the binding. |
| Q | So, I mean-- |
| A | The students do not do-- |
| Q | --these people that are out on the floor do the binding? |
| A | Yes, yes. |
| Q | Okay.  So that's not done behind the front desk? |
| A | No, see, the binding is done after they have copied something. |
| Q | Okay.  Is there a separate machine for that? |
| A | There is a separate machine for that. |
| Q | What kind of binding is it? |
| A | It's like a book.  It's a polymer adhesive, so it makes a--I mean, it's--I'm not sure quite how to describe it-- |

| Q | Oh, I see. |
|---|---|
| A | It's a permanent type of binding.  It makes it look like a paperback book, kind of. |

*****

| Q | Okay.  Do you have any idea approximately how many--what percentage of the coursepacks that come out of your shop are bound? |
|---|---|
| A | That's a little hard to say.  I would say more than half. |

Miller Dep., pp.. 25-32

**Response:**  None

21.     In short, defendants supply the master, the machines, the paper, the electricity, the technical assistance – everything that goes into the manufacture of the coursepack copy, other than pushing the button on the photocopying machine.  As defendants boast in their advertising, "We set up the equipment and [the students] press the START button."  Miller Dep., p. 17 and Exhibit 1.  Defendants are further involved by binding more than half of the coursepacks made at their shop.  And for all this, defendants receive payment.

**Response:**    Excel makes no sales of excerpts or articles to the public.  Students using Excel's copying equipment sign statements attesting to their status as students and their enrollment in a particular course, and make their own copies.  Excel has declined to make copies of materials at the request of graduate students who wish to learn more about the subject matter of a course but who are not enrolled in a course.  Excel has declined to make copies for other professors who have asked for courtesy copies of readings.  Many students have asked Excel to make their copies for them, and have offered to pay in order to avoid standing in line and making their own copy, but Excel has refused to honor these requests.[3]

---

[3] [new footnote] The above response occurs in Defs.' Stmt. of Facts No.2.

22.     All coursepacks that Excel binds also have a front cover bearing Excel's trademark, prominently identifying Excel as the source of the coursepack.  Miller Dep., p. 31-32; for examples see Exhibit B to the Cohen Declaration.

**Response:**  None

23.     Defendants have never obtained copyright permission for the contents of any coursepack.  Miller Dep., p.90-91.

**Response:**  Defendants did not seek permission because they have not made any reproductions.  The students have made reproductions, which they are entitled to do pursuant to the various contracts in place with Plaintiffs and the University library.[4]

24.     Despite defendants' protestation that they do not "sell" coursepacks, their customers do not share this perception.  Attached as Exhibit B to the Strong Declaration are pages from University of Michigan course syllabi in which professors advise their students that their coursepacks are for "sale" at Excel.

**Response:**  None

25.     Defendants adopted the business model described above in a deliberate effort to get around copyright.  From the beginning, they have touted their alleged avoidance of copyright as a virtue of their business.  Miller Dep., p. 17 and Exhibit 1.

**Response:**  None.

26.     Defendants specifically promote their coursepack model as saving money by avoiding copyright fees.  They say:

> Since each student is making just one copy for his or her own individual use, no copyright permissions or royalty fees are involved… As a result, you have greater flexibility and convenience in selecting your readings and your students benefit by paying substantially less (generally saving 50% or more) for their coursepacks.

_____
[4] [new footnote] The above response occurs in Defs.' Stmt. of Facts No. 9.

Miller Dep., Exhibit 1.  In short, defendants have deliberately sought to drive business to their shop by their copyright-evasion scheme.  They have at the same time sought to take business away from shops that *do* go to the bother of getting copyright permission for their coursepacks.

**Response:**  None.

27.     At no time prior to the initiation of this lawsuit did defendants seek legal advice as to the validity of their claims.  Miller Dep., p.16.

**Response:**  None

### *Unauthorized Reproduction of Plaintiffs' Materials*

28.     Plaintiffs' seek summary judgment at this time as to thirty-four book excerpts and journal articles that have been reproduced in Excel coursepacks.[5, 6]  Defendants have admitted to all of these.  Miller Dep., pp. 78-83 and Exhibit 3.[7]  Thus, as to these thirty-four copyrighted works there is no dispute that they were reproduced in whole or in part in Excel coursepacks.  These works are identified on Exhibit A hereto.

