UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BLACKWELL PUBLISHING, INC., ELSEVIER,
INC., OXFORD UNIVERSITY PRESS INC.,
SAGE PUBLICATION, INC., and
JOHN WILY & SONS, INC.,

    Plaintiffs,

v.                                                                                          Case No. 07-12731

EXCEL RESEARCH GROUP, LLC                                      HONORABLE AVERN COHN
d/b/a EXCEL TEST PREPARATION,
COURSEPACKS & COPIES, and NORMAN
MILLER, individually,

    Defendants.

_____/

## MEMORANDUM AND ORDER
## GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### I. Introduction

This is a copyright infringement case. Plaintiffs Blackwell Publishing Inc., (Blackwell), Elsevier, Inc. (Elsevier), Oxford University Press, Inc. (Oxford), Sage Publication, Inc. (Sage) and John Wiley & Sons, Inc. (Wiley) (collectively, "publishers") are suing defendants Excel Research Group, LLC d/b/a Excel Test Preparation Coursepacks & Copies, and Norman Miller (collectively "Excel") claiming that Excel has violated its right of reproduction under 17 U.S.C. § 106(1) and right of distribution under 17 U.S.C. § 106(3) in the manner in which it provides copying services to professors and students at the University of Michigan ("University") in Ann Arbor, Michigan.

Before the Court is the publishers' motion for partial summary judgment. The

publishers ask for summary judgment on liability, arguing that Excel has infringed their copyrights on thirty-three discrete works identified as Exhibit A to its Statement of Undisputed Facts.[1]  For the reasons that follow, the motion is GRANTED.

## II.  Background

The material facts as gleaned from the parties' papers follow.[2]

Plaintiffs are publishers of copyrighted works.[3]

Excel is Michigan Limited Liability Company located in Ann Arbor, Michigan.  It does business under the name "Excel Test Preparation, Coursepacks, and Copies."  It is owned and operated by Norman Miller.

For the past ten years, Excel has been in the business of providing photocopying equipment and ancillary services to students and professors at the University of Michigan.  Specifically, Excel has three lines of business.  Two of them - test preparation (i.e. preparing students for standard tests such as the LSAT) and ad hoc copying services - are not at issue here.  What is at issue is Excel's furnishing of coursepacks to students.

---

[1]According to the publishers, all but seven of the thirty-three works are identified in the Amended Complaint.  The thirty-three works included in the motion were either registered in the United States Copyright Office or are "non-US Works" for which registration is not a prerequisite to suit.  See 17 U.S.C. § 411.

[2]As will be explained, Excel filed a motion for summary judgment prior to discovery.  The Court denied the motion and the parties then engaged in discovery.  In its response to the publishers' motion, Excel incorporated the facts and arguments asserted in its prior motion for summary judgment.  As such, the Court has referred to Excel's summary judgment papers in addition to the publishers in discussing the background of the case and addressing its arguments.

[3]Blackwell, once a subsidiary of Wiley, has since ceased to have a separate corporate existence.

A coursepack is a collection of readings designed by a professor for use in a particular course. A coursepack may include, for example, journal articles, excerpts from books, and other printed material. Excel currently handles approximately seventy coursepacks each semester.

Excel handles coursepacks by:

> physically accepting from the professors the readings selected, excerpted, and compiled by the professors, checking to see that the pages are not bent or blurry and will photocopy well, retaining a master copy of the handouts for the benefit of the students, handing the master to students who request it and who confirm in writing that they are a student enrolled in the course, ensuring the proper operation of the photocopy machines and refilling paper and toner, binding copies of documents upon request, and answering any student questions as to the operation of the photocopy machines.

Excel's Statement of Undisputed Facts in Support of Summary Judgment (SOMF) filed in support of its motion for summary judgment at ¶ 2.[4]

From the review of the record, it is fair to say that the process works as follows. First, a professor brings Excel photocopies of the contents of the coursepack (or creates copies using Excel's copy machines). These photocopies become the "master" copy. Excel numbers the pages by hand. It take steps to ensure good copy quality, which may require re-copying the original source.

A student wanting a coursepack comes to Excel's premises and fills out a form on which the student writes the course the student is enrolled in and for which the student needs the material. The form contains a statement to the effect that: "I am a student in this class and am making a copy for educational purposes." The student

---

[4]The process is also described in detail on pages 25-32 of Miller's deposition testimony, which is recited verbatim in the publishers' Statement of Undisputed Facts at ¶ 20.