**Response:**  None

29.     The excerpts reproduced from plaintiffs' copyrighted works consist of entire journal articles, and entire chapters of books – in many cases well over 10% of the

---

[5]   [new footnote:] This is a slight misstatement.  Although there are 34 line items on Exhibit A to their pending Motion, two of those line items identify different portions of a single work that were reproduced in two different coursepacks.  See Van Valkenburg Decl., ¶3(d).  Thus, there are actually 33 works at issue in the pending motion, not 34.  Plaintiffs corrected the misstatement in their response to defendants' statement of facts, as noted below, and apologize for any intervening confusion.

[6] As noted below, plaintiffs have through discovery identified yet more infringed works, but these have not been formally added to case as of this date.

[7]   With respect to one work, defendants admit that some but not all portions identified by plaintiffs were reproduced.  *Id.*

books from which they are taken.  The percentages that they represent of the works from which they are taken are set forth on Exhibit A.

**Response:**  Defendants claim fair use and also authority pursuant to contracts between the University of Michigan and plaintiffs, as well as partly admissions that students can copy library books and articles.[8]

30.     In reviewing coursepacks that were not known to them when the Amended Complaint was filed, but were produced in discovery, plaintiffs have identified numerous other publications of theirs that were copied in the same manner as described above. See Cohen Decl., ¶10; Kaufman Decl., ¶¶ 7-8;   For example,

a.     The coursepack for Environment 449, Winter 2009 (Professor Romani) contains the following:

- 17 different excerpts from Wiley's journal *Public Administration Review*, including multiple excerpts from several issues;
- two chapters, constituting 57 pages, from Wiley's book *Understanding and Managing Public Organizations*, 3rd ed., by Hal G. Rainey, and
- an article from Wiley's *Journal of Policy Analysis and Management*, Vo. 21, No. 4.

Kaufman Decl., ¶ 7.

b.     The coursepack for Political Science 389-005/German 302, Winter 2009 (Professor Rensmann) contains Chapters 5 and 6 in Pulzer, *German Politics 1945-1995* (Oxford University Press 1995), pp 90-128.  See Ex. B to Cohen Decl., ¶10.

Plaintiffs will seek to amend the Complaint at the appropriate time to add these works to the case.

**Response:**  None

---

[8] [new footnote] The above response is a summary of Defs.' Stmt. of Facts Nos.11 and 12, reproduced below.

31. As noted above, defendants never sought permission for reproduction of any of plaintiffs' materials in coursepacks.

**Response:** Defendants never needed to do so because of fair use and the University of Michigan contracts and student rights to reproduce library materials.[9]

32. Defendants, in their summary judgment motion filed in December, 2007, have asserted that plaintiffs' license agreements with the University of Michigan Library authorized the reproduction identified in the Amended Complaint. (The license agreements are reproduced as Exhibits to Defendants' Motion for Summary Judgment, Docket Entry #16.) However, this is not correct. Specifically:

a. The Elsevier agreement (defendants' Exhibit 5, Docket Entry 16-7) covers the journals identified in items 3-7 on Exhibit A hereto. It allows students to print and download excerpts from the Elsevier database. It does not, however, grant permission for any other kind of reproduction, such as offsite photocopying – and it specifically says that all rights in the database remain with Elsevier "except as expressly set forth in this Agreement." (*Id.*, §1.5) Moreover, the Elsevier Agreement specifically says that Authorized Users may not "substantially or systematically reproduce, retain or redistribute the Licensed Products." *Id.*, §1.4.3. Yet defendants' business relies on precisely such conduct.

b. The OUP agreement (defendants' Exhibit 6, Docket Entry 16-8) covers journals only, not books. All the OUP works identified in the Amended Complaint (items 8-22, 24, 26-28 on Exhibit A hereto) are books. In so saying OUP does not

---

[9] [new footnote] The above response is a summary of Defs.' Stmt. of Facts Nos.11 and 12, reproduced below.