3

signs and dates the form. The student hands the form over to an Excel staff member who retrieves the "master," hands it to the student, who then makes a copy using Excel's copy machines. Excel also offers the student binding services, where an Excel staff member uses a special binding machine to bind all the pages of the coursepack. The student pays Excel.

Excel does not pay copyright fees to the publishers, which it admits enables it to charge a lower fee than if the students obtained the materials at a traditional "copyshop" or copied the materials on a copy machine located on campus. As Miller testified at deposition:

> Since each student is making just one copy for his or her own individual use, no copyright permissions or royalty fees are involved . . . As a result, you have greater flexibility and convenience in selecting your readings and your students benefits by paying substantially less (generally saving 50% or more) for their coursepacks.

### III. Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a

4

genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

IV. Analysis

A. The Law

The Constitution establishes Congress' power to create copyrights to "promote the Progress of Science and the useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. CONST. art. I, § 8, cl. 8. The Copyright Act gives copyright owners exclusive rights to

5

reproduce, prepare derivative works from, distribute, and publicly perform or display a copyrighted work, and allows "the legal or beneficial owner of an exclusive right under a copyright . . . to institute an action for any infringement of that particular right."  17 U.S.C. §§ 106, 501(b).

The publishers say that Excel has violated its right of reproduction and right of distribution under Section 106, which provides:

> Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
> (1) to <u>reproduce</u> the copyrighted work in copies or phonorecords;
> . . .
> (3) to <u>distribute</u> copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

17 U.S.C. § 106 (emphasis added).

The elements of a copyright-infringement claim are (1) ownership of the copyright by the plaintiff and (2) copying by the defendant.  See <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991); <u>Zomba Enterprises, Inc. v. Panorama Records, Inc.</u>, 491 F.3d 574, 581 (6th Cir. 2007).

Here, the publishers have asserted ownership of the thirty-three copyrighted works at issue.  Excel does not deny this.  As to the second element - copying - Excel has denied liability.  Specifically, Excel says that its has not violated the copyright laws because (1) all of the publishers have authorized the copying of their copyrighted materials, including the creation of coursepacks, (2) the publishers do not contend that the students or professors are infringers, a pre-requisite to finding Excel liable, (3) and Excel's activities fall within the "fair use" rights granted under the Copyright Act.  Each

argument will be addressed in turn.[5]

## B. Contracts/Licensing

### 1.

Excel says that each of the publishers are a party to a written contract under which the University and its students and faculty have the right to access and copy certain works and include them in coursepacks. Excel says the University has paid the publishers significant sums for such contracts. Excel makes much of the fact that the contracts do not specify that the students make copies at a particular copy machine.

Excel spends a good deal of time citing excerpts from the various contracts between the University and the publishers. These agreements generally allow for students and professors at the University to access and copy materials covered by the agreement, including materials prepared in coursepacks.

Excel also says that it is not making any "use" of the works at issue, it "sells no product, makes no copies, and stocks no coursepacks." Excel says it merely sells a service - access to a copy machine - where students make their own copy of the works. As such, Excel says the students, not it, is doing the copying which is permitted under the contracts.

As the publishers point out, however, the licenses granted under the contracts only apply to "Authorized Users" – students and other members of the University

---

[5]Excel also argues that some of the publishers claims "may" be barred by the three year statute of limitations under 17 U.S.C. § 507(b). This argument lacks merit. Excel does not identify which works may be barred. Moreover, the papers are clear that every infringement occurred within three years prior to June 28, 2007, the date of the filing of this case.

7

community. Excel is not an authorized user. As will be discussed below, this is not a case of "student copying" which arguably would be permissible under the licenses. Moreover, only four of the works at issue are within the scope of any license agreement. That license, between the University of Michigan and Elsevier, permits students to "print" and "download" material. It does not allow students to copy and pay for material at an offsite copy shop. The remaining twenty-nine are not covered by any license agreement. Overall, Excel's argument that its activities are protected by license agreements fails.