concede that the aforesaid agreement would authorize reproduction of journal contents in Excel coursepacks; that issue is simply not relevant here. [10]

    c.     The SAGE agreement (defendants' Exhibit 4, Docket Entry 16-6) became effective on December 30, 2006, after all the SAGE infringements identified in the Amended Complaint had occurred. There was no agreement in effect between SAGE and the University prior to that date. Van Valkenburg Decl., ¶ 11. In so saying SAGE does not concede that the aforesaid agreement would authorize reproduction of SAGE journal contents in Excel coursepacks; that issue is simply not relevant here.

    d.     The Wiley agreement (defendants' Exhibit 3 – Docket Entry 16-5) at Section C ("Terms and Conditions of Use"), allows Authorized Users to "download, view, copy and save to hard disk or diskette and store or print out" single copies of individual articles and chapters (Paragraph C(1)(a)), and allows U of M faculty to make coursepacks "to be distributed to students … free of charge or at a cost-based fee" (Paragraph C1(d)). In Paragraph 2 of Section C, the agreement specifically says that "[e]xcept as provided in Paragraph C(1) above, Authorized Users may not copy, distribute, transmit or otherwise reproduce material from [the licensed products]. Thus the Wiley agreement, like the other license agreements between plaintiffs and the University, in no way authorizes what has gone on at Excel.[11]

---

[10] [new footnote:] The first sentence in this subparagraph (b) is incorrect, although not in any way that is relevant to this case. What plaintiffs should have said was that the *particular* OUP books identified in the Amended Complaint have never been subject to the OUP license, and there was no other license in effect covering such books. Plaintiffs corrected the record in this respect in their response to defendants' statement #9 (see page 20 below).

[11] The Blackwell agreement is, technically, not at issue here because no Blackwell work is included in the present Motion for Partial Summary Judgment. However, that agreement (defendants' Exhibit 2) expressly forbids "Commercial Use" of those journals, which it defines as "[u]se for the purpose of monetary reward (whether by *or for the*

**Response:**  Defendants state that No. 12 of their Statement of Facts (reproduced below) is responsive to this statement.

**B.  DEFENDANTS' STATEMENT OF FACTS, AND PLAINTIFFS' RESPONSES THERETO**

*The following un-numbered allegations appear on page 1 of Defendants' Response to Plaintiffs' Motion*:

**Allegation:**  "The University of Michigan currently pays millions of dollars per year for licenses that allow its students to obtain copyrighted works from the Plaintiffs, which includes all or virtually all of the material copied in Defendants' shop."

**Response:**  There is no evidence in the record to establish how much of the material copied in defendants' shop comes from works that are subject to license agreements between plaintiffs and the University.  As noted below, 29 of the 34 works at issue in the pending motion are not subject to any such license.

**Allegation:**  "To the extent that Plaintiffs claim to be able to identify 34 items outside of the Licensing Agreements – which Defendants deny – the binding admissions of their own  30(b)(6) depositions admit that students can make copies of journal articles and books from hard copies."

**Response:**  False.  These so-called "admissions" are discussed below in response to defendants' numbered statement 12.

---

Licensee or an Authorized User) by means of the sale, resale, loan, transfer, hire or other form of exploitation of the Licensed Materials." (emphasis added).  Thus, the Blackwell Agreement does not allow an Authorized User to be the beneficiary of any use from which any person receives monetary reward.

**Allegation:**    "Moreover, Plaintiffs have sandbagged Defendant with last-minute

identifying of 34 documents out of thousands that they claim are not

included on databases."

**Response:**    Just what "thousands" defendants are referring to is unclear, but the 34

are, presumably, the 34 documents identified on Exhibit A to Plaintiffs'

Statement of Undisputed Facts.[12]   The claim that these were identified at

the "last minute" is astonishing.  The works in question are all among

those named more than two years ago in plaintiffs' Amended Complaint.

Nor was this in any way obscure. As plaintiffs explained in their

Statement of Undisputed Facts:

The works included in this Motion for Partial Summary Judgment are
identified in Exhibit A hereto.  They are all but seven of the works
identified in the Amended Complaint.[13]

If defendants have been "sandbagged," it is by their own careless reading

of plaintiffs' papers.