Moreover, Excel's characterization as to what occurs at its facility ignores a key point - that Excel makes <u>money</u> from the copying, even if the students do the copying. The license agreement does not provide the students with the ability to make copies at a commercial establishment where a third party profits from the copying.[6]

### C. Direct Infringers

Excel next argues that because it is the <u>students</u> who do the copying, they are the purported infringers and therefore the publishers cannot establish that Excel is an infringer. While "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another," <u>Sony Corp. of America v. Universal City Studios, Inc.</u>, 464 U.S. 417, 434 (1984), Excel's argument ignores the circumstances of the copying.

---

[6]Excel cites excerpts of the 30(b)(6) deposition testimony from the publishers, arguing that the publishers have essentially "admitted" that Excel's conduct is permitted under the license agreements. As the publishers point out, Excel has mischaracterized the testimony; it contains no such admissions. Furthermore, in any event, none of the witnesses gave, or were qualified to give, an opinion as to the legality of Excel's actions.

First, although students press the start button and make a copy of the coursepack, Excel is the source of the reproduction. Excel controls the entire copying process. It retains the "master," maintains its quality, gives it to a student to copy, and accepts payment. Excel also owns and supplies all of the elements of reproduction – the venue, the copy machines, the paper, and the utilities. Excel staff members are available to assist students in the copying process and also provide binding services if requested. This scenario is vastly different from a student, who happens to obtain a coursepack from a friend or other third party and comes into Excel's premises and makes a copy. Under this scenario, whether Excel would be liable is a different question. Here, however, it is clear that this is not mere student copying.

Moreover, the publishers have claimed that Excel's actions have infringed their distribution rights. Under section 106(3), a copyright owner has the exclusive right

> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending. . .

Excel's delivery of the "master" to the student is an act of "lending." Indeed, Excel has engaged in the unauthorized <u>distribution</u> of the publishers' work when (1) it gives the coursepack to the students for copying and (2) when the students pay for the copying of the coursepack. These facts show infringement apart from the role of the students. Excel has not responded to this claim of infringement.

### D. Fair Use/<u>MDS</u>

#### 1.

Excel's main argument is that the copying at issue constitutes fair use. The purpose of the fair-use doctrine is to ensure that courts "avoid rigid application of the

9

copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." Princeton Univ. Press v. Mich. Doc. Servs., Inc., 99 F.3d 1381, 1385 (6th Cir. 1996) (en banc), cert. denied, 520 U.S. 1156 (1997) (hereinafter "MDS"). Accordingly, section 107 of the Copyright Act provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107.

The publishers say that Excel's position was soundly rejected by the Court of Appeals for the Sixth Circuit in MDS. In MDS, the Sixth Circuit discussed the doctrine of fair use at length. At issue was whether a copy shop that sold coursepacks to students at the University of Michigan without the permission from the plaintiffs-copyright holders was a fair use. The court held that it was not. MDS will be discussed in context with the analysis of fair use below.

2.

The fair use doctrine was initially developed by judicial decision; Congress codified it at 17 U.S.C. § 107 in 1976. As noted in part above, section 107 provides:

> [T]he fair use of a copyrighted work, including such use by reproduction in copies . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include-
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value of the copyrighted work. . . .

17 U.S.C. § 107.

In <u>MDS</u>, the Sixth Circuit held that the fair use doctrine, particularly the language "multiple copies for classroom use," the phrase upon which Excel relies, does not provide "blanket immunity" for an accused infringer. <u>MDS</u>, 99 F.3d at 1385. The Sixth Circuit also said whether a fair use exists must be determined upon the application of each factor. <u>See</u> <u>id.</u> Accordingly, Excel's actions will be analyzed under the four statutory factors.

First, as to the purpose and character of the use, Excel says that its use is non-profit and educational. Excel's focus on the use put by the professors and the students distorts reality. The publishers are not challenging the students or the professor's use, but rather Excel's use – which is for-profit and commercial. The copyshop in <u>MDS</u> made a similar argument, which the Sixth Circuit rejected, explaining:

> It is true that the use to which the materials are put by the students who purchase the coursepacks is noncommercial in nature. But the use of the materials by the students is not the use that the publishers are challenging. What the publishers are challenging is the duplication of copyrighted materials for sale by a for-profit corporation that has decided to maximize its profits–and give itself a competitive edge over other copyshops–by declining to pay the royalties requested by the copyrights.