*Defendants' Numbered Statement of Facts*:

1.    Students at the University of Michigan (the "University") have used

photocopy equipment at the premises of Defendant Excel Research Group, LLC

---

[12]   [new footnote:] As noted above (see fn. 3), there are actually 33 works at issue in the
pending motion, not 34.  Plaintiffs corrected the record in a footnote to this Response.
[13]   Stmt of Undisp. Facts, ¶8.  Each of plaintiffs' declarants delivers the same message.
See, *e.g.*, Declaration of Roy Kaufman at ¶3:
    Wiley (including Blackwell) is limiting its request for summary judgment at this
    time to one work identified in the Amended Complaint, namely that identified in
    Count 41.

("Excel") to copy the readings assigned by their professors.  Excel does not make copies for the students.

**Response:**    As discussed at length in plaintiffs' opening brief, this is only superficially correct.  Defendants are the true makers of the coursepacks as they control the entire process other than the pushing of the button on the copy machine that causes the copy to be created.

2.    Excel sells no product.  Excel has no inventory of products.  It does not stock or sell course packs.  It does not create or sell compilations.  It does not create or sell books. Excel makes no sales of excerpts or articles to the public.  Students using Excel's copying equipment sign statements attesting to their status as students and their enrollment in a particular course, and *make their own copies*.  Excel does not make the students' personal copies of the professor's assigned readings. Excel has declined to make copies of materials at the request of graduate students who wish to learn more about the subject matter of a course but who are not enrolled in a course. Excel has also declined to make copies for other professors who have asked for courtesy copies of the readings. Many students have asked Excel to make their copies for them, and have offered to pay in order to avoid standing in line and making their own copy, but Excel has refused to honor these requests.  Defs.' Stmt. Of Undisp. Facts, ¶ 7. (No. 17)[14].

**Response:**  No additional response needed.  The identity of who runs the masters through the machines is not relevant.

3.    Students can utilize Excel's copying equipment to make their own

---

[14]  [new footnote:] References here to "Defs.' Stmt. Of Undisp. Facts … (No. 17)" are to Docket Entry #17, namely, the statement of facts submitted previously by defendants in support of their own motion for summary judgment.

personal copies.  Unlike some "copyshops," Excel does not create an inventory of coursepacks for sale to University students.  Defs.' Mem. Supp. Summ. J. at 2. (No. 16).

**Response:**  No additional response needed.

4.      Excel employees are available to assist students with the copy machines. Defs.' Stmt. Of Undisp. Facts. ¶ 2. (No. 17).

**Response:**  Agreed.  See Plaintiffs' Statement of Undisputed Facts, at ¶20.

5.      Defendants do not contest that they supply the machines, the paper, and the electricity needed to make copies on their premises; however, Defendants would like to point out that the University library provides the same materials to make copies.

**Response:**  The concession does not give a full picture of defendants' thorough involvement in the process of manufacturing coursepacks; see Plaintiffs' Statement of Undisputed Facts at ¶¶18-22.  The statement concerning the University library is without foundation but also irrelevant.

6.      Excel will, for a fee and upon request, bind the copy that the student has made.

**Response:**      Statement does not give the full flavor of defendants' operation; see Plaintiffs' Statement of Undisputed Facts at ¶22.  And as stated above, the student does not truly "make" the copy.

7.      The students do, in fact, make the copies themselves.  It should also be noted, however, that professors compile the coursepacks.

**Response:**  No additional response needed.  The fact that professors compile the coursepacks is not relevant.

8.      Excel does not "produce" coursepacks as alleged in Plaintiffs' Motion for

Partial Summary Judgment (p. 4, ¶ 8). Excel merely provides a place for students to copy coursepacks compiled by University professors. Defs.' Stmt. Of Undisp. Facts, ¶ 7. (No. 17).

**Response:**   No additional response needed.

9.      Defendants did not seek permission because they have not made any reproductions. The students have made reproductions, which they are entitled to do pursuant to the various contracts in place with Plaintiffs and the University library.

**Response:**      As to the first part of this sentence, plaintiffs incorporate their responses above. As for plaintiffs' licenses to the University, [15] plaintiffs are frankly surprised to see this argument raised again, and especially to see it raised as regards the claims of SAGE Publications ("SAGE") and Oxford University Press ("OUP"). Plaintiffs make the following observations:

   (1)      The SAGE license, on its face, became effective *after* the reproductions alleged in the Amended Complaint had already occurred. (See Plntffs' Stmt of Undisp. Facts, ¶ 32(c). [16]  Its effective date (December 31, 2006) is plain for all to see, at the top of on the first page, and the dates of the infringements – all earlier than 12/31/06 – are clearly set forth in Column 2 of Schedule A to the Amended Complaint and of Exhibit A to the pending motion. (The latest coursepacks identified as infringing SAGE

---

[15]  [revised footnote:] The "contracts" referred to in defendants' statement #9 are certain license agreements that were entered into between plaintiffs and the University of Michigan. Elsewhere in their response to plaintiffs' summary judgment motion, defendants refer to these license agreements as being incorporated in an Exhibit F. However, as of the date of plaintiffs' Reply to Defendants' Statement of Facts, no Exhibit F had been filed with the Court. Since the license agreements were previously filed by defendants in support of their own summary judgment motion, plaintiffs have in these responses identified the agreements  by reference to the earlier docket entries.

material are from the Winter 2006 term, which began in January 2006.) Even a cursory examination would have confirmed this.[17]

(2)    Plaintiffs' counsel made the above observation in an email to defendants' counsel dated February 23, 2009. See Second Declaration of William S. Strong, submitted herewith, at ¶1.

(3)    The fact that all infringements predated the date of the license agreement was reiterated by Sara Van Valkenburg in her Declaration filed in support of plaintiffs' Motion. Van Valkenburg Decl., ¶11. Ms. Van Valkenburg also testified, in the interest of thoroughness, that "SAGE had no license agreement in place with the University of Michigan prior to December 30, 2006." *Id.*

(4)    With respect to the OUP license (Docket #16-8), undersigned counsel advised defendants' counsel by email on March 12, 2009, that, *inter alia*, the OUP books identified in the Amended Complaint had never been subject to the OUP license, and there was no other license in effect covering such books. See Second Strong Declaration, ¶2. Some of the same information was set forth in OUP's written discovery responses served on defendants on March 16, 2009. *Id.*, ¶3. Defendants never challenged this information or sought discovery with respect to it. *Id.,* ¶4. In short, there was absolutely no basis on which defendants could

---

[16] The SAGE license is reproduced at Docket Entry 16-6.
[17] Furthermore, two of the SAGE works at issue here are books, and the SAGE license by its terms covers only journals. (See the second paragraph under heading (I) on the first page of the SAGE license.)

reasonably claim that the OUP license had any bearing on the lawfulness of the reproduction of the 19 OUP works at issue here. [18]

(5)     So that the record as regards OUP will be absolutely clear, plaintiffs have filed herewith the Second Declaration of Barbara Cohen.

(6)     Between them, the SAGE and OUP claims comprise 28 of the 33 claims at issue in the pending summary judgment motion.  Of the other five other works at issue, four are Elsevier works, and arguably subject to the license between Elsevier and the University.  (Docket #16-7.)  However, the Elsevier license does not extend to anyone other than "Authorized Users" (i.e., member of the University community); it does not extend to off-campus copy shops.  It does not authorize any copying at off-campus copy shops.  It permits students to "print and download" from the Elsevier database.  (It also says that students cannot "substantially or systematically reproduce, retain or redistribute the Licensed Products.")

(7)     The fifth and last work at issue here was published by plaintiff John Wiley & Sons, Inc. ("Wiley").  The Wiley license agreement with the University of Michigan (Docket #16-5) does not include that work. [19]

10.     Defendants' coursepacks cost less than their competitors because their competitors do not require the students to make the copies for themselves, but simply sell students pre-made coursepacks.

---

[18]   Plaintiffs' Statement of Undisputed Facts, at ¶32(b).  The first sentence of said paragraph 32(b) was, on review, a flawed summary of the above information, but the main point – that the OUP books at issue here were never subject to the license – was correct.

**Response:** This statement is not supported by any evidence. On the contrary, defendants themselves advertised that their coursepacks cost less than their competitors because defendants did not pay copyright fees. (*See* Plaintiffs' Statement of Undisputed Facts, at ¶25.)

11.    Currently, the vast bulk of journals on campus are read after being downloaded. (*See* **Ex. D**; **Ex. B** at 30; **Ex. E** at 14.)

**Response:** Plaintiffs are at loss to discern the relevance of this statement. Furthermore, although defendants cite their own "**Ex D; Ex. B** at 30; **Ex. E** at 14" as evidence for it, nothing in those references actually supports the statement, and there is no other evidence in the record to support it.

12.    Plaintiffs concede that to the extent students desire to copy hardbound journals from the library, they can do so, and that is what the Companies foresee and expect. (**Ex. B** at 34, 35, 41).

Q: "You've already testified that you expected the students to make copies of the journal articles, using the copy machines in the library, right?"

A: "Since the copy machines are near the journals we would assume they would do that."

(**Ex. B** at 41)

Plaintiffs have actually sent mixed messages about student copying of journal articles – because their primary business is to sell to universities, and they want to demonstrate higher usage to show demand. (**Ex. B** at 36) ("we did want to encourage the use of our materials.")

---

[19] This, again, is something that should have been apparent to defendants, who bear the burden of proving their license defense. The work is not identified in any of the lists of

Most significantly, in its 30(B)(6) deposition for Plaintiffs Wily and Blackwell, the corporate representative and Vice President, Chris McKenzie, described the business relationship between his companies and the University of Michigan and its students. (**Ex. C** at 17-33). It is well worth reading in its entirety to capture the company's understandings and admissions both as to how students will use printed materials and electronic materials.

The present motion claims to limit itself to those not governed by the electronic licensing agreements. The admissions are clear, and they are repeated:

"if a student were to take a book or journal and Xerox the assigned reading for a class that constituted the portion of that material, that would fall within the sanctioned or expected use, appropriate use of that, I grant that would be an expected use for a student." (Ex. C at 20).

Q: "Now, if the student is able to take the material physically out of the library and performs the copies outside the library, does that matter as compared to using the copying machines in the library? Again, we're talking just about the assigned reading, a portion of the text?"

A: "No."

(**Ex. C** at 21.)

**Response:** As to what students might do with hardbound journals, Mr. Hueckel's testimony was beyond the scope of his designated competence as a 30(b)(6) witness for Elsevier, and is therefore admissible only to show his personal opinions. Second Strong Declaration, ¶¶5-6.

---

licensed materials attached to the document defendants have entered into evidence.

For what other purpose defendants proffer this evidence is obscure. If they proffer it to show what the Elsevier license means, it is inadmissible. There is no showing of ambiguity concerning the language of the license, so parol evidence is not admissible on that topic. Even if admissible, the evidence is irrelevant because

(1) The Elsevier license concerns electronic versions of Elsevier journals, not hardbound physical copies in the collection of the University library, so Mr. Hueckel's expectations as to what students would do with hard copies has nothing to do with the license.

(2) It is obvious from Mr. Hueckel's testimony that he is referring to *ad hoc* copying of journal articles. ("Since the copy machines are near the journals we would assume they would do that.") It has nothing to do with organized off-site copying.

So far as Mr. Hueckel's statement about fair use is concerned, defendants try to cast this testimony as an admission against interest. But the attempt must fail. Mr. Hueckel's testimony about student copying of physical materials in the University library was beyond the scope of his designated competence as a 30(b)(6) witness for Elsevier. Second Strong Declaration, ¶¶5-6. Thus, it constitutes at most his personal opinion on the issue. Indeed, Mr. Hueckel makes clear he is giving only his second-hand understanding of a legal issue: "My understanding of the use of print materials is that there is something called fair-use and if the student can get a physical copy of the journal, they have a right to make a copy of an article from that journal…"[20]

Defendants next claim that Wiley's 30(b)(6) deponent, Christopher McKenzie,

---

[20] It should also be noted, for the record, that as a 30(b)(6) witness for Elsevier, Mr. Hueckel had no capacity to bind any of the other plaintiffs.

"admitted" that "if a student were to take a book or journal and Xerox the assigned

reading for a class that constituted the portion of that material, that would fall within the

sanctioned or expected use, appropriate use of that, I grant that would be an expected use

for a student." Like Mr. Hueckel's testimony cited above, this testimony of Mr.

McKenzie is outside the scope of what he was designated to address under Rule 30(b)(6).

Second Strong Decl., ¶¶5-6.  Moreover, defendants grossly misstate what he said.  The

actual colloquy, as shown at p. 20 of defendants' Exhibit C, is as follows:

> Q.   But if a student were to take a book or a journal and Xerox the
> assigned reading for a class that constituted a portion of that material, that would
> fall within the sanctioned or expected use, appropriate use of that material?
>
> MR. STRONG: I object to the question. You have three different
> adjectives out there.
>
> A.  I am again not a lawyer and would not speculate on the copyright law
> governing that use, but I would grant that that would be an expected use for a
> student.

In short, Mr. McKenzie admitted to nothing beyond a certain realism, or resignation, as to

what students will do.  He does not admit that any student had the right to participate in

the sort of conduct that has gone on at defendants' shop.

> Defendants also characterize the following as an "admission":
>
> Q.  "Now, if the student is able to take the material physically out of the
> library and perform the copies outside the library, does that matter as compared to
> using the copying machines in the library?  Again, we're talking just about the
> assigned reading, a portion of the text?"
>
> A.  "No."

Again, the testimony is (i) outside Mr. McKenzie's 30(b)(6) designation and (ii) taken

out of context.  The full colloquy runs thus, at pp.20-21 of defendants' Exhibit C:

> Q. Okay. Just to clarify, you don't need to keep telling me you're not a
> lawyer. I'm not asking you for a legal opinion. I'm asking you because you're a

Vice President of Wiley and Wiley is in the business of selling and licensing information and you're an officer of this company. Right?

    A. Correct.  I'm an officer of Wiley Subscription Services, Inc.

    Q  So I'm asking you just in that capacity, as you understand things, recognizing that you're not a lawyer, and we're not having a legal debate here, just as you understand how the business works, that's all. So you expect students to take print materials off the shelves and to copy portions of them for their assigned reading. Right?

    A. Yes.

    Q. Now, if the student is able to take the material physically out of the library and perform [sic] the copies outside the library, does that matter as compared to using the copying machines in the library?  Again, we're talking just about the assigned reading, a portion of the text.

    A.  No.

Here again, it is unclear what if anything Mr. McKenzie has "admitted," but it is clearly

not an admission of any legal point whatever.

*The following un-numbered allegation appears on page 7 of Defendants' Response to Plaintiffs' Motion.*

**Allegation:**    "… Plaintiffs <u>admit</u> that students have the right to engage in copying for

        classroom use at copy stores…"

**Response:**    Plaintiffs have made no such admission. See discussion above.


*The following un-numbered allegation appears on page 10 of Defendants' Response to Plaintiffs' Motion.*

**Allegation:**    "Apparently, Plaintiffs concede that as a matter of law, they cannot prevail

        that the vast bulk of Defendants' activities infringe as a result of the

        Licensing Agreements."

**Response:**    Plaintiffs have made no such concession.  There is no evidence in the

        record at this point as to what "the vast bulk of Defendants' activities"

consist of, nor are such activities relevant to the pending motion, which seeks a finding of infringement as to 33 specific works. (For the record, plaintiffs do not believe that the license agreements excuse any of defendants' conduct.)

*The following un-numbered allegations appear on page 12 of Defendants' Response to Plaintiffs' Motion.*

**Allegation:** "Strangely for Plaintiffs however, their corporate representatives have admitted in Rule 30(b)(6) depositions that as for printed materials – that is those not covered by the Licensing Agreements (which relate to electronic downloads), <u>students have the right to take physical copies; bring them to the copy store and make a copy for use in classwork</u>. (**Ex. C** at 32-33)."[21]

**Response:** Plaintiffs have made no such admission. Mr. McKenzie has testified only that, so far as Wiley is concerned, a student who has printed out a copy of licensed material can take it to a copy shop to make another copy. And since the Wiley work at issue in the pending motion is not even governed by the Wiley-UM license agreement, that testimony has no bearing on the motion.[22]

---

[21] [new footnote:] Ex. C is the deposition of Christopher McKenzie, Wiley's 30(b)(6) witness.

[22] For the record, however, plaintiffs note that the Wiley license explicitly allows students to "download, view, copy and save to hard disk or diskette and store or print out" single copies of individual articles and chapters, and allows faculty to make coursepacks "to be distributed to students … free of charge or at a cost-based fee" It also provides that students and faculty cannot otherwise "copy, distribute, transmit or otherwise reproduce material from [the licensed products]." Thus, even more explicitly than the Elsevier license, it does not authorize student copying off-campus, let alone for-profit copying by an off-campus copy shop. Mr. McKenzie's testimony indicates a certain forbearance on the part of Wiley with respect to the activity described in the

**Allegation:**  "… [T]o the extent the professor holds the copyrights on works – and that clearly applies to a number of items at issue in this case – those claims are barred by the doctrines of accord, waiver and estoppel."

**Response:**  This is simply false.  The unrebutted testimony of plaintiffs' declarants establishes that copyright in all works at issue in this motion is owned by the respective plaintiff identified in Exhibit A to plaintiffs' motion.

*The following un-numbered allegation appears on page 13 of Defendants' Response to Plaintiffs' Motion.*

**Allegation:**  "…Excel is essentially an agent of the professor."

**Response:**  There is nothing in the record to support a finding of agency.  Indeed, since Excel evidently did not turn over its coursepack revenues to the professors, the suggestion is wrong on its face.

*The following un-numbered allegations appear on Pages 13-14 of Defendants' Response to Plaintiffs' Motion.*

**Allegation:**  "… Plaintiffs concede that fair use is a question of fact for those materials subject to the licensing agreements,  and … those items (those included in the licensing agreements) constitute the vast bulk of copying that is performed at the store by students…"

**Response:**  Plaintiffs have made no such concession.  Indeed, the statement appears to confuse the issue of fair use with the issue of what is permitted by license.  As for the "vast bulk" of copying, there is no evidence whatever in the

---

question and answer, but cannot be introduced to alter the language of the agreement, which is unambiguous.

record to support the statement – even if the statement were relevant to the pending motion, which it is not.

**Allegation:** "The Copyright Act bars lawsuits premised on a copyright claim brought after three years from accrual of that claim. 17 U.S.C. § 507(b). Plaintiffs now, apparently for the first time, are alleging violations from prior to that period. (See Plaintiffs' brief, alleging that summary judgment is appropriate as to those infringements that occurred prior to the Licenses with the University) They are barred."

**Response:** Every infringement at issue here occurred within three years prior to June 28, 2007, the filing date of this action. The earliest coursepacks at issue were for the Fall Semester of 2004. See 2nd column, labeled "Course," on Exhibit A to Plaintiffs' Statement of Undisputed Facts.

Respectfully submitted,

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
OXFORD UNIVERSITY PRESS, INC.,
SAGE PUBLICATIONS, INC.,
JOHN WILEY & SONS, INC.,
Plaintiffs,

By their Attorneys:

KOTIN, CRABTREE & STRONG LLP

Dated: September 24, 2009          By: /s/ William S. Strong
                                       /s/ Amy C. Mainelli Burke
                                       William S. Strong, Esq., BBO #483520
                                       Amy C. Mainelli Burke, Esq., BBO#657201
                                       KOTIN, CRABTREE & STRONG, LLP
                                       One Bowdoin Square
                                       Boston, MA 02114
                                       (617) 227-7031
                                       (617) 367-2988 (fax)

Local Counsel:

Claudia Rast (P40165)
Karl V. Fink (P13429)
Cynthia M. York (P39722)
Pear, Sperling, Eggan & Daniels, P.C.
24 Frank Lloyd Wright Drive
Ann Arbor, Michigan  48105
(734) 665-4441
(734) 665-8788 (fax)

EXCEL RESEARCH GROUP, LLC d/b/a
EXCEL TEST PREPARATION,
COURSEPACKS, & COPIES and
NORMAN MILLER, individually,
Defendants,

By their Attorneys:

NACHT & ASSOCIATES, P.C.


By:     /s/ David Nacht_____
        David Nacht, Esq.
        Nacht & Associates, P.C.
        101 N. Main St., Ste. 555
        Ann Arbor, MI 48104
        Phone:  (734) 663-7550
        Fax:      (734) 663-7592

## CERTIFICATE OF SERVICE

I, Amy C. Mainelli Burke, hereby certify that the foregoing document was filed with the Clerk of Court through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent by first class mail to those indicated as non registered participants on September 24, 2009.


                /s/ Amy C. Mainelli Burke_____
                Amy C. Mainelli Burke