<u>MDS</u>, 99 F.3d at 1386.

Notably, the Sixth Circuit went on to say that student copying may be problematic:

> As to the proposition that it would be a fair use for the students or professors to make their own copies, the issue is by no means free from doubt. We need not decide this question, however, for the fact is that the copying complained of here was performed on a profit-making basis by a commercial

11

enterprise. And, "[t]he courts have . . . properly rejected attempts by for-profit users to stand in the shoes of their customers making nonprofit or noncommercial uses.

Id. at 1389 (citation omitted).

Thus, the fact that students do the copying does not ipso facto mean that a commercial use cannot be found. Here, while students are doing the copying, the manner in which the copying takes place cannot be overlooked. A student enters Excel's premises, a for-profit commercial business. A student asks for a master copy retained by Excel and makes a copy on Excel's equipment. A student pays Excel for the privilege to do so. Excel's use of the material is unmistakably commercial.

The second statutory factor, "the nature of the copyrighted work," cannot seriously be in dispute, as it was not in dispute in MDS. The nature of the material is certainly creative, which militates against a finding of fair use.

The third factor–the amount of the use in relation to the copyrighted work as a whole – also favors the publishers. The Sixth Circuit in MDS rejected an argument Excel makes here – that the professor's selected only the amount necessary in relation to the entire work – favors fair use:

> And to the extent that the third factor requires some type of assessment of the "value" of the excerpted material in relation to the entire work, the fact that the professors thought the excerpts sufficiently important to make them required reading strikes us as fairly convincing "evidence of the qualitative value of the copied material."

Id. at 1389 (citation omitted).

The fourth factor – "the effect of the use upon the potential market for or value of the copyrighted work" – cuts against a finding of fair use. While Excel believes that the publishers should not be allowed to charge royalty fees and otherwise receives such

12

fees through their contracts with the University, this argument misses the point. The point, for purposes of this factor, is that Excel is admittedly able to charge less than competitors for coursepacks because it does not have to pay the publishers. By not paying a fee where others do, it adversely impacts the marketplace.

Finally, Excel encourages an examination of other non-statutory factors to determine whether the use furthers the purpose of copyright law. In so doing, Excel cites from the dissenting opinions in MDS as to the value of free distribution of educational works and the social benefits. While the laudable goal of a free exchange of materials used to advance higher education is not to be denied, or whether the coursepacks themselves are valuable, that is not the issue. The issue is whether Excel has violated the copyright law. As one commentator, in discussing MDS and fair use, explained:

> To deny fair use in [MDS] . . . was not to in any way speak ill of the infringing products at issue. Photocopied university materials are tremendously worthwhile products, and no one disputes that. To deny fair use was instead to decide that these beneficial but infringing products ought to fall under copyright holders' sphere of influence, with the relevant copyright holders having the right to influence who produced the packets, under what terms and how much everyone profits from that interaction.

Douglas Lichtman, Google Book Search is Not Fair Use, 4 SCHOLARLY PERSP. (UCLA School of Law) 15, 19 (2008).

3.

At bottom, the case is not seriously distinguishable from MDS. The fact that the students push a button on a copier in the manner described is of no significance. Excel's assertion that it has no inventory and simply offers copying services is not correct - it has an inventory of copyrighted materials given to it by professors, some of

whom even state in their course syllabi that the material is available for "purchase" at Excel. A student wishing to access the copyrighted material must come to Excel to obtain it. Excel's position that this is a case of protected student copying is sophistry. As the publishers cogently say:

> [Excel is] . . . engaged in an elaborate effort to reproduce plaintiffs' materials on a commercial basis without paying copyright fees – an effort in which their customers serve as proxies, performing a minor task that [Excel's] employees would otherwise perform. To pretend that [Excel is] not, in fact, reproducing plaintiffs' material on a commercial basis is to elevate form, indeed pretense of form, over substance.

Simply put, copyright law should not turn on who presses the start button on a copier. Excel's actions violate the publishers' copyrights.

The publishers shall within ten days from the date of this order to inform the Court as to what is left of the case, including the form and steps for determining damages.

SO ORDERED.

    s/ Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: October 14, 2009

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 14, 2009, by electronic and/or ordinary mail.

    s/ Julie Owens
Case Manager, (313) 234-5